NUSBAUM, STEIN, GOLDSTEIN
BRONSTEIN & KRON, P.A.
20 Commerce Blvd., Suite E
Succasunna, New Jersey 07876
(973)584-1400
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BASSEM KANDIL AND FLORA KANDIL, his spouse,<br>　　　　Plaintiff(s)<br>　　v.<br><br>POLICE OFFICER GARY YURKOVIC, POLICE OFFICER ANTHONY MARK ABODE, et al.<br>　　　　Defendant(s) | Civil Action No. 06-cv-4701<br><br><br><br>AFFIDAVIT OF BASSEM KANDIL |

Bassem Kandil of full age being duly sworn upon his oath deposes and says:

1.  On October 1, 2004 I was arrested by the New Brunswick Police Department and charged with resisting arrest; attempting to disarm a police officer; and disorderly conduct. I did not commit the crimes charged or the disorderly person offense charged. I at no time struggled with, resisted or otherwise acted in an aggressive fashion towards the police officers of New Brunswick Police Department.

2.  On October 1, 2004 I was severely beaten by the Police Officers of the New Brunswick Police Department. Ex. "A" – is a photograph taken on October 2, 2004 which shows the condition of my face after being beaten by the New Brunswick Police Officers.



3. As a result of my arrest by the New Brunswick Police Department, I retained counsel, i.e., the firm of Nusbaum, Stein, Goldstein, Bronstein & Kron, P.A., and in particular Robert D. Kobin, Esq. to represent me in the criminal charges and to also pursue a civil action against the appropriate parties, in particular the police officers that engaged in the unlawful arrest and were responsible for beating me.

4. Subsequent to my arrest and beating, my recollection is that I was contacted by Mohammed (Roman) Farzaie who was familiar with the girls in the Shell Station that my friends and I had stopped to talk to just prior to the police officers confronting us. My recollection is that Mr. Farzaie told me that one of the girls who was at the Shell Station "Lindsay" was going to be at the home of another girl that Mr. Farzaie knew. Mr. Farzaie was able to obtain the phone number of Lindsay's friend where Lindsay would be located. Mr. Farzaie dialed a number which he stated was Lindsay's girlfriend's number. I obtained a tape and began to tape the conversation. The first part of the conversation was with Lindsay's girlfriend. The second part of the conversation is with a female who identified herself as Lindsay. It is clear from the conversation that Lindsay was one of the girls at the Shell Station that we engaged in conversation. It is also clear from the conversation that she was accompanied by a woman named Pam who knew, to some degree, a police officer named Gary. A transcript of that taped conversation is attached as Ex. "B".

5. At this point based upon the interrogatories answered by Office Gary Yurkovic, it is clear that Gary Yurkovic was having an affair with a Pam Radziewicz at the time of my incident. It is further clear from the information obtained, that Pam

Radziewicz was one of the girls who were present at the Shell Station on the evening in question.

6. While it is somewhat difficult, at least for me to determine what the motive was for my arrest and beating in that I did nothing wrong, it appears at least to some extent that we were confronted by the police as a result of our interaction with the two women in the police station identified, to my knowledge, as Lindsay and Pam Radziewicz. I note that my attorneys continually asked for the identity of the two females in the Shell Station and were not given the same by the Prosecutor's Office and/or the New Brunswick Police Department.

7. Ultimately I was informed that the response from the New Brunswick Police Department was that they did not know the identities of the two women at the Shell Station that my friends and I were speaking to on the date of the incident. It took numerous court appearances before we received this information.

8. I am aware that sometime during a court appearance in September 2005 my attorney turned over to the State the investigation that had been conducted by myself, my friends and the investigator for my attorney. This investigation involved interviews of my friends as well as the taped conversation with one of the females at the Shell Station as well as various photographs of myself and my brother-in-law, Sam Aboelata who was beaten by the police at the hospital where I was taken after my beating.

9. Prior to October 18, 2005 when I made one of my numerous trips to the New Brunswick Court for another conference, the PTI program was discussed between

myself and counsel, Susan B. Reed, Esq. of the firm of Nusbaum, Stein, Goldstein, Bronstein & Kron, P.A.

10. From time that I was placed into PTI until the time that I received the threat of termination from PTI because I had not executed a Release/Hold Harmless Agreement, I did have discussions with counsel regarding what action should be taken. There were discussions with myself and Mr. Kobin regarding going back before the same judge and asking that the condition of the Release/Hold Harmless be removed from my PTI. I do recall specifically discussing this with Mr. Kobin when I received the letter threatening to terminate my PTI. It was decided at that time that based on my desire not to return to New Brunswick and go back before the same judge, that no application would be made and that I would execute the Release/Hold Harmless and proceed to see what happened with my case because of the Release/Hold Harmless Agreement in Federal Court.

11. As to the condition that I execute a Release/Hold Harmless Agreement as a condition of entry into PTI, to me it was more of the same. My impression of the proceedings in the Middlesex County Courthouse was that the Prosecutor was attempting to protect the police for the wrongful arrest and the beating that I received. It was virtually impossible for us to get discovery. Police Officer Gary Yurkovic clearly lied when he said that he was not aware of the identities of the two females at the Shell Station and from my perspective the Prosecutor's Office was not interested in investigating, to any degree, the information that we provided to them regarding the identities of the two women.

12. Subsequent to us providing our discovery to them, is when there was a discussion of PTI. Mr. Kobin did inform me that requesting a Release/Hold Harmless Agreement in the context of the disposition of a criminal case was unethical. He also informed me that he knew of no prosecutor's office and/or prosecutors that would make such a request. This concerned me greatly. It reinforced my opinion that the Prosecutor's Office was attempting to protect the New Brunswick Police Department.

13. As I stated in my deposition, I do have a recollection of there being some indication that the Judge knew about or suggested the Release/Hold Harmless Agreement on October 18, 2005. The Judge's involvement in asking me to drop any pursuit of a civil lawsuit only reinforced my impression that I was not going to get a fair trial in New Brunswick. It was inconceivable to me as a lay person that the Judge would become involved in a potential civil lawsuit against the New Brunswick Police Department. I could not understand as a lay person why the Prosecutor and the Court were interested in my not pursuing a civil lawsuit. With the problems in getting discovery and then the suggestion that I forego my civil lawsuit, whether by the Prosecutor or the Judge, the overall proceedings in the Middlesex County Criminal Court led me to believe that their main purpose was to protect the police officers. This went into my thinking when we received the letter threatening to terminate my PTI and when I originally agreed to the condition of the Release/Hold Harmless Agreement in November 9, 2005.

14. Based on my discussions with counsel, it was determined that we would not bring an application before Judge DeVesa but that we would merely proceed in Federal Court.

15. It is fair to conclude that I knew what I was doing when I went into PTI and accepted the condition of executing the Release/Hold Harmless Agreement. Furthermore, it is fair to say that I knew what I was doing when I actually executed the Release/Hold Harmless Agreement.

16. What I knew was that we were unable to obtain discovery despite numerous requests. I knew that Officer Gary Yurkovic was lying about his knowledge of the identities and the presence of the girls at the Shell Station, one of which was his girlfriend at the time. What I further knew based upon conversations with counsel, that in his words, the request for Release/Hold Harmless Agreement was improper and unethical. What I also knew is that other Prosecutors Offices and prosecutors did not make such requests in the disposition of criminal cases. The knowledge that I had reinforced my belief that the only concern of the Prosecutor's Office and even the Judge in this matter was the protection of the police officers and not whether or not I was treated fairly and whether or not justice was done. I had been to Court numerous times with my attorney, and as stated above, it was inconceivable to me as a lay person that the prosecutor and/or judge in criminal court would become involved in a request that I not bring a lawsuit to protect my civil rights.

17. I feel that my civil rights suit has substantial merit. I was walking down the street in New Brunswick doing nothing wrong when I was confronted and then subsequently assaulted by police officers of the New Brunswick Police Department. I have a B.S. Degree from Rutgers University, have never been in trouble before, and currently have three young children. What the New Brunswick Police Department wants the Federal Court to believe is that I would suddenly loose my mind and attack a police

officer and try to remove his gun from his holster. I would never conceive of confronting a police officer in an aggressive fashion. It is my desire to pursue my civil rights case against the police officers involved in this matter. While I knew what I was executing when I executed the Release/Hold Harmless Agreement, I was under great stress because of the threat of jail and the fact that I am a family man. While I knew that I had a right to go before a jury to tell my side of the story, it was clear to me at the time that the police officers would take the stand and lie, and that they would be supported by the prosecutor's office in the prosecution of this case. Therefore, I agreed to accept the condition of execution of a Release/Hold Harmless Agreement.

18. I did ask my counsel on numerous occasions if he felt that we could move the criminal case out of Middlesex County. My counsel indicated that is was very unlikely that such an application would be granted and this also went into my thinking with respect to the execution of the Release/Hold Harmless Agreement.

Date: 1/6/10

Bassem Kandil

Sworn and subscribed to
before me this 6th day of
January, 2010.

June E. Berkheiser

JUNE E. BERKHEISER
A NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES 07/02/2010