---

**132**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CASE NO. 06CV4701 (JAG)

| | |
|---|---|
| BASSEM KANDIL and FLORA KANDIL, his wife,<br><br>Plaintiffs,<br><br>v.<br><br>POLICE OFFICER GARY YURKOVIC, POLICE OFFICER ANTHONY MARK ABODE, POLICE OFFICER WILLIAM C. OELS, III, SERGEANT WILLIAM OELS, CHIEF OF POLICE, CITY OF NEW BRUNSWICK POLICE DEPARTMENT, MIDDLESEX COUNTY PROSECUTOR'S OFFICE, MIDDLESEX COUNTY CORRECTIONAL FACILITY, JOHN DOE SUPERVISING OFFICERS 1-10, JON DOES 1-10, ABC CORPS, 1-10,<br><br>Defendants. | DEPOSITION UNDER<br><br>ORAL EXAMINATION<br><br>OF:<br><br>ROBERT D. KOBIN, ESQ.<br><br>VOLUME 2<br>PAGES 132-141 |

B E F O R E :

MARYANNE DELPOME BONIELLO, a Certified
Court Reporter of the State of New Jersey, at the
offices of NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN &
KRON, P.A., 20 Commerce Boulevard, Succasunna, New
Jersey, on Thursday, May 28, 2009, commencing at 1:35
p.m. pursuant to Notice.

SUPERIOR COURT REPORTERS, INC.
Certified Court Reporters
612 Bergen Boulevard
Ridgefield, New Jersey 07657
(201) 941-1550

---

**133**

A P P E A R A N C E S :

NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, P.A.
BY:  ROBERT D. KOBIN, ESQ.
Attorneys for Plaintiffs

DWYER, CONNELL & LISBONA, ESQS.
BY:  WILLIAM T. CONNELL, ESQ.
Attorneys for Defendant P.O. Gary Yurkovic

GOLDEN, ROTHSCHILD, SPAGNOLA, LUNDELL, LEVITT &
BOYLAN, P.C.
BY:  GARY S. SPAGNOLA, ESQ.
Attorneys for Defendant P.O. Anthony Mark Abode

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
BY:  SUSAN K. O'CONNOR, ESQ.
Attorneys for Defendants City of New Brunswick, New
Brunswick Police Department and Director
Joseph Catenese

MICHAEL J. STONE, ESQ.
Attorneys for Defendant P.O. William Oels, III

LAWRENCE Y. BITTERMAN, ESQ.
Attorney for P.O. Yurkovic, P.O. William C. Oels,
III, and Sergeant William Oels on punitive damages
claim

I N D E X

| WITNESS | PAGE |
|---|---|
| ROBERT D. KOBIN, ESQ. | |
| Direct by Mr. Connell | 134 |
| Cross by Mr. Stone | 180 |
| Cross by Mr. Spagnola | 224 |
| Cross by Ms. O'Connor | 235 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Kobin-1 | Handwritten notes, 3 pgs. | 206 |

---

**134**

1      R O B E R T   D.   K O B I N, ESQ.,

2  20 Commerce Boulevard, Succasunna, New Jersey, having

3  been previously sworn, was examined and testified as

4  follows:

5  DIRECT EXAMINATION BY MR. CONNELL:

6      Q.      Good afternoon, Mr. Kobin. We're again

7  proceeding with your deposition, and when we're done

8  with your deposition we're going to continue with

9  Susan Reed's deposition.

10             You obviously understand the parameters

11  of the deposition and that you're still under oath.

12  Right?

13      A.      Yes.

14      Q.      When you left the courthouse on

15  November 9th, 2005 after your appearance before Judge

16  DeVesa -- strike the question and start over.

17             When you were presented with the

18  conditions of PTI that morning of November 9, 2005 and

19  before you spoke with your client, had you formulated

20  a strategy or position whether or not you were going

21  to object to that condition?

22      A.      Between the time -- between the time I

23  was handed the --

24      Q.      Yeah. In other words, after you read the

25  document, and you had testified that you then went

---

**135**

1  outside and talked with your client about it, his

2  mother was present and you talked to him about the

3  condition and you also talked to him about his options

4  with respect to PTI, had you at that time formulated a

5  strategy as to whether or not you were going to object

6  to the condition or whether you were going to object

7  to the judge when you were placing this on the record

8  or that you intended to do something subsequently?

9      A.      Had not decided on any of those things,

10  any of the above.

11      Q.      Okay. But it's clear that you didn't

12  object to the condition to Judge DeVesa on the record

13  or even off the record; is that fair?

14      A.      Are we talking about before I spoke to my

15  client or after I spoke to my client?

16      Q.      Right now we're talking about the judge.

17      A.      Oh, by the time I got to the judge?

18      Q.      Yeah. You did not mention to the judge

19  off the record that you objected to this condition of

20  the release being part of the entry into PTI, did you?

21      A.      No, no. You're talking about my

22  strategy. Obviously, when I went on the record --

23      Q.      Listen to my question. Okay?

24      A.      Okay.

25      Q.      My question is when you ultimately spoke

Case 2:06-cv-04701-DMC -MF   Document 99-14   Filed 01/07/10   Page 2 of 47 PageID: 1541

KANDIL v. YURKOVIC, et al.                                        Testimony of R. ROBIN, ESQ. - 6-2-09

**136**

1  to Judge DeVesa — and you already knew now that there
2  was a condition of his entry into PTI was signing this
3  release -- did you object to Judge DeVesa off the
4  record?
5      A.   No.
6      Q.   Okay.  On the record did you object to
7  Judge DeVesa that you had any problems with this
8  condition being part of his entry into PTI?
9      A.   First of all, I did not speak to Judge
10 DeVesa off the record that day.
11     Q.   Then you answered my question; no.
12     A.   Right.
13     Q.   Okay.
14     A.   And so on the record is what we've gone
15 over and I've already said that the transcript is what
16 it is.
17     Q.   Okay.  And you did not mention anything
18 in that regard concerning a problem that you had with
19 the condition; is that fair?
20     A.   I've answered that question I think
21 several times.
22          MR. STONE:  No, you haven't.  You just
23 said that the record is the record.  Do you agree
24 that's what the record says?
25          THE WITNESS:  I've said that several

**137**

1  times also.
2          MR. STONE:  Right.  Do you agree it is
3  not in the record that you made any complaints?
4          THE WITNESS:  Absolutely.  The last time
5  we were here I said review the record, mark it for the
6  dep and that's the record.
7          MR. BITTERMAN:  You also answered my
8  question.
9      Q.   We can also answer the question and we
10 can agree that you did not mention anything on the
11 record to Judge DeVesa complaining about the
12 condition?
13     A.   Correct.
14     Q.   Thank you.  When you left the courtroom
15 did you have any further discussions with Mr. Kandil
16 concerning that condition of providing the release for
17 the hold harmless agreement before you left the
18 courthouse?
19     A.   Just so I can clarify --
20     Q.   Let me ask the question again.  After you
21 let the courtroom and you placed this application for
22 PTI and the agreement on the record with Judge DeVesa
23 present and the prosecutor present and your client
24 present, after you did that and you walked outside,
25 before leaving the courthouse did you again speak to

**138**

1  your client concerning what your strategy was going to
2  be about the execution of the release and hold
3  harmless agreement?
4      A.   I don't know if I had a conversation with
5  him that day.  But the only reason I interjected
6  myself, I think that you go to another building where
7  you walk your client over for -- once you're admitted
8  into the PTI program.  And I think I walked him over
9  to another building where you sign in and then you
10 wait for someone to come out.  So that probably is
11 where the bulk of the conversation took place that
12 day.
13     Q.   Let's talk about it there then.
14     A.   That's the only reason.  You talked about
15 leaving the courthouse, but we had to walk over to
16 another building.
17     Q.   I said leaving the courtroom.
18          And before you left the courthouse -- and
19 what I meant is understanding that you also went and
20 helped him apply to PTI at that time as well --
21 actually, what did you do when you left the courtroom
22 and you went to that other building?
23     A.   I think I walked over to the other
24 building with him.  The main topic of conversation was
25 this condition.

**139**

1      Q.   Okay, fine.
2      A.   And at least in my mind the main topic of
3  conversation was that condition.
4      Q.   That's your best recollection?
5      A.   They may have had other issues, but
6  because of the other things in PTI, in my mind, are
7  rather routine, there was no -- they may have had
8  other questions, but I was kind of blowing over those,
9  and at least in my mind, the main topic of
10 conversation was this condition.
11     Q.   Okay.  And he had already applied for PTI
12 so you weren't over there to do that.  What were you
13 there to do?
14     A.   I think -- because I don't do a lot of
15 the day-to-day stuff in this, I think when you get
16 admitted they tell you you got to go over to probation
17 with the order and you sign it.  I think you sign up,
18 Mr. Connell, for an initial interview or for them to
19 get you set up with a probation officer.  So I think
20 they said go report -- you know, if you get sentenced
21 they say go report to probation.  If you get PTI I
22 think they say go over there sign up and they'll give
23 you an appointment.  I think that's what needs to be
24 done, Mr. Connell.
25     Q.   Fine.  Your recollection is that you went

**140**

1  to the probation department to begin to process?
2  A.  Yes. Yeah.
3  Q.  And at that time what did you say to
4  Mr. Kandil concerning the condition of the release
5  while you were in that building?
6  A.  Well, I'm just saying the conversation
7  probably began in the courthouse and walking across
8  the street.
9  Q.  I don't care where it happened. What was
10  the conversation?
11  A.  It was that, generally speaking, this
12  is -- I think this release, this whole situation with
13  this condition, I know it's against public policy
14  because it's unethical. I don't know -- I really was
15  a little bit unsure what was going on because I was
16  somewhat surprised that the judge didn't say something
17  responsive about the condition.
18  I expressed to him that I was under the
19  impression at that time that there was case law that
20  wouldn't -- that suggested that these things were
21  inappropriate under the circumstances and I would have
22  to think about what to do and what recommendations to
23  make to him and I would have to see whether or not
24  they actually pressed that condition going forward.
25  So I really didn't have good answer. I had those

**141**

1  answers for him, but as far as strategy and things
2  like that, you know, I don't know. Strategy might be
3  the wrong word.
4  Q.  You said that you were also going to see
5  whether or not they were going to press the condition.
6  Did you have in your mind at that point that you were
7  not going to sign the agreement that you agreed to the
8  Court that you were going to have signed?
9  A.  I told you I think last time -- and I'll
10  try to repeat myself -- I thought that there were
11  three things that would occur or could occur: I would
12  move to have it set aside with the client's consent, I
13  would execute it or he would execute it. First of
14  all --
15  Q.  You're not answering my question. You've
16  got to think about my question and just answer the
17  question. I don't need you to rehash other testimony
18  or other answers that you've given.
19  I just asked you is when you left that
20  courthouse did you have as part of your strategy that
21  you were not going to prepare that document and see
22  whether or not that they would continue to press the
23  condition?
24  A.  First of all, I was never going to
25  execute that release in the sense that I don't execute

**142**

1  releases, Mr. Connell, the client executes releases,
2  as you well know. So my strategy was I had a strategy
3  of consulting with my client and determining what he
4  would like to do so since I don't execute releases.
5  Q.  Fine, Mr. Kobin. I understand your
6  distinction. Let me clarify the question.
7  Did you intend not to prepare the
8  document and not to instruct your client to sign a
9  document which you both agreed to do in the courtroom
10  before you left the courthouse?
11  A.  Did I instruct him?
12  Q.  Yes.
13  A.  No.
14  Q.  No. My question is when you left that
15  courthouse that day or the probation department that
16  day, had you already formulated a strategy that you
17  were not going to prepare the agreement or release and
18  hold harmless agreement. Was that your strategy?
19  A.  No.
20  Q.  Was it your strategy at that time that
21  you were going to instruct your client not to sign the
22  document?
23  A.  No.
24  Q.  Was it your strategy at that point that
25  you were going to prepare the document, have your

**143**

1  client sign it, but then wait to see whether or not
2  you have to provide it to the Court to see whether or
3  not the State would press the condition?
4  A.  You're premising all this that I had a
5  strategy.
6  Q.  Just answer my question. I'm asking if
7  that was your strategy. If it wasn't, then you can
8  say so.
9  A.  I object to the form. You're talking
10  about strategy. I did not have a strategy when I
11  walked out of there. There were options that were
12  being considered, sir.
13  Q.  Mr. Kobin, I will change --
14  A.  I don't like the word "strategy" and
15  since I am the witness --
16  Q.  That's all you've got to say. You object
17  to the word "strategy". I'll rephrase the question.
18  You don't have to raise your voice and get upset.
19  Mr. Kobin, did you have an intention at
20  that time when you left the courthouse on November 9,
21  2005 not to prepare the document?
22  A.  I did not have intention or strategy.
23  What I had was options. I was discussing with my
24  client potential options.
25  Q.  So you're saying you didn't form an

144

1  intent not to sign the document on that date; is that
2  your answer?
3      A.     No intent or strategy was decided upon at
4  that date.  Options were discussed.
5      Q.     Since you said before you left the and
6  you when you were having this discussion with
7  Mr. Kandil that you were surprised that the judge
8  didn't say anything about this condition, did you
9  bring that to the attention of the judge?
10     A.     No.
11     Q.     Did you tell the judge that there was
12 case law on this subject and that this was unethical?
13     A.     No.
14     Q.     You indicated that you did say to
15 Mr. Kandil that you were going to see whether or not
16 the prosecution was going to press this condition.
17 What did you mean by that?
18     A.     That was one of the options, keep that in
19 front of it.
20     Q.     Right.  One of the options that you said
21 that you were going to see whether or not they were
22 going to press the condition.  What did you
23 contemplate when you said that to him?
24     A.     In that it was an unethical condition, I
25 was curious as to whether they would press that

145

1  condition.
2      Q.     Under what circumstance did you believe
3  that?  Since it was already written there, the Court
4  agreed to it, the prosecutor agreed to it, that they
5  would allow your client into PTI based upon this and
6  other conditions, what was it in your mind that you
7  thought they would not press the condition?
8      A.     That it was unethical and inappropriate.
9      Q.     And what did you think was going to bring
10 that to their attention?
11     A.     I hadn't worked that out.  I didn't know
12 whether it would be brought to their attention by
13 motion or if they would come to that conclusion.
14     Q.     So you think that they would have come to
15 that conclusion on their own without you bringing it
16 to their attention?
17     A.     Well, I would have hoped so.
18     Q.     Okay.  So therefore, you didn't have a
19 plan at that point of what you were going to do when
20 you left the courthouse, that you were going to
21 research it further and get back to your client; is
22 that right?
23     A.     I wouldn't say there wasn't -- well,
24 here's what we were going to do -- and I don't like
25 your word "plan".  I didn't have a plan.

146

1          The objective was for him to sign up for
2  PTI, to do everything that PTI required and then for
3  there to be some additional research and thought given
4  to that condition, okay.  So there was a plan in the
5  sense that get all your money paid, do what you're
6  supposed to do, and you know, I don't have a good
7  answer for you on these other issues.  We'll see.
8      Q.     When you received the first phone call
9  from Marcia Silva from the prosecutor's office looking
10 for the agreement, had you made a decision at that
11 point that you were not going to prepare the document
12 for execution by your client?
13     A.     Had I or had he?
14     Q.     Had you already decided that you were not
15 going to prepare the release and hold harmless
16 agreement by the time she first called you two to
17 three weeks after the court hearing asking for where
18 it was or maybe a month later?
19     A.     Well, my client made the decisions about
20 the hold harmless and release, not me.  So did I
21 discuss it with him?  So I didn't make a decision.
22     Q.     Fine.  I assume your client made his
23 decision as a result of consultation with you; is that
24 fair to say?
25     A.     Correct.

147

1      Q.     As a result of the consultation with you
2  about this agreement -- by the way, which is not
3  privileged and the Court has already ruled that we can
4  find out what the substance of your conversations
5  were.
6      A.     Thanks for that premise.  I'm wondering
7  why I'm sitting here for a day and a half.
8      Q.     As a result of that conversation that you
9  had with your client, you're saying that your client
10 had decided that he would not execute a release and
11 hold harmless agreement; is that right?
12     A.     No, that's not correct.
13     Q.     Okay.
14     A.     How could that be correct, Mr. Connell?
15 He executed one.
16     Q.     Because you forgot the time frame that I
17 just talked to you about.  I will repeat the time
18 frame again.
19          Before Marcia Silva first called you
20 which was in early December approximately a month
21 after the court hearing looking for the agreement, do
22 you recall whether or not Mr. Kandil had already
23 decided he was not going to execute a release and hold
24 harmless agreement?
25     A.     I don't think he had decided that he was

148

1  not going to execute.
2      Q.    Okay. So therefore, he hadn't yet come
3  to that conclusion based upon your research and
4  discussions with him at that point?
5      A.    I can't tell you that in that time frame
6  that you're talking about that all those things
7  occurred. So I don't know that the consultation
8  occurred and the research occurred in that time frame.
9      Q.    Do you have any notes indicating when
10 Marcia Silva called your office and spoke with you
11 concerning the agreement?
12     A.    No.
13     Q.    Do you have any notes that were given to
14 you by your secretary when she called the office and
15 you were out involved in a trial and she called the
16 secretary requesting to speak with you about it?
17     A.    I looked through the file when we got out
18 of here to look for those little note things.
19     Q.    Right. Phone messages?
20     A.    Yeah. And my going through the file did
21 not reveal any of those phone messages. I did not go
22 back and look at the spirals.
23     Q.    So as you're sitting here today, you
24 don't know whether or not your secretary gave you a
25 phone message that Marcia Silva was looking to speak

149

1  to you?
2      A.    If Marcia Silva was looking to speak to
3  me, they gave me a phone message.
4      Q.    And do you recall that ultimately
5  happened in this case and she called a couple times
6  before she ultimately spoke to you?
7      A.    You know, Mr. Connell, you've got to let
8  me answer one question. Let me answer -- go back and
9  read back to me the first question that he asked so I
10 can answer it. I'm not going to continue do that.
11 We'll get the judge on the phone.
12          (The pending question is read back by the
13 Reporter.)
14     A.    I'll answer the first part because -- I
15 don't understand the first part.
16     Q.    There's only one question there.
17     A.    What is the one question?
18     Q.    Do you recall that before you actually
19 spoke to her herself, that Marcia Silva had called
20 your office a couple times looking for the agreement?
21     A.    She called.
22     Q.    Can you answer that yes or no?
23     A.    I don't recall actually speaking to the
24 young lady.
25     Q.    I didn't ask you that.

150

1      A.    Read the question again.
2      Q.    Listen to the question. Before you
3  ultimately spoke to Marcia Silva --
4      A.    You're suggesting I ultimately spoke to
5  her, sir.
6          MS. O'CONNOR: He's saying he didn't.
7      A.    I'm not sure I did.
8      Q.    Do you recall having a discussion with
9  Mr. Abramowitz where you informed him that you did
10 speak with her and that you told her that you were not
11 about to give her any agreement? Do you remember
12 having that conversation with Mr. Abramowitz?
13     A.    I remember several conversations with
14 Mr. Abramowitz, but not necessarily that one.
15     Q.    All right. Let's get back then. Are you
16 saying that you did not have a phone conversation with
17 Marcia Silva wherein she was looking for the release
18 and hold harmless agreement? You did not have any
19 such conversation?
20     A.    No. I said I don't recall having that
21 conversation with her. That doesn't mean the
22 information wasn't given to me and that I knew she was
23 looking for it. I'm just telling you I don't recall
24 having a conversation with her.
25     Q.    Do you recall anything that you said to

151

1  her with respect to this release and hold harmless
2  agreement and your intentions relative thereto?
3      A.    If I don't recall having a conversation
4  with her then I don't recall --
5      Q.    Fine.
6      A.    -- then I don't recall what I said to her
7  or didn't say to her with respect to the hold harmless
8  agreement.
9      Q.    Did you read Marcia Silva's deposition
10 testimony before today?
11     A.    I read parts of it, yes. If you want to
12 show me a part of it, show me a part of it.
13     Q.    Page 59, that's where we'll start. And
14 before I refer you to Page 59, do you recall reading
15 the memo from Marcia Silva that was provided in
16 discovery in this case where she outlined the various
17 discussions?
18          MR. CONNELL: Off the record.
19          (Off-the-record discussion.)
20     Q.    Mr. Kobin, I'm showing you a document
21 marked PMS-2 for identification which was marked at
22 Ms. Silva's deposition on --
23     A.    12-17-08.
24     Q.    My question is do you recall reading that
25 document before coming here today?

152

1     A.     You know, because some of this
2 information is in the dep, I can't tell you. You know
3 what I mean?
4     Q.     I'm going to give you an opportunity to
5 read it.
6     A.     You know, I read some things.
7     Q.     Why don't you read it and tell me whether
8 or not you recall reading it before testifying here
9 today.
10    A.     Okay. I read it.
11    Q.     And do you recall reading that before
12 this deposition?
13    A.     I can't tell you if I read this because
14 certain of the information is contained in other
15 places like the dep, et cetera. So I don't know,
16 Mr. Connell, where the information came from.
17    Q.     Fair enough.
18    A.     But the information I see in here I
19 recall being brought to my attention in some fashion
20 previously.
21    Q.     Very good. Now I refer you to Page 59 of
22 Marcia Silva's deposition. Referring you to Page 59,
23 Line 15, okay:
24           "Did you have the opportunity to speak
25     with Mr. Kobin after November 9th, 2005

153

1 concerning the hold harmless agreement?
2           "ANSWER: I did.
3           "QUESTION: Okay. And when did you first
4 make contact with Mr. Kobin?
5           "ANSWER: I don't recall the date, but it
6 was approximately it was before Thanksgiving and
7 it was approximately ten days to two weeks after
8 November 9th."
9     A.     Mr. Connell, are you suggesting that I
10 should read these things and refresh my recollection?
11    Q.     No.
12    A.     Why are we reading this transcript into
13 the record?
14    Q.     I was finished right there after the
15 answer. I was referring you to that part of the
16 transcript. Do you recall reading Pages 59, 60, 61
17 and 62 concerning her contact with your office?
18    A.     What does that have to do with anything?
19    Q.     Just answer my question. Did you read
20 the deposition transcript?
21    A.     I'm not answering that question.
22    MR. BITTERMAN: You have no right not to
23 answer any questions on relevance. On what grounds
24 are you not answering the question?
25           THE WITNESS: It's a total waste of time.

154

1 Far outside the discovery rules.
2     Q.     It's not about the discovery rules. It
3 deals directly with whether she had conversations with
4 you.
5     A.     Ask me that question.
6     Q.     I'm going to ask that question. I'm
7 asking if you read the deposition testimony.
8     A.     I just read it now.
9     Q.     And did you read 59, 60, 61?
10    A.     And you want to know if it refreshes my
11 recollection?
12    Q.     I haven't asked you that question, have
13 I?
14    A.     I assume you —
15    Q.     You said you read parts of Ms. Silva's
16 deposition. I'm asking whether or not you read these
17 pages which deals with her contact with you after
18 November 9th, 2005 concerning her efforts to get this
19 agreement?
20    A.     I read it.
21    Q.     Okay. Do you recall now and does that
22 refresh your recollection as to whether or not you had
23 a conversation with Marcia Silva?
24    A.     No.
25    Q.     Do you know that what is contained in the

155

1 deposition concerning her version of what you said to
2 her is a lie?
3     A.     Rephrase that.
4     Q.     Is it your position that what she states
5 in terms of her actual conversation with you, that you
6 did not have that conversation and her recount of that
7 conversation is a lie?
8     A.     If I said I don't recall, then I'm not
9 telling you it's a lie. If I said it didn't happen,
10 then I'm saying it's a lie.
11    Q.     Did it happen? Did the conversation
12 happen?
13    A.     I don't recall whether it did.
14    Q.     Well, as a result of you reading these
15 pages, does it refresh your recollection of what you
16 said to her?
17    A.     No.
18    Q.     What did you say to her?
19    A.     I don't recall the conversation. I don't
20 recall having the conversation, so therefore, I don't
21 recall what I said to her.
22    Q.     Well, does this refresh your recollection
23 that you had a conversation?
24    A.     It does not. I'm not saying I didn't,
25 but the answer doesn't refresh my recollection.

Case 2:06-cv-04701-DMC -MF   Document 99-14   Filed 01/07/10   Page 7 of 47 PageID: 1546

RANDALL J. PETROVIC et al.                                    Testimony of R. ROBIN, ESQ - 6-2-09

**156**

1    Q.    So therefore, since you don't recall
2  having the conversation, you cannot comment whether or
3  not the information relayed in this transcript that
4  Mrs. Silva relates to is true. Right?
5    A.    Yes. Are we looking at the deposition?
6    Q.    Yes.
7    A.    Because that's somewhat different than
8  the statement that we referred to.
9    Q.    Specifically your answer on Page 60, Line
10  15.
11    A.    I'm reading that.
12        Well, I don't know why I would have
13  promised to do it, so I don't agree with that
14  statement because I wouldn't say something like that.
15  I would have said I'm busy. I would have said I'm in
16  the middle -- I don't know if I was in the middle of
17  writing a brief for federal court because I have to
18  tell you something, me writing a brief is not a good
19  thing, but at any rate, Sue Reed usually writes the
20  brief, so I wouldn't have said that. I think at that
21  time I may have been preparing for a trial in federal
22  court, but I'll have to go back and take a look, but I
23  wouldn't have said a brief.
24        MR. STONE:  You didn't say or you
25  wouldn't have said because you don't believe you said

**157**

1  it?
2        THE WITNESS:  It's very unlikely I would
3  have been writing a brief.
4        MR. STONE:  That's not the point.
5        THE WITNESS:  I would --
6        MR. STONE:  That's the question. Either
7  the question is did you or didn't you. If it's not
8  something you would normally say --
9        THE WITNESS:  It's not something I would
10  normally say because it's not something I would
11  normally do. You see, in her statements she talks
12  about trial which would be more really --
13  BY MR. CONNELL:
14    Q.    I'm not asking about her statement, and
15  now you're referring to the document marked at her
16  deposition. I'm talking about her answer on Line 15
17  which continues on Page 60 to Line 25.
18    A.    Probably wouldn't have said I was writing
19  a brief.
20    Q.    Is there anything else that she claims
21  you told her other than you were in the middle of
22  writing a brief?
23    A.    Yeah. I don't think I promised anybody
24  anything. And other than that, there's nothing in
25  here that would be glaringly something that I wouldn't

**158**

1  say.
2    Q.    Okay. So you acknowledge then that you
3  could have said to her, "and he told me that I didn't
4  need to sign it, that the defendant would execute it
5  and that he would absolutely send me a copy of it"?
6    A.    I would have told her -- because it's
7  accurate as far as the law goes, if I had a
8  conversation with her that she didn't need to sign it,
9  that the defendant would be the one who would need to
10  execute a release. And would absolutely send me a
11  copy of it?
12    Q.    Yeah, that you would absolutely send her
13  a copy of it.
14    A.    Yeah. If it was done, I would certainly
15  send her a copy of it.
16    Q.    No. Did you tell her that you were
17  absolutely going to send her a copy of it?
18    A.    That I wouldn't have -- I don't know. I
19  don't recall that either.
20    Q.    Do you have any notes in your office of a
21  subsequent conversation that Ms. Silva had with a
22  representative of your office wherein she was informed
23  by the person, a female in your office, who said that
24  it had been done -- meaning the agreement -- and sent
25  to probation as per Page 52, Lines 5 to 9? 62. I'm

**159**

1  sorry. 62, Lines 5 to 9.
2    A.    Read that back to me from the beginning.
3    Q.    I'll rephrase the question.
4    A.    Go ahead, rephrase it.
5    Q.    Do you have any information that Ms.
6  Silva again called after this conversation, alleged
7  conversation with you, and that she was told by a
8  female representative of your office that the document
9  had been done and sent to probation? Do you have any
10  indication in your file that that happened?
11    A.    No.
12    Q.    Did you instruct somebody in your office
13  to tell Ms. Silva that it had been done and was sent
14  to probation?
15    A.    Well, at some point it was. Are you
16  talking about before it was done?
17    Q.    I'm talking about within a month.
18    A.    No, no.
19    Q.    Within a month or two.
20    A.    No. That didn't occur.
21    Q.    We're still in 2007.
22    A.    That didn't occur, and I have no
23  information that anyone in this office told her that,
24  and that didn't happen.
25    Q.    And I said 2007. I meant 2005. So

160

1   you're saying that that did not happen?

2       A.      That did not happen.

3       Q.      So for her to testify about that would be

4   a lie?

5       A.      Well, if it's intentional then it's a

6   lie.  If she's just having trouble with her

7   recollection.  You know, you'll have to ask her if

8   that's a lie or she's just not remembering things

9   particularly well.

10      Q.      There then came another year went by, all

11  of 2006 went by.  Did you have any intent at that

12  point of completing that document and sending it to

13  the probation department during 2006?

14      A.      When you throw in "any intent", that's a

15  little bit vague.  I don't know that we had even at

16  that point determined completely what we were going to

17  do.

18      Q.      Well, at that point -- are you saying

19  from the point that you speak to Marcia Silva until

20  2007 when the probation department notified you by

21  motion that they were going to terminate probation and

22  PTI that you had not given this any further thought?

23      A.      No, that's not accurate.

24      Q.      Did you give it further thought?

25      A.      Yeah, I gave it further thought.

161

1       Q.      And what was the substance of your

2   thought before you received the motion?

3       A.      The substance of my thought before the

4   receipt of the motion?  Well, you're missing a big

5   step in this process where there was some hard thought

6   given to the whole subject because we filed a lawsuit

7   in October of '06 and I looked back through the file

8   trying to figure out when I really began to sit down

9   and study case law and to formulate just exactly what

10  was going to go on here.  And the only way I can tell,

11  Mr. Connell, is I look at those cases and I think

12  they're printed off of West Law in September of '06.

13  So I was thinking about this, you know, I don't know,

14  I think about things all the time.  I think about

15  things when I'm taking a walk.

16      Q.      I'm not asking about other things.  We're

17  talking about this document and --

18      A.      You're right.  I gave a great deal of

19  thought throughout this, Mr. Connell.

20      Q.      In September of '06?

21      A.      No.  I gave a great deal of thought on

22  the day I walked in there on the 9th or the night

23  before when I was told this was going to be a PTI I

24  guess until I've given it a great deal of thought

25  until we walked in here today.

162

1       Q.      Very good.  And what you did you had

2   mentioned the research based upon looking at your file

3   and you have no notes whatsoever, and you can only

4   base it upon the West Law printouts in '06, you pulled

5   cases?

6       A.      Yeah, that would make sense because we

7   had a statute coming up in October of '06.

8       Q.      And before you filed your lawsuit, did

9   you think to contact the Court to let them know that

10  you intended to not abide by the condition?

11      A.      I never -- hold it.  You're confusing two

12  subjects.  You're confusing two subjects, Mr. Connell.

13      Q.      Strike the question.  Before you --

14      MR. STONE:  Why?  I'd like the answer.

15      MS. O'CONNOR:  Before October of 2006.

16      Q.      Before October of 2006 did you advise

17  Judge DeVesa that you had no intention of having your

18  client execute the agreement, the release and hold

19  harmless agreement?

20      A.      No, because it wasn't my intention up

21  until that point.  I didn't have an intention with

22  respect to that.

23      Q.      Did you file a motion seeking to have

24  that stricken from the agreement of your client to

25  enter PTI?

163

1       A.      No.

2       Q.      You spoke with Ms. Reed about this.  Did

3   she do any of the research?

4       A.      Okay, what did I speak -- I spoke to Ms.

5   Reed about lots of things, Mr. Connell.

6       Q.      I said "this".

7       A.      "This" being what?

8       Q.      This issue.  The issue of whether or not

9   you were going to execute a release and hold harmless

10  agreement.

11      A.      Yes.  The answer is yes.  I've spoken to

12  her since after the 9th up until, I don't know, up

13  until this thing, up until we got involved in the

14  lawsuit about it.

15      Q.      Well, as a result of Marcia Silva's

16  contact with your office on numerous occasions looking

17  for this agreement and you indicating that not giving

18  her -- giving her an indication that you were going to

19  prepare the agreement, but you didn't execute the

20  agreement, your client didn't execute and you didn't

21  prepare it, that was no longer your understanding that

22  they were not going to press the condition, was it, as

23  long as she was looking for it for a couple months?

24      A.      Hold it.  Did you just say me speaking to

25  her?

**164**

1    Q.    As a result of conversations -- you said
2  you may have spoken to her, but you don't know what
3  the conversation was.
4    A.    I said I don't recall speaking to her and
5  I don't recall the conversation. So don't put that in
6  the premise. As a result of information coming to me
7  that they were looking for the release. Leave it at
8  that, Mr. Connell.
9    Q.    Then I will leave it at that. As a
10  result of information coming to you through
11  representatives in this office that Marcia Silva was
12  looking for this release and hold harmless agreement
13  that you promised to the Court and to her would be
14  executed by your client and forwarded to the Court and
15  to probation, as a result of that, that was no longer
16  your understanding that you had on November 9th that
17  maybe they wouldn't press the condition?
18    A.    You are right. One of the three options
19  appeared to have vanished.
20    Q.    And yet you did nothing affirmatively to
21  clear this up with the Court or with probation? And
22  I'm talking about the criminal court wherein you made
23  the agreements.
24    A.    I never made a motion before Judge DeVesa
25  to lift that condition.

**165**

1    Q.    Okay.
2    A.    And when you say "nothing", that would be
3  the only thing that would come to my mind, and the
4  only option that came to my mind. That's why I said
5  that was one of the three options, and I've told you
6  ten times I didn't make that motion.
7    Q.    All right. There came a time when in
8  February of '07 you received a motion in
9  State vs. Kandil that the probation department was
10  seeking to terminate the probation term and the PTI
11  agreement that was entered into because your client
12  had not executed the agreement as promised. Correct?
13    A.    You're correct. I don't know if "motion"
14  is the right word, but we were noticed. We got that
15  notice.
16    Q.    And as a result of getting that notice, I
17  presume you had a discussion with your client about
18  it?
19    A.    Absolutely.
20    Q.    What did you tell your client?
21    A.    I told him that we could bring an
22  application to have it lifted. I thought that it was
23  an invalid condition, as I had previously explained to
24  him. That as a result of that, the condition may be
25  lifted or the condition may not be lifted. That if

**166**

1  the condition is lifted, the judge may allow the
2  prosecutor's office to go back to square one and
3  prosecutor him for a second degree crime and No Early
4  Release Act, and then we discussed bail pending
5  appeal. We discussed, you know, bail pending
6  sentence, having your bail yanked. We discussed the
7  prospect of interlocutory appeals. I didn't
8  discuss -- and I went over this with Mr. Bitterman --
9  I didn't discuss with him change of venue, which I do
10  kind of regret at this point, although I didn't
11  realize how significant my argument could have been
12  for change of venue given Judge DeVesa and Judge
13  Gelade's stated desire in this case to get a civil
14  release or to get involved in the civil release on
15  several aspects -- Gelade not so much. Gelade talked
16  about us not getting discovery in a criminal case.
17  DeVesa, if it's true what this person says about
18  DeVesa, this Silva woman, he interjected himself into
19  this. If I had known that -- I wonder if my client
20  knew that. That's a frightening thought, a real
21  frightening thing. So bringing a motion before that
22  judge? I'm glad I didn't do it at this point if what
23  Ms. Silva says is true here. You know, I'm glad I
24  just did what I did and got out of that court and I'm
25  in Federal Court. They're frightening thoughts.

**167**

1              MR. STONE: Do you have any facts to
2  indicate that what Ms. Silva says is not true
3  regarding --
4              THE WITNESS: Interjection?
5              MR. STONE: -- Interjection regarding the
6  release?
7              THE WITNESS: You know, I asked Ms. Reed
8  about this and she's a little -- at least you guys
9  will get her testimony on this subject -- she's a
10  little vague on that.
11              MR. STONE: That's not what I asked. I
12  don't know about Ms. Reed. I'll ask her the same
13  exact question, trust me.
14              Do you have any facts that indicate that
15  what Ms. Silva says in her memo regarding the
16  suggestion by Judge DeVesa is not true?
17              THE WITNESS: Let me see what she says in
18  the memo.
19              Well, what she said in this memo is way
20  off in a sense because she says I suggested it, she
21  says I was there, and everyone knows I wasn't there
22  because the transcript that day says I wasn't there.
23  So this is way off.
24              MR. STONE: Okay.
25              THE WITNESS: This memo is way off

168

1  because I wasn't even there. So I thought there was a
2  suggestion in the dep --
3              MR. CONNELL: It is. It's in the
4  deposition.
5              THE WITNESS: -- that DeVesa is the one
6  who brought this up.
7              MR. STONE: We said --
8              MR. CONNELL: Page 27 in the deposition.
9              MR. STONE: I asked you last time and got
10  the answer you have no facts, so it's not a problem.
11  Go ahead, Bill.
12  CONTINUING DIRECT EXAMINATION BY MR. CONNELL:
13      Q.     The same question with respect to what
14  Mr. Stone just asked you. Did you read the deposition
15  testimony of Ms. Silva at Page 27 where she states
16  exactly that, Judge DeVesa was the one who inquired if
17  there was a civil suit out there and if there would be
18  an agreement to dismiss it?
19      A.     I don't have a fact to suggest that
20  except to say that's a pretty frightening thought if
21  Judge DeVesa did that.
22      Q.     Mr. Kobin, I'm not asking you for your
23  opinions about Judge DeVesa. All I'm asking is --
24  first of all, did you read this testimony before
25  coming here today?

169

1      A.     Yeah, I know that.
2      Q.     So you were already on notice of what Ms.
3  Silva claims occurred with Judge DeVesa; is that fair?
4      A.     In here today.
5      Q.     You didn't read this before today; you
6  just read it here now?
7      A.     What does me being on notice about Judge
8  DeVesa after this deposition have to do with anything?
9  What are you talking about, Mr. Connell? I've lost
10  the ability to understand your questions.
11      Q.     Maybe that's your problem because maybe
12  you're not concentrating. My question is very simple.
13  Did you read this deposition, this Page
14  27 concerning Ms. Silva's testimony concerning Judge
15  DeVesa bringing the issue up and asking whether or not
16  the defendant would be willing to dismiss a civil
17  suit? Did you read that before you came here today?
18      A.     Yeah.
19      Q.     Okay. So therefore, before you testified
20  here today, you knew that that was her claim in her
21  deposition; that Judge DeVesa was the one who
22  suggested the dismissal?
23      A.     Right.
24      Q.     And do you have any facts after reading
25  this deposition that would render Ms. Silva's

170

1  testimony untrue?
2      A.     Well, I have a lot of facts that would
3  render her testimony untrue.
4      Q.     On that subject matter that Judge DeVesa
5  was the one who suggested the agreement?
6      A.     I can't just do it that way.
7      Q.     That's what I'm asking about.
8      A.     She's got a generally poor recollection
9  of the individual, ergo, her memo. She doesn't have a
10  good recollection of the event. It shocks me -- well,
11  it shocks me when he didn't respond to kick out the
12  condition, and it really shocks me if he's the one who
13  got involved in this and made this suggestion. So
14  those are facts. Those are facts. Given my
15  experience in the law, those are facts.
16      Q.     And it shocks you that he would not
17  strike out that agreement even when you didn't bring
18  it to his intention when you were in court on
19  November 9th?
20      A.     I repeat myself. If you go out in the
21  rain and you get wet, Mr. Connell, I don't have to
22  tell you you're going to get wet. He should have know
23  this, the prosecutor should have known this. I'm the
24  one who's sitting there with a guy facing a ten-year
25  NERA case. These folks have their obligations.

171

1      Q.     You don't think you've got your
2  obligations to object to a condition that is illegal?
3      A.     I have many obligations impinging on me,
4  impacting on me on that date.
5              MR. BITTERMAN: Could you answer that
6  question, please? Did you consider that you had an
7  obligation to bring to the Court's attention that you
8  believe that it was an illegal term and condition,
9  that being requiring your client to sign a release and
10  hold harmless agreement? Did you believe it was your
11  obligation to bring it forward?
12              THE WITNESS: I think that my obligation
13  was trumped by other obligations that I have.
14              MR. BITTERMAN: So you believe you did
15  not, given the facts and circumstances as they were
16  presented to you at that point, did not believe it was
17  your ethical obligation to bring up the facts that you
18  believed this condition was against public policy or
19  illegal?
20              THE WITNESS: You're right. I thought
21  given the totality of the circumstances on that day at
22  that time that while being put in a very, very bad
23  position, I had to be cognizant of other obligations
24  that I had, so that trumped that obligation at that
25  time.

Case 2:06-cv-04791-DMC -MF   Document 99-14   Filed 01/07/10   Page 11 of 47 PageID: 1550

KANDIL v. YURKOVIC, et al.                                        Testimony of R. KUGBY, ESQ. 6-2-09

172

1  MR. BITTERMAN: So the answer would be
2  you believed that it was not your obligation given the
3  circumstances as they were presented to you on
4  November 9th, 2005 in that courtroom to bring to the
5  Court's attention that you believed the condition
6  being imposed upon your client was illegal or against
7  public policy?
8          MR. CONNELL: Or unethical.
9          MR. BITTERMAN: Or unethical.
10         THE WITNESS: Extremely, extremely close
11 call. I made the decision, obviously, so I would
12 assume I believe that, but extremely close call,
13 Mr. Bitterman.
14         MR. BITTERMAN: So the answer would be
15 you believed that you were not obligated to do so.
16 Correct?
17         THE WITNESS: Yes.
18         MR. CONNELL: All right.
19 BY MR. CONNELL:
20    Q.    Now in February of '07 when you had all
21 of these issues going around and you're talking with
22 your client about his various options which was for
23 you to file a motion, for you to -- with the results
24 of that motion potentially being the recision of the
25 probation term, the recision of PTI, your client going

173

1  to trial and subjecting himself to trial, the options
2  of appeal on the judge's decision, all of those things
3  were all discussed with him and then he decided, I
4  presume, to sign the agreement that you prepared?
5     A.    Yeah. I also discussed with him bringing
6  the matter to the attention of the federal courts and
7  seeing how we did there. And I think I discussed that
8  with him along the way and that that would be the
9  better forum perhaps to do this so we could get away
10 from the local interests, although I was not --
11    Q.    The answer to my question is you did talk
12 to him about all of his options? And you already told
13 us about the federal options, about dealing with this
14 with the federal judge concerning a civil suit. He
15 ultimately decided to sign a document that you
16 prepared for him; is that right?
17    A.    Yeah. His signature's on it so and we
18 submitted it.
19    Q.    So why don't you just say yes, that's
20 what he said?
21    A.    Well, what are you asking the question
22 for when we know what he did?
23    Q.    Because I need to have that to ask the
24 basis for the next question.
25    A.    Is there some dispute that he didn't sign

174

1  the document?
2     Q.    No.
3          And do you believe that he signed the
4  document knowing what he was signing?
5     A.    He knew the generally parameters what he
6  was doing.
7     Q.    He knew he was giving up his right to sue
8  the officers when he signed the document?
9     A.    No, he did not.
10    Q.    Isn't that what the document says?
11    A.    That's not what I told him.
12    Q.    That's what?
13    A.    No. You said did he know he was giving
14 up his right to sue the officers.
15    Q.    Exactly.
16    A.    No.
17    Q.    He didn't know that?
18    A.    No.
19    Q.    But that's what the document says and
20 that's what he signed.
21    A.    The document says what it says and his
22 signature's on the document. You can save your
23 argument for the Court.
24    Q.    I'm asking you whether or not he felt
25 when he signed that document -- he could read the

175

1  document; you know he could read English. Right?
2     A.    He's got a BS in biology. I assume he
3  could read English.
4     Q.    Did he have any questions about what he
5  was signing?
6     A.    He had a ton of questions.
7     Q.    And when he signed it, did you tell him
8  as you just testified and he has testified that you
9  told him he would be giving up the right to sue these
10 officers?
11    A.    That agreement could, although I did not
12 think it was valid, I cannot guarantee that the judges
13 in the federal court would agree with me and find that
14 the whole agreement and the whole condition was void.
15    Q.    Therefore, you did tell him that one of
16 the options of the Federal Court would be to bar his
17 civil lawsuit?
18    A.    I said that that could happen.
19    Q.    Right. And you recognize that Mr. Kandil
20 testified about that; that he was told that by you,
21 that there's a chance he was giving up his rights to
22 sue the officers by signing the document?
23    A.    You know what?
24    Q.    Would you agree with that? That's what
25 you said to him because that's what he said you said

**176**

1  to him?

2  A.    Of course I said that to him.

3  Q.    And therefore, his signature on the

4  document was voluntary?

5  A.    I don't like your phrase, Mr. Connell. I

6  don't agree with "voluntary". I will not agree to the

7  word "voluntary" or lack of coercion in a second

8  degree NERA case. I will not agree to it. I will not

9  agree to it when they filed a termination notice that

10  there's nothing voluntary about it. There's nothing

11  that lacks coercion about it. That's why it's against

12  public policy. So you can keep using the word

13  "voluntary", sir, but I suggest you save it for the

14  Court.

15  Q.    Did you ever tell him not to sign the

16  document?

17  A.    No. I'm not going to tell a man to take

18  a risk on a ten with a NERA.

19  Q.    Just answer the question. Did you ever

20  tell him that?

21  A.    Of course I didn't.

22  Q.    When you signed the document did you know

23  that at that point that that would result in the

24  prosecutor's office or the probation department, the

25  State of New Jersey withdrawing their motion?

**177**

1  A.    I wasn't sure about that.

2  Q.    That was the request of your office; you

3  provided them with the agreement?

4  A.    Right. But I wasn't sure what they were

5  going to do.

6  Q.    Your client got the bargain of PTI and he

7  completed his probation without violating it; isn't

8  that right?

9  A.    There are two questions.

10  Q.    I'll withdraw the question.

11  Did your client get the benefit of the

12  agreement of PTI intervention?

13  A.    You call it an agreement. I call it a

14  gun to the head. He was allowed into PTI with a

15  condition that doesn't even belong in a PTI. See, a

16  PTI is not a bargain.

17  Q.    Why don't you do us a favor? You don't

18  have to make your arguments to the federal court in

19  every answer you give.

20  A.    PTI is not a bargain.

21  Q.    You don't think PTI is a bargain?

22  A.    PTI is not a bargain by definition.

23  Q.    So in other words, the fact that your

24  client avoided prosecution for a second degree offense

25  and third degree offenses, did not have to stand trial

**178**

1  and did not get a conviction for an offense, did not

2  have to plead guilty to any offense and in turn,

3  received a probation term which he successfully

4  satisfied the terms of the probation, you don't

5  believe that was a bargain between the two sides?

6  A.    I don't believe the PTI application and

7  PTI admissions are bargains. Plea bargains they are

8  not.

9  Q.    So there for -- is a plea bargain a

10  bargain in your opinion?

11  A.    Yes.

12  Q.    You believe that an agreement to allow

13  your client to go into PTI is not a bargain with the

14  State of New Jersey?

15  A.    No.

16  Q.    Okay. Good enough. He certainly got

17  everything that the State promised to him, did he not?

18  A.    I don't view it as -- PTI as a State's

19  promise to you.

20  Q.    I didn't say that. I said did he get

21  everything that the State had provided to him by

22  allowing him into the PTI?

23  A.    He was entered into a pretrial

24  intervention program pursuant to a somewhat normal

25  procedure with a somewhat abnormal condition attached

**179**

1  thereto, so I don't view it as a bargain at all.

2  Q.    Your client didn't provide the condition

3  of the release until he was threatened with going to

4  trial; isn't that correct, in February of '07?

5  A.    He was threatened all along with a NERA

6  violation and that's why he provided a release.

7  Q.    Well, you saw the application to

8  terminate his PTI and what that application stated.

9  Are you familiar with the terms of that application?

10  A.    You mean --

11  Q.    The State's application to terminate his

12  PTI and end the probation. You received that

13  document, did you not?

14  A.    Yes, I received it.

15  Q.    And you understood -- because you had to

16  explain the consequences to your client, you then had

17  a subsequent discussion?

18  A.    Yeah.

19  Q.    As a result of your preparation and your

20  client's execution of the release in this case, your

21  client was allowed to stay on probation and he

22  completed his probation. Correct?

23  A.    Well, we don't know what would have

24  happened at the termination here.

25  Q.    I didn't ask you that. I said as a

180

1  result of you providing your release.
2       A.   But you don't know that. You don't know
3  that.
4       Q.   No, we do know what happened for your
5  client. I'm not asking you what the State might have
6  done.
7            MR. BITTERMAN: Can I rephrase the
8  question? As a result of the fact that your client
9  signed the release, the State withdrew its application
10 to terminate your client from the Pretrial
11 Intervention Program. Correct?
12           THE WITNESS: Bingo. Correct.
13           MR. BITTERMAN: And your client completed
14 PTI. Correct?
15           THE WITNESS: Yes.
16 BY MR. CONNELL:
17      Q.   And the charges were then dismissed.
18 Correct?
19      A.   Yes.
20           MR. CONNELL: That's all I have at this
21 moment.
22           MR. BITTERMAN: I have nothing further.
23 CROSS-EXAMINATION BY MR. STONE:
24      Q.   When you left the courtroom on November
25 9, 2005, was it your intention to prepare the release

181

1  that was discussed?
2       A.   Didn't know. I don't know.
3       Q.   Was it a misrepresentation to the Court
4  to say you were going to prepare the release that you
5  discussed?
6       A.   Didn't know. Don't know.
7       Q.   You don't know if it was a
8  misrepresentation?
9       A.   No. I didn't know what I was going to do
10 because I was a bit taken back by the whole thing. So
11 I did not know whether I needed to -- what I needed to
12 do at that point.
13      Q.   That was the first question. The second
14 question is was it a misrepresentation to the Court
15 when you said that you were going to prepare the
16 release since you didn't know if, in fact, you were
17 going to?
18      A.   No. When I walked out of the court I
19 didn't know. When I was on the record I was basically
20 didn't know what I was going to do. I didn't know
21 what I was going to do.
22      Q.   So when you told the judge that you were
23 going to prepare the release, even though you didn't
24 know what you were going to do, was it a
25 misrepresentation?

182

1       A.   No, because I may have done it. We did
2  do it, so I mean I don't know that it was a
3  misrepresentation.
4       Q.   Okay. When they requested a copy of the
5  release in November or December of 2005, did you ever
6  advise anyone that you were going to provide it?
7       A.   Well, I certainly didn't say I wasn't
8  going to provide it, so I guess I indicated at least
9  to the staff tell them we'll get it to them at a
10 minimum because if I indicated we weren't going to
11 provide it, I'm sure that something, based upon their
12 subsequent move to terminate, they would have done
13 something.
14      Q.   Telling your staff to tell them we'll get
15 it to them is not making a representation that you are
16 not going to provide the release, is it?
17      A.   No, no, no. I'm just saying -- you're
18 right. I'm saying that if I had said to my staff tell
19 them we're not going to give it to them or I said to
20 Marcia -- is it Marcia Silva? If I said to Silva on
21 the phone, I'm not giving it to you I'm sure that,
22 based upon their subsequent action when I filed the
23 lawsuit, would have generated some type of activity on
24 their part.
25      Q.   Well, what I'm looking for is when in the

183

1  compendium of time from November 9, 2005 when you told
2  the Court you were going to give them a release until
3  February of 2007 when your client was threatened with
4  being thrown out of PTI did your statement to the
5  judge become a misrepresentation?
6       A.   It never did because we provided it. I'm
7  not quite sure if you do something that it's hard to
8  -- I don't know what you're saying.
9       Q.   So in other words, if you tell the Court
10 I'll have it to you by December 2005 and December 2005
11 goes by and all of 2006 goes by, it's still not a
12 misrepresentation?
13      A.   I would say that it's not under these
14 circumstances at all a misrepresentation, under the
15 totality of these circumstances it's not.
16      Q.   Well, you would agree that if you
17 represent to a judge in open court that you were going
18 to do something by a certain date, you're representing
19 you're going to do that. Correct?
20      A.   Correct.
21      Q.   What makes this instance so special that
22 your representation in open court that you were going
23 to do something by a certain date doesn't become a
24 misrepresentation in your mind?
25      A.   Well, if that's your definition of

**184**

1  misrepresentation, me doing something by a certain
2  date, I've misrepresented things often in my career.
3      Q.    You're not answering my question, sir.
4      A.    I think I'm answering the question. I
5  don't consider it a misrepresentation, sir.
6            MR. BITTERMAN: Do you mind if I
7  interject?
8            MR. STONE: Absolutely not.
9            MR. BITTERMAN: When you were in court in
10 front of Judge DeVesa you said to the judge, as an
11 officer of the Court, I will prepare a release.
12 Correct?
13           THE WITNESS: Yes.
14           MR. BITTERMAN: At the time you made that
15 comment to the judge, you just told Mr. Stone you
16 didn't know whether you were going to prepare the
17 release. Correct? You just said that a minute ago.
18 Correct?
19           THE WITNESS: That's probably an accurate
20 description of my mindset at the time.
21           MR. BITTERMAN: So when you told the
22 judge you were going to do a release --
23           THE WITNESS: Right.
24      Q.    -- and in your mind you weren't sure you
25 were actually going to do a release, sir, is that or

**185**

1  is that not a misrepresentation?
2            THE WITNESS: No.
3            MR. BITTERMAN: You said I'm going to do
4  it. Correct?
5            THE WITNESS: Right.
6            MR. BITTERMAN: And you didn't know
7  whether you were going to do it. Correct?
8            THE WITNESS: Right.
9            MR. BITTERMAN: Okay. So you told the
10 judge one thing?
11           THE WITNESS: Right.
12           MR. BITTERMAN: What your mindset was.
13 Correct?
14           THE WITNESS: Yes.
15           MR. BITTERMAN: But that wasn't your
16 mindset because your mindset was I'm not sure?
17           THE WITNESS: That is correct. My
18 mindset was I'm not sure. I told you the three
19 options that I kind of had floating around in my mind.
20           MR. BITTERMAN: You didn't tell the judge
21 those three options; you told him unequivocally you
22 were going to prepare the release. Correct?
23           THE WITNESS: I told him I was going to
24 prepare the release. The transcript says what it
25 says.

**186**

1  CONTINUING CROSS-EXAMINATION BY MR. STONE:
2      Q.    One of the options, I believe -- I could
3  be wrong, I'm getting old -- I think you said number
4  one, you were hoping it would just be forgotten about?
5      A.    Yes.
6      Q.    Number two, you might make an application
7  for some form of relief -- let's me finish my
8  question -- and number three, was you might have to
9  prepare the release. Weren't those the three options?
10     A.    That the release could be prepared, that
11 a motion would be made or motion to be made, or that
12 they would --
13     Q.    -- forget about it?
14     A.    Basically waive the condition and forget
15 about it. Now when to my mind -- you know, as of the
16 9th when I'm confronted with this, when did this stuff
17 start or the 8th when Sue Reed told me about it, Sue
18 told me about it because on the 8th when I was
19 confronted with it in court, all those things were
20 racing through my head. So I don't know when that
21 actually came to be solidified as options or not;
22 while I was on my feet, whether it was after I got off
23 my feet, whether it was before I went up there, you
24 know, I don't know.
25     Q.    Okay. Would it be fair to say that those

**187**

1  three items were solidified as options prior to you
2  receiving notice from the prosecutor's office that
3  they wanted the release?
4      A.    Oh, yeah.
5      Q.    Okay. Did you ever once -- strike that.
6  Once these three options were solidified in your mind,
7  did you, in fact, make any kind of application to the
8  Court for some form of relief?
9      A.    For the 20th time, no.
10     Q.    I only asked it the first time.
11     A.    Good for you.
12     Q.    That's all that counts to me.
13           At the time that these three options
14 solidified in your mind, did you make a determination
15 that you were going to, in fact, prepare the release
16 and comply with the representation made in Court?
17     A.    At some time we obviously prepared the
18 release and submitted the release.
19     Q.    You know that we're talking about between
20 November and December of 2005 for my question; isn't
21 that true?
22     A.    I don't know when we decided we were
23 going to do it.
24     Q.    Hold it. You said that you decided you
25 had these three options before the prosecutor pressed

188

1  you for the release; isn't that correct?
2      A.    Yeah.
3      Q.    Wasn't that December of 2005?
4      A.    What are you talking about press me for
5  the release?
6              MR. CONNELL:  They were asking for it.
7      Q.    They kept contacting your office asking
8  for the release, where is it?
9      A.    Right.
10     Q.    That was December 2005, was it not?
11     A.    If you say so.
12     Q.    You don't know when it was?
13     A.    Everybody says it's about the time, it's
14  about the time.  I remember some calls about that
15  time.  Did I have those three options in my mind at
16  that point?  Is that what you're asking?
17     Q.    You already said you did.
18     A.    Okay, so I did.
19     Q.    So why are you telling me about what you
20  did later on in February/March of 2007?  We're dealing
21  with November and December of 2005.  You already
22  said -- and after the 21st time -- that you did not
23  make an application to the Court as one of the
24  options.
25     A.    Right.

189

1      Q.    You did not prepare the release in that
2  time frame.  Correct?
3      A.    No.
4      Q.    And --
5      A.    Yes.  The answer is yes, I did not
6  prepare the release in that time frame.
7      Q.    And the third option was out the window
8  because they were asking for the release; they did not
9  forget about it.
10     A.    I'm not quite sure I determined in my
11  mind that the third option was out the window.  I
12  didn't determine that the third option was out the
13  window until they made a formal -- until there was a
14  formal request made in court.
15     Q.    Did you ever discuss with your client
16  just pay no attention to any requests for the release
17  and see whether he could go through PTI without ever
18  having to give it?
19     A.    I think I did discuss with him that
20  option.
21     Q.    When is the first time you discussed with
22  your client the option of not giving the release that
23  was agreed to on November 9, 2005?
24     A.    Don't know, but it was early on.  It was
25  early on in the sense of not years, months.

190

1      Q.    In other words, November/December in or
2  around when it was supposed to be provided?
3      A.    You know, I can't answer that
4  specifically, but if I was being called by them about
5  the release, I'm sure I had some discussions with him
6  about it.  And if those were the three options that I
7  had in my mind, then undoubtedly those were the three
8  options that I -- I can't tell you what kind of
9  detail, but at least discussed with him in some sort
10  of broad terms.
11     Q.    That's exactly in the next question we'll
12  get into detail.
13              Tell me exactly whether you had -- strike
14  that.
15              Tell me specifically all you can remember
16  regarding the discussion you had with your client
17  about not providing the release and seeing whether he
18  could just slip through PTI?
19     A.    I never used those phrases with him, so I
20  didn't have that discussion with him.  The discussion
21  would have been much different than as you've
22  characterized it.  The discussion -- well, you know,
23  I'm getting --
24              MR. CONNELL:  Your objection is the "slip
25  through PTI"?

191

1              THE WITNESS:  Yeah.  There were
2  discussions about it.
3              MR. CONNELL:  How about complete PTI?
4      A.    There were discussions about the nature
5  of the release; whether it was an enforceable
6  condition; whether it was void as under public policy;
7  whether they would even request that this be done;
8  whether they would make a motion to request that an
9  illegal condition be enforced.  Were we simply getting
10  completely -- I would have used other words -- unfair
11  treatment in Middlesex?  Could we trust the judges and
12  in this case, the prosecutors, given the fact that
13  there was this release?  Should we wait and see what
14  they do?  We've been asked to engage -- we've been
15  asked to sign an illegal document, an unethical
16  document.  So we had all these discussions.
17              At that juncture I would say we obviously
18  decided at that point that we would not execute the
19  release.  Now when I say "at that point," I wouldn't
20  say that all of that occurred before you get into the
21  new year.  I may not have spoken to my client at all
22  about this in detail after the 9th before the new
23  year.  So those calls may have come in at that time
24  and I may not have gotten together with him.  So I
25  don't know the answer to that, but it wouldn't be

192

1  unusual for that time frame when you got Thanksgiving
2  and the holidays, I may have been involved.
3      Q.    Did you make a recommendation to your
4  client to do nothing and see whether the prosecutor
5  affirmatively sought the release?
6      A.    I would say that that was one of the
7  options that I eventually discussed with him without
8  being tied down to that November/December time frame.
9      Q.    I know it was an objection. The question
10  is did you recommend that's what he do?
11     A.    No, I don't think I recommended one of
12  the options over the other. I told him what the
13  dangers were with each option.
14     Q.    Well, what was the danger with each
15  option?
16     A.    Well, the danger with the option of
17  letting -- of not executing it was that you would go
18  back to prosecution, you would have a trial, and
19  although I feel like, you know, we have a defensible
20  case, I feel like the percentages are with you, if you
21  don't prevail you would be given a state sentence with
22  prison, we'll have to see about an interlocutory
23  appeal which are rarely granted, you would then get in
24  line for an appeal. It's most likely they'll yank
25  your bail.

193

1      MR. CONNELL: Interlocutory appeal about
2  what; not about the trial results?
3      THE WITNESS: No. It would have to be
4  about the fact that they determined that -- and this
5  is very difficult. This is where it got a little bit
6  scary because if they just yanked the PTI, they would
7  say he's a second degree, but I thought perhaps an
8  argument could be made, but you see all these
9  things -- because you can't get to the Appellate
10  Division on interlocutory basis on PTI and the --
11  because the only people that can appeal PTI is the
12  State essentially, so I couldn't get up on the rules.
13     MR. CONNELL: But when I was talking
14  about interlocutory appeal, what were you --
15     THE WITNESS: See, the prosecutor can
16  under the rules get up to the Appellate Division
17  before trial on an interlocutory appeal, the defense
18  really can't. So --
19     MR. CONNELL: So what were you talking to
20  your client about with respect to filing an
21  interlocutory appeal?
22     THE WITNESS: I'm going to answer that,
23  Mr. Connell, if you let me go -- I know my thought
24  processes bore you, but they were my thought
25  processes, and since you want to know what I discussed

194

1  with my client, you're going to have to get the boring
2  version of it.
3      MR. CONNELL: Go ahead.
4      THE WITNESS: So what happens is I can't
5  get up there to the Appellate Division, so what would
6  happen is I do think that ultimately I'm 99 percent
7  certain after my client spent two years in jail that I
8  would have gotten the Appellate Division to say wait a
9  second, this guy is a PTI guy, you decided under the
10  normal PTI guidelines he's a PTI guy and so now you
11  throw in this condition of some civil rights lawsuit
12  that has nothing to do with the PTI guidelines and
13  because he wouldn't agree to that and because he
14  didn't sign a release, you tossed him out. I think
15  ultimately, after my client sits in jail for two
16  years, I win that argument. So I decided to -- well,
17  we decided that we would not pursue that because
18  spending two years in jail is not really winning an
19  argument, so we decided that we would execute the
20  release.
21     MR. CONNELL: No, you decided that you
22  wouldn't execute the release.
23     MR. STONE: I don't think that has
24  anything to do with my question, but that's okay.
25

195

1  CONTINUING CROSS-EXAMINATION BY MR. STONE:
2      Q.    Were you shocked having made it one year
3  and four months through PTI without giving this
4  release that someone finally asked you for it?
5      A.    No. I thought that they wouldn't have
6  the guts to make a formal application to enforce that.
7  I thought that was -- so I wasn't shocked because that
8  was one of the things I was thinking, no one's got the
9  guts to make this application and no judge is going to
10  enforce this if they really bring it to light. They
11  were basically, in my -- they were putting it to an
12  out-of-town guy down there with this deal and I was
13  going to get -- my client was getting punished and I
14  was, for some reason, getting punished. That's how I
15  viewed the whole thing. So did I think that they had
16  the guts to really go through with it? They did.
17  It's amazing to me.
18     Q.    Does that mean you were or weren't
19  shocked then? I still don't understand the answer to
20  the question.
21     A.    You know what? I was shocked that the
22  prosecutor called up the probation department after
23  they got a call from the cops and did what they did in
24  this case and did what they did which we can't talk
25  about, yeah, I was shocked.

*RANDLE v. YORKOVIC, et al.*                                    *Testimony of R. KOBIN, ESQ. - 6-2-09*

---

**196**

1    Q.    Other than having --

2    A.    I was shocked when I first walked into

3    court and saw this condition on the piece of paper.

4    Q.    That's not what I asked. I'm very, very

5    specific with my time frames and questions, Mr. Kobin,

6    as you know.

7    A.    Very good.

8           MR. BITTERMAN: You were shocked when you

9    walked into court November 9, 2005 and saw this

10   condition. Is that what you now testified under oath?

11          THE WITNESS: I testified also --

12          MR. BITTERMAN: Just now.

13          THE WITNESS: Yes.

14          MR. BITTERMAN: Even though you know

15   about it on November 8th or before November 8th that

16   was going to be a condition because Sue already told

17   you, you were shocked on November 9th?

18          THE WITNESS: Absolutely.

19          MR. BITTERMAN: You think Susan Reed was

20   making it up?

21          THE WITNESS: The question was was I

22   shocked that she was making it up that she knew this?

23          MR. BITTERMAN: That was the question.

24          THE WITNESS: I didn't think she was

25   making it up. I thought it was a joke.

---

**197**

1           MR. BITTERMAN: You thought it was the

2    prosecutor's office was making a joke?

3           THE WITNESS: I didn't think anyone would

4    put this on a Goddamn piece of paper. I thought it

5    was a joke.

6           MR. CONNELL: And you had this discussion

7    with Sue?

8           THE WITNESS: Yeah.

9           MR. CONNELL: Before you got there you

10   talked to Sue Reed, I don't think they got the

11   gumption, or whatever word you used, to put this on a

12   piece of paper the next day?

13          THE WITNESS: My recollection of the

14   conversation is yeah, right.

15          MR. CONNELL: And did Susan Reed not tell

16   you at the time you were having this discussion that

17   it was the judge's idea? You tell me she didn't say

18   that?

19          THE WITNESS: You keep saying -- were you

20   in chambers, Mr. Connell?

21          MR. CONNELL: I'm just asking you whether

22   Susan Reed told you anything, whether it was the

23   judge's idea; did she or did she not when this issue

24   was coming out where you were so outraged about it?

25          THE WITNESS: Did she tell me it was the

---

**198**

1    judge's idea?

2           MR. CONNELL: Yes.

3           THE WITNESS: I can tell you as I sit

4    here today that I only recently came to conclude that

5    this judge may have been involved in this.

6           MR. CONNELL: Okay. And would it be fair

7    to say that understanding your outrage and the outrage

8    that you've expressed throughout this deposition about

9    the judge being involved in that, that if Susan Reed

10   had told you about the fact that the judge was

11   involved in it, you would have done something about it

12   with the judge the next day, would you have not?

13          THE WITNESS: Not necessarily. I would

14   have been -- I probably would have been more -- I

15   probably would have been like my client who wanted to

16   get out of there, that the presiding judge was -- if I

17   knew the presiding judge was trying to protect the New

18   Brunswick Police Department, I would have gotten out

19   of there and I would have done it the way I did it. I

20   wasn't going to let my client spend two years in jail

21   just to prove them wrong.

22          MR. CONNELL: So then you were shocked

23   when you heard that the judge had some part of this

24   because Susan Reed didn't ever tell you about that?

25          THE WITNESS: I don't recall Susan Reed

---

**199**

1    telling me about that, okay.

2           MR. CONNELL: All right.

3           THE WITNESS: It's only when I'd gone

4    back and looked at this thing in the context of Gelade

5    because I never saw Gelade's transcript where he

6    starts talking about civil discovery. Then I start

7    looking at Silva's testimony. I had a conversation

8    over the last several days with Sue Reed. I don't

9    know. I don't know.

10          (Mr. Spagnola enters the deposition

11   room.)

12          MR. CONNELL: Okay.

13   CONTINUING CROSS-EXAMINATION BY MR. STONE:

14   Q.    Once you were notified from Hunterdon

15   probation that the release was required, you had

16   another discussion with your client concerning what

17   actions to take.

18   A.    Of course, yes.

19   Q.    And you realized that you were now down

20   to two options?

21   A.    The answer is yes.

22   Q.    Did you come up with any other options

23   during that time other than the two that remained,

24   which was preparing the release and making an

25   application to the Court for relief?

---

200

1    A.    I'm trying to think.  He's re-asking the
2  question, so I assume he's giving me an opportunity to
3  dig back into my brain to see if there was any other.
4  Since that question's been asked and answered ten
5  times, I assume he wants me to dig back into my brain
6  to see if there was some other option which I forgot.
7            MR. BITTERMAN:  That's the first time
8  that particular question was asked.
9            THE WITNESS:  No, it's not.  Guys,
10  please.
11            MR. CONNELL:  Just answer the question
12  and be done with it.  He's got a right to ask all the
13  questions he wants.
14    Q.    Just answer the question.  I'm not
15  worried about it.  Just answer question.
16    A.    Well, I guess, yeah, that's about it.  If
17  the question is, is that generally what I discussed
18  with my client?  That would be the answer.  As I sit
19  here today could I think of perhaps another option or
20  something?  I maybe could, but that is --
21    Q.    -- what you discussed with him in and
22  around February of 2007?
23    A.    If you guys are telling me the dates and
24  I'm trusting you that those are the dates because I
25  don't have the documents in front of me, but okay --

201

1    Q.    (A) never trust me, (B) I don't have the
2  documents in front of me, and (C) it was
3  February 2007.
4    A.    -- because I don't know the date.  Just
5  could I see that document February of '07?
6            MR. CONNELL:  Yeah, it is February of
7  '07.  You saw it last week.
8            THE WITNESS:  Okay.  Go ahead.
9            MR. CONNELL:  We're talking about the
10  application from the Hunterdon probation.
11    Q.    You ultimately decided that he would
12  execute the release rather than make some application
13  to the Court?
14    A.    Yeah.
15            MR. CONNELL:  For the record, I just
16  showed Mr. Kobin DRA -- is that 2?  At the bottom.
17            THE WITNESS:  Yeah.  DRA-2, Abramowitz.
18            MR. CONNELL:  Here's DRA-3.
19    Q.    And here's your response, DRA-4, just so
20  you'll have them all there.  Your response was in
21  March when you provided the agreement and suggested
22  they withdraw their motion or their application.
23    A.    Okay.
24    Q.    After your discussions with your client
25  in and around February or March of 2007 regarding the

202

1  execution of the release, did your client inquire what
2  effect the release would have?
3    A.    Well, we certainly discussed it.
4    Q.    What did you tell him what effect the
5  release -- what effect it would have?
6    A.    I told him that it's my understanding,
7  that the release is null and void, it's against public
8  policy and it has basically no -- what time frame are
9  were talking about, by the way?
10            MR. CONNELL:  February of '07.
11    Q.    I said February or March of 2007.
12    A.    Oh, yeah, yeah.  I don't believe that
13  this is a meaningful document; however, you know, the
14  defense will make an application to the Court to
15  basically do what we're doing and try to get your case
16  thrown out.  I said that this is an invalid way for
17  the State to have proceeded, that this document is
18  null and void, against public policy, and really a
19  Court should not uphold this document and should not
20  reward the State or the police for the way they
21  behaved in this case, and that is my position, sir,
22  and that's what I told him.  I told him that the -- of
23  course, a judge may not agree with me on that
24  position, and if the judge does not agree, summary
25  judgment may be granted and then we would, of course,

203

1  have to discuss from there whether or not we were
2  going to the Third Circuit.  So I told him that -- you
3  know, that's what we talked about.
4    Q.    And knowing that a judge may determine
5  that the release was in force and effect, he still
6  signed the agreement?
7    A.    Yeah.  He said he couldn't go to a
8  criminal trial because of his family.  If it was just
9  him and he didn't have a family he would not -- he
10  would try the case, but he couldn't because he had
11  kids, his mom and all that stuff.  He couldn't do it.
12  So he understood what was happening to him, that he
13  was having a gun put to his head and he was being
14  treated inappropriately.  He didn't use those words,
15  but he couldn't put his family through a trial.  So he
16  said that, you know, I'm just going to have to hope
17  that -- and I explained to him that the federal courts
18  are -- really the point of the federal court is to
19  deal with civil rights claims to get away from these
20  local interests where civil rights are being violated
21  and to get to a forum where civil rights, you know you
22  can make a good civil rights argument.  And so I
23  discussed all that, the purpose of civil rights law in
24  the federal courts, and I said that's really where we
25  have to go because, obviously, I can't tell you you'll

204

1  get a fair shake in a sense of what goes on in
2  Middlesex County. And that's what occurred. And so
3  he decided based upon those discussions that he would
4  sign the document but still pursue his federal civil
5  rights claims.
6       Q.    Did anybody from this office besides
7  yourself have any conversations with the plaintiff
8  regarding his executing the release in and around
9  February and March of 2007?
10      A.    You know, of real substance in the sense
11  that it would have been the discussion that the client
12  would have utilized. You know, the client will
13  utilize anything he wants to make a decision, so I
14  shouldn't phrase it that way. I guess Susan Reed may
15  have had some discussions with him about the release.
16      Q.    Do you know?
17      A.    Don't know. Well, it doesn't matter. I
18  felt that -- I am going to say why. I felt that I had
19  gone over the whole issue with him, so I didn't say,
20  Did you also talk to Susan Reed about this? because
21  you know, I told him what I thought.
22      Q.    How do associates provide information to
23  you on your files as to what happens regarding events
24  that they cover for you?
25      A.    Comes in all kinds of different ways

205

1  because there's all kinds of different associates at
2  the office.
3       Q.    Then I'll narrow it for you to Susan
4  Reed.
5       A.    Yeah, because she's in kind of somewhat
6  of a unique position in that Susan Reed works with me
7  hand-in-hand to some extent.
8       Q.    Okay.
9       A.    Susan Reed takes notes, so they're either
10  for me to review the notes, there's documents that I
11  can review. She tells me sometimes. I mean every
12  method you can think of is utilized, but except for
13  internal memorandum. You know, like you see "memo to
14  file" in some firms and memo to Bob Kobin.
15      Q.    There are none?
16      A.    There's none of that stuff. Nothing, no.
17      Q.    That's not the way you and she
18  communicate?
19      A.    Correct.
20      Q.    Let's take specifically the court
21  appearance of October 19th, 2005.
22      A.    18th.
23      Q.    I'm sorry. 18th.
24      MR. CONNELL: October 18th, '05.
25      A.    How much more do you have to go?

206

1       (Brief recess.)
2       (Exhibit IKobin-1, handwritten notes,
3  three    pages, is marked for identification.)
4  BY MR STONE:
5       Q.    Mr. Kobin, you've just produced what
6  we've marked as Kobin-1 under today's date which you
7  indicated are the notes from the file from Susan Reed;
8  is that correct?
9       A.    I indicated that these are notes that
10  Susan pulled out of the file last night. Just to be
11  specific, these notes were pulled out last night when
12  me and her looked at the requests you folks made and
13  this is what we pulled out and this is what I reviewed
14  last evening. I really didn't pay attention to the
15  11-4-05.
16      Q.    All I asked is were these the notes from
17  the file?
18      A.    These are notes from the file.
19      MR. BITTERMAN: That was the question.
20      Q.    Are there other notes in the file that
21  you did not produce?
22      A.    I would say yes, there are other notes in
23  the file that are not produced.
24      Q.    I thought we asked for all notes in the
25  file.

207

1       A.    No. You asked for all notes in the file
2  regarding a specific issue and a specific time frame,
3  okay.
4       MR. CONNELL: That's correct. We're not
5  entitled to his notes that deal with things unrelated
6  to this.
7       MR. STONE: Not through March of '07?
8  That's not what we asked for?
9       MR. CONNELL: We did ask for that.
10      Q.    So are these all the notes from the file
11  that deal with the issues of the release and the PTI
12  of the plaintiff from October of '05 through March of
13  '07?
14      A.    Based upon my review, yes. Whether or
15  not Ms. Reed found other notes or not, I don't know.
16      Q.    We'll ask her.
17      Specifically regarding two of the dates
18  we've been discussing, October 18, 2005 and
19  November 9, 2005, are these the notes from Sue Reed
20  regarding those two dates?
21      A.    Yeah. Those are the notes that she
22  showed me last night and I asked her to copy. Again,
23  if she found some other notes, just ask her, okay, but
24  these are what I took a look at. These are what were
25  brought to my attention, okay.

208

1   Q.    Did you take any notes regarding either
2   of those dates?
3   A.    No.
4   Q.    Did you review these notes prior to the
5   November 9, 2005 hearing?
6   A.    Don't specifically recall, but I would be
7   on the side of did not.
8   Q.    Was Sue Reed also at the November 9, 2005
9   hearing?
10  A.    November?
11  Q.    9, 2005.
12  A.    I thought you said December. No, she was
13  not there.
14  Q.    Then who made the notes regarding
15  November 9, 2005?
16  A.    Well, you're suggesting they were made on
17  November 9th, '05.
18  Q.    I didn't. I said who made them? I
19  didn't say when they were made. That's another
20  question.
21  A.    I think that's her handwriting.
22  Q.    Why would she be making notes on a
23  hearing she didn't attend?
24  A.    Because these could be notes from -- and
25  as I understand it, there was some issue about the

209

1   scheduling of the next date, and at some point there
2   was a discussion about different dates that people
3   would be available. So that's what I think that 11/9
4   as the result of a discussion about a date, and then
5   her notes about the next court date as a result of a
6   discussion and I can't remember where -- I think that
7   was maybe even part of the Silva deposition, and I
8   think that that's sort of what she would do. So she
9   can come back and say -- of course nobody checked with
10  me about my availability between the 18th and the 9th.
11  They made sure their calendars weren't interfered
12  with, but that's another issue.
13  Q.    So the notation on November 9th you
14  believe was -- part of it was done on the 18th of
15  October?
16  A.    Makes sense to me, or a subsequent phone
17  call with case management or somebody. I don't
18  believe that could be on the 9th because "9 a.m.
19  status conference".
20  Q.    That's what I'm asking. The very last
21  item on this document that you provided is October
22  18th, 2005 again "completed PTI App". Correct?
23  A.    Yeah.
24  MR. STONE:  Could we just for the record,
25  because you just marked a document, just put down you

210

1   marked the entire document. Did you mark the one with
2   11-4-05? Is that the document that's been marked?
3   MR. CONNELL:  Yes.
4   Q.    The three pages you produced --
5   A.    Starts out with "8-4-05 Bessam Kandil"
6   and the next page is 10 something. I want the --
7   Q.    I didn't ask you to read the document.
8   A.    I want the document on the record.
9   Q.    The document speaks for itself. Whatever
10  it says, it says. Right?
11  A.    Right.
12  Q.    You gave me two pages written -- I'll say
13  it again. Two pages written on two and a half sides
14  was marked --
15  A.    Yes.
16  Q.    -- because that's the way it was
17  photocopied, three photocopied.
18  Regarding October 18, 2005, it says:
19  "PTI dash "but" question mark "waive civil suit"; is
20  that correct?
21  A.    I see that.
22  Q.    When is the first time you read that on
23  her notes?
24  A.    I told you before. You know, you ask
25  questions and I told you before I don't recall reading

211

1   this until I read this yesterday. So that's the only
2   recollection I have of reading this. You asked
3   before. I think you asked before did I read this.
4   Q.    How could I ask before when we just
5   marked the document and you just saw it?
6   A.    Go ahead. I thought you asked whether I
7   saw it before. Go ahead.
8   Q.    Now we know there are notes. Correct?
9   A.    Yes.
10  Q.    And we know they were made by Sue Reed on
11  October 18, 2005 regarding this conference. Correct?
12  A.    Okay, I know that, but we don't know it
13  for the record yet, but go ahead.
14  MR. CONNELL:  You recognize her
15  handwriting? That's her handwriting?
16  THE WITNESS:  Absolutely. I assume she
17  did it at the time of the status conference, but go
18  ahead.
19  Q.    And do you have a recollection of Sue
20  Reed telling you that the waiver of the civil suit was
21  a condition of PTI?
22  A.    I have a recollection, as I've testified
23  to, that I was told something about that prior to
24  November 9th.
25  Q.    Is this an unusual request, waiver of a

Case 2:06-cv-04701-DMC -MF   Document 99-14   Filed 01/07/10   Page 21 of 47 PageID: 4560

KANDIL v. YURKOVIC, et al.                                    Testimony of R. RABIN, ESQ. 6-2-09

212

1   civil suit for PTI?
2        A.    Yes. Unusual is your word. Mine is
3   unheard of, but go ahead.
4        Q.    Well, whatever word you want to use, is
5   it something so out of the ordinary that Sue Reed
6   would tell you immediately that that is a requirement
7   for PTI in the Kandil matter?
8        A.    She did tell me.
9        Q.    Did she tell you the day it occurred,
10  October 18th?
11       A.    I don't have a recollection of her
12  telling me that day, but she did tell me.
13       Q.    Tell me exactly what you remember to the
14  best of your recollection as to what she told you
15  regarding the requirement for a waiver of the civil
16  suit regarding PTI?
17       A.    I don't — you know, to go into what I
18  remember, I simply remember that there was some
19  discussion about that as a condition of PTI. My
20  recollection is it happened on the 8th.
21       Q.    Did at any time in your entire career
22  handling criminal litigation have you ever been
23  requested to have a waiver of a civil suit for entry
24  into PTI before?
25       A.    No.

213

1        Q.    And even though this is the first time
2   it's ever occurred, this specific discussion doesn't
3   stay in your memory?
4        A.    No, no, no. It absolutely does stay in
5   my memory, okay. The specific discussion in the sense
6   of I don't remember what she said to me. I know what
7   my reaction was.
8        Q.    Did you react by saying why did you wait
9   until the 8th to tell me about this, it's so unusual?
10       A.    No, no, no, because I didn't react that
11  way. I didn't react that way. I probably had a
12  pretty strong reaction, but I didn't react that way.
13  I didn't put any blame on her for that, for what they
14  were doing.
15       Q.    Would you agree — since we all agree
16  that the document speaks for itself — that there's no
17  reference as to who suggested the waiver of the civil
18  suit regarding PTI in Sue Reed's notes?
19       A.    First off, I don't know that this
20  document speaks for itself. You would have to ask Sue
21  Reed where you get to this document speaking for
22  itself because these are handwritten notes. So that
23  would be something you would have to discuss with her
24  as far as that goes.
25            Now, the document does say what the

214

1   document says, but you can't compare this document to
2   a court transcript, I don't think. But you know, do
3   whatever you want to do.
4        Q.    Now try and answer my question. Is there
5   anywhere referenced in the document as to who
6   suggested you just —
7        A.    Read the question back. I want the
8   original question read back.
9            (The following question is read back by
10  the Reporter:
11            "QUESTION: Would you agree — since we
12  all agree that the document speaks for itself —
13  that there's no reference as to who suggested
14  the waiver of the civil suit regarding PTI in
15  Sue Reed's notes?")
16       A.    All right. I don't agree that you can
17  say a document like this speaks for itself.
18       Q.    We went through that already.
19       A.    I'm going to answer the second part of
20  the question, sir.
21       Q.    Why didn't you answer it the first time?
22       A.    I am answering the first part. I do not
23  agree that this type of document can be classified as
24  one that speaks for itself. I do agree that the
25  document says "dash waive civil suit."

215

1        Q.    Now answer the second part of the
2   question.
3            MR. CONNELL: Well, it actually says,
4   "PTI dash but" question mark with a dash
5   underneath "waive civil suit."
6            THE WITNESS: Right. Well, it actually
7   has two little lines, an arrow, "PTI", a dash "but",
8   that appears to be a question mark with two dots under
9   it, another dash underneath "waive civil suit" with
10  some sort of mark next to that, and underneath a dash
11  with nothing next to it.
12       Q.    Now show me who suggested waiver of the
13  civil suit on the notes?
14       A.    It does.
15       Q.    Does what?
16       A.    I don't know. Could I just read the
17  notes?
18       Q.    Sure. You haven't read them yet?
19       A.    I've read them, but when you use the
20  words "suggest" that opens up a whole issue because of
21  the form of your question. So I have to now read this
22  and sparse this to see if there's any suggestion of
23  who suggested that it be — that the civil suit be
24  waived.
25       Q.    I suggest you read it then.

216

1    A.    Because that question entails a great
2  deal of interpretation.
3          Well, this suggests to me that the
4  prosecutor may have suggested.
5    Q.    What in this document, Kobin-1, suggests
6  that the prosecutor suggested the waiver of the civil
7  suit?
8    A.    Well --
9    Q.    Just point it out to me.
10   A.    No, no, no, no, no.  Let me answer the
11 question.  What in this document suggests that to me?
12   Q.    That's what I just said.
13   A.    Which I will use my experience and
14 knowledge to interpret this document.  Prosecutor will
15 consent to application.  I've never been involved
16 really in a situation where a judge suggests -- gets
17 involved in any of these, getting rid of civil
18 lawsuits.  So my only way to interpret this without a
19 whole bunch of other information that's flying around
20 here is to say it was the prosecutor.  So this
21 document, if I just read this document without some of
22 the other things I've taken a look at, I would say
23 that the prosecutor's going to consent to
24 application --
25         MR. CONNELL:  It says "apply".

217

1  "Prosecutor will consent to apply."
2          THE WITNESS:  Right.  Consent to
3  application.
4          MR. STONE:  Let him finish his answer.
5    A.    And interpret that to mean consent to
6  application, that it would have been the prosecutor
7  who suggested the waiver of the civil.  So that's how
8  I would interpret all of what is written here.  So
9  these words, in my experience, would suggest that the
10 prosecutor was the one that brought that up.
11   Q.    Did you ask Sue Reed if the prosecutor
12 brought it up?
13   A.    Up until today, yes, I have asked her
14 that.
15   Q.    No.  I'm talking about between
16 October 18th and November 9th of 2005.
17   A.    No, I wouldn't have.  I would not have.
18   Q.    Did you have any conversation with Sue
19 Reed prior to you appearing in court on November 9,
20 2005 regarding the PTI application?
21   A.    Yes.
22   Q.    Part of that conversation include mention
23 of a waiver of a civil suit?
24   A.    Between the 18th and the 9th, yes.
25   Q.    And did you ask Sue Reed who suggested

218

1  the waiver of the civil suit?
2    A.    No.
3    Q.    Did she tell you without being asked who
4  suggested the waiver of the civil suit?
5    A.    You know, I can't -- I wouldn't have
6  asked the question.
7          MR. CONNELL:  That's not the pending
8  question.
9    A.    No, no, no.  Just let me do my thought
10 process.  I wouldn't have asked that question.  Did
11 she volunteer?  I don't recall her volunteering that
12 information.
13   Q.    I don't know if you want to use the word
14 volunteer.  Did she tell you who suggested the waiver
15 of the civil suit in your conversations with her
16 between October 18th and November 9th of 2005?
17   A.    I don't have a recollection of that.
18   Q.    Does Kobin-1 set a status conference for
19 November 9, 2005?
20   A.    Kobin-1 suggests or has some implication
21 in it that there is a 9:00 a.m. status conference on
22 11-9-05 on the third page on these copies.
23   Q.    Can you read -- because I cannot -- the
24 next line after that, "if" something?  I can't.  Do
25 you see where it says "9:00 a.m. status conference"?

219

1          MR. CONNELL:  Next line.
2    Q.    The next line.
3    A.    "If" something "a".
4    Q.    "Res"?
5    A.    "Will execute".
6    Q.    Yeah.  Do you know what that says?
7    A.    No, I don't.
8    Q.    The next line does that say "if not will
9  hear PTI appeal"?
10   A.    Yes, that's how I read that line.  You're
11 saying if that's what it says.  That line I think I
12 can read, "if not will hear PTI appeal."
13   Q.    That's what you read it to be as well?
14   A.    Yes.
15   Q.    Does Sue Reed have to check with you
16 regarding new conferences that are scheduled to check
17 your availability?
18   A.    I like to think so.
19         MS. O'CONNOR:  Are you alone in that
20 thought?
21         THE WITNESS:  I think sometimes I am
22 alone in that thought.  I think my time is committed
23 by people here sometimes when it shouldn't be
24 committed.
25   Q.    Did you ever, between October 18th and

Case 2:06-cv-04091-DMC -MF   Document 99-14   Filed 01/07/10   Page 23 of 47 PageID: 1562

KINBIR V. TURKOVIC, et al.                          Testimony of D. KOBIN, ESQ. 6-2-09

220

1    November 9th of 2005, ask Sue Reed what that line says
2    that we cannot read?
3        A.    Oh, no, I did not, which is why I said
4    before I would lean to the side of I didn't see these
5    notes. It's one of the reasons I said that. I don't
6    have a recollection of seeing these notes before last
7    night.
8        Q.    And you have no recollection of what Sue
9    Reed told you in your conversation between
10   October 18th and November 9th of 2005 regarding the
11   waiver of civil suit. Correct?
12       A.    Well, I don't know what she said to me.
13   I know when she said something to me about it how I
14   responded.
15       Q.    That's not what I asked. What I asked is
16   you don't remember what she said to you.
17       A.    I don't remember the words that she used.
18       Q.    To your knowledge, are there more notes
19   on the file from October 18th, 2005 through March of
20   2007 when the release was finally executed?
21       A.    Are there more notes?
22       Q.    Notes. Sue Reed's type of notes.
23       A.    There may be during that period of time.
24       Q.    Did you look in the file to see whether
25   there were?

221

1        A.    I flipped through the file to look for
2    notes, phone messages, et cetera, but I was focused on
3    some specific type of notes. So I'm sure there are --
4    I'm pretty sure there's some other type of notes in
5    there between those dates.
6            MR. CONNELL: Let's go off the record.
7        A.    If you let me finish what I'm saying,
8    there's notes up through March 7th. There are other
9    notes. It's not my understanding based upon my
10   discussion with Sue Reed and based upon my review of
11   the file that they deal with this topic.
12           MR. CONNELL: Including after receipt of
13   the February '07 notes from the Hunterdon County
14   Probation Department until you do your letter there's
15   no notes in those two months, February of '07 and
16   March of '07?
17           THE WITNESS: Well, that would be
18   correct, Mr. Connell.
19   BY MR. STONE:
20       Q.    Does anyone besides yourself and Sue Reed
21   work on this file?
22       A.    Other than clerical staff, I would say
23   no.
24       Q.    The only two people that would have made
25   notes in the file were either you or Sue Reed?

222

1        A.    Well, clerical staff takes phone
2    messages, et cetera, but anything that's real -- you
3    know what I mean -- of substance would be me or Sue
4    Reed.
5        Q.    And you already indicated you were not a
6    note taker; that's not the way you handle things?
7        A.    I'm generally not a note taker in the
8    context we discussed here.
9        Q.    Well, I would request at least you look
10   and see if between the 18th of October 2005, which is
11   the date of the document produced through I guess it
12   would be March 7, 2007, which I think is when --
13           MR. CONNELL: March 20th.
14       Q.    -- March 20th when the release was
15   finally sent if there are any other notes in the file
16   that relate to the release, I'd like those produced.
17       A.    All right. I can tell you gentlemen --
18       Q.    And lady.
19       A.    And lady. Folks. There is probably
20   research notes in there, because if you take the time
21   frame of this -- and I'm not giving those to you
22   guys -- but if you take the time frame of all of this
23   then there was a lawsuit filed in, I think, October of
24   '06. So there's research notes and things of that
25   nature in there. We were probably involved in some

223

1    sort of preliminary steps in the litigation. So
2    there's some notes in there to that effect. So those
3    are the type of notes that I saw when I looked
4    through.
5            MR. CONNELL: Mr. Kobin, we're not
6    concerned about your research. We want to know
7    whether or not there's any notes in there concerning
8    phone conversations that you or any member of your
9    staff had with Marcia Silva or any other prosecutor's
10   representative in November '05, in December '05 up to
11   and including March of '07 that deals with the
12   execution and release and hold harmless agreement.
13           THE WITNESS: I didn't see any.
14           MR. CONNELL: Or between the two of you.
15           THE WITNESS: I didn't see any notes or
16   she didn't bring any to my attention that dealt with
17   those subjects, okay. So who's up?
18           MS. O'CONNOR: I don't know if he's done.
19           MR. SPAGNOLA: Did we have the
20   transcript of the 10-18-05 marked?
21           MR. CONNELL: We have marked it
22   previously.
23           MS. O'CONNOR: It is DMS-2.
24           MR. CONNELL: I'll give him a copy of it.
25

KANDIL v. YURKOVIC, et al.                                              *Testimony of R. KOBIN, ESQ.* - 6-2-09

---

**224**

1    CROSS-EXAMINATION BY MR. SPAGNOLA:
2        Q.    Mr. Kobin, the transcript of the
3    proceedings before Judge DeVesa on October 18th, 2005
4    have been marked previously as Defendant's Exhibit
5    DMS-2.
6        A.    Yes.  Go ahead.
7        Q.    We've talked about that.
8        A.    Yeah.
9        Q.    Do you see on the bottom of Page 5 after
10   the Court stated on the record "Then why don't we
11   conference this matter if you don't mind and maybe I
12   can be brought up-to-date myself?"  There's a
13   reference at the bottom of Page 5 that there was a
14   recess.
15       A.    Yes.
16       Q.    And then on Page 6, top of Page 6 the
17   Court -- it says "court resumes" and then they go back
18   on the record.
19       A.    Yeah.  I got all of that.
20       Q.    Okay.  Did you discuss with Susan Reed if
21   that hiatus in the transcript occurred in that there
22   was something that occurred in Judge DeVesa's chambers
23   between her and Marcia Silva and the Court?
24       A.    Yes.
25       Q.    Did you discuss with her what went on

**225**

1    during that conference?
2        A.    Yes.
3        Q.    Do you recall what you discussed about
4    what went on during that in-chambers conference with
5    Judge DeVesa?
6        A.    Do I recall what was discussed between
7    her and I?
8        Q.    Right.
9        A.    Yes, generally speaking.
10       Q.    Did she tell you what occurred in the
11   in-chambers conference with Judge DeVesa?
12       A.    Well, this discussion happened.
13       Q.    Is it yes or no?
14       A.    Do I recall -- say it again.
15             MR. CONNELL:  Did she tell you what
16   happened?
17       Q.    Did she tell you what was discussed?
18       A.    As the best she could recollect she told
19   me what her recollection was, in conjunction with
20   looking at this, what her recollection was.
21       Q.    Did she tell you she took any notes of
22   what occurred during the in-chambers conference with
23   Judge DeVesa and Marcia Silva?
24       A.    I think that what -- based on my
25   discussions with her, unless I'm incorrect -- is these

**226**

1    10-18-05 notes.  If you look on the left-hand side
2    where it says "conference".
3        Q.    Yes.
4        A.    And those lines.
5        Q.    Which lines?  The lines above and below
6    the "conference"?
7        A.    She explained to me how she takes her
8    notes.  This, I think, conforms to your pages.
9    Recess, the line.
10       Q.    The long line above "will allow app for
11   PTI"?
12       A.    Yes.
13       Q.    And the line under it is back on the
14   record?  Did she tell you that?
15       A.    She didn't put it in those words, but
16   that's what that -- I'm only putting in those words
17   now because of you with the transcript.
18       Q.    Okay.  What is your recollection of what
19   she told you she recollected that occurred during that
20   conference?
21       A.    Generally, what it was they went back in
22   there, there was some discussion about PTI
23   application, what had been going on in the case, and
24   that there would be this PTI application, I guess
25   Silva would check with her people to see what was

**227**

1    going on, you know, to see if they would do it.
2    Somebody in the chambers -- I'm not sure whether she's
3    sure today whether it was DeVesa or Silva or Silva
4    first then DeVesa, but there was a discussion about
5    waiving of a civil suit in chambers.
6        Q.    Well, above the -- you'll agree after
7    having read -- strike that.  The section of the notes
8    that you've just referred to it says "c-o-n-f" and
9    there's a big line above it and --
10       A.    Right.
11       Q.    You think that might be her notes of what
12   occurred in chambers.  Correct?
13       A.    Right.
14       Q.    Then do you believe that the notes that
15   occur above the big line starting with "10-18-05
16   status conference" on down is her notes, Ms. Reed's
17   notes of what occurred when they were in court --
18       A.    Well --
19       Q.    -- and was on the record?
20       A.    I'm looking -- no, because I'm looking at
21   the record.
22       Q.    We know the record doesn't have any
23   reference to --
24       A.    See --
25       Q.    Excuse me.  Let me just finish the

*KANDIL v. YURKOVIC, et al.*                                    *Testimony of R. KOBIN, ESQ. - 6-2-09*

---

228

1 question. You know that the record doesn't contain
2 any reference to a condition of PTI being a waiver of
3 the civil suit. Correct?
4    A.    Correct.
5    Q.    Okay. And the notes, Ms. Reed's notes of
6 that conference clearly have a reference to PTI in
7 conjunction with a waiver of the civil suit. It does
8 say "PTI" hyphen "but" question mark, line under that,
9 "waive civil suit".
10    A.    Right. And I would look at this and
11 say -- which I haven't done because I haven't looked
12 at it in that context -- now I would say well, why --
13 because that waive civil suit's up there, why isn't it
14 down here in conference? I don't think anybody in
15 this case disagrees that -- well, maybe they do, I
16 don't know, I wasn't there. I don't know. You know,
17 you would at least -- I thought at this point that at
18 least whoever suggested it, this waiver of civil suit,
19 it was suggested in that conference.
20    Q.    In the chambers?
21    A.    In chambers.
22    Q.    Not on the record. Correct?
23    A.    I don't know if --
24    Q.    There is no record of this, is there? I
25    A.    Exactly. It couldn't be on the record, I

229

1 don't know, if they were in the hallway.
2    Q.    There's no stenographic record --
3    A.    Right. We all agree.
4    Q.    -- that reflects the fact that what was
5 discussed was the waiver of the civil suit or
6 execution of a release and hold harmless agreement as
7 a condition of your client's entry into PTI. Correct?
8    A.    I guess that if there was maybe I
9 wouldn't have been here for all this time, but I
10 haven't found one, and no one's told me about one, and
11 you gentleman, I'm sure if you had one would have
12 shown it to me. So we can all agree there is no
13 stenographic record that exists.
14    Q.    Do you attach any significance to the
15 fact that to the left of the words there's an arrow
16 "PTI but" question mark "waive civil suit", there's a
17 double line there that runs up and down?
18    A.    Yeah, the old double line.
19    Q.    Do you attach any significance to it?
20    A.    Maybe --
21    Q.    I'm sorry.
22    A.    Maybe Susan Reed does.
23    Q.    We'll have to ask her.
24          Do you have any recollection of Susan
25 Reed telling you -- and bear with me if this was asked

230

1 because I probably zoned out -- that Sue Reed told you
2 that the condition of the waiver of the civil suit --
3 the waiver of the civil suit as a condition of entry
4 into PTI was discussed in chambers between her and
5 Marcia Silva and Judge DeVesa?
6    A.    Between the 18th and the 9th I don't have
7 recollection of having that type of specificity with
8 respect to this condition. It's only since then that
9 I have information pertaining to the specifics of what
10 was discussed and who suggested, okay.
11    Q.    All right. So we know that at least the
12 notes, Sue Reed's notes about that "PTI" hyphen "but"
13 question mark "waive civil suit" do not appear on the
14 transcript of the proceeding before Judge DeVesa on
15 October 18th, '05. We're all in agreement with that?
16    A.    Yes.
17    Q.    Is there any discussion about a trial
18 date in January or February in the transcript of the
19 proceeding before Judge DeVesa on October 18th, '05?
20    A.    Well, you know --
21    Q.    Specifically.
22    A.    Specifically, I don't see January,
23 February mentioned, but when I see looking to "hear
24 motion on the third week of December" I know where
25 this whole thing's going, you know.

231

1    Q.    But on Susan Reed's notes that we've
2 marked as Kobin-1, there is a reference to a "trial"
3 period "January or February", is there not? And those
4 appear across from the word "conf" with the big line;
5 is that right?
6    A.    Yeah. You guys are giving me less and
7 less confidence in this transcript or the notes or
8 both.
9          MR. CONNELL: Certainly the notes.
10    Q.    We'll get to that in a minute. There's
11 another entry, I'll call it above the big line, below
12 the date of October 18th, '05 and above the big line.
13 It says -- it looks like it's the third entry, if you
14 would. It's below "PTI" hyphen "but waive civil
15 suit". It seems to say there's an arrow "pretrial",
16 maybe that word is "hearing", and I suggest it's
17 within, the "W" slash is within and then "1 MO",
18 month. Do you see that on the notes? It's on the
19 page you just flipped up, right above "trial".
20    A.    "Pretrial hearing within", okay, if
21 that's one month, that makes some sense.
22    Q.    Can we agree that there's no reference in
23 the transcript of the hearing on 10-18-05 to a
24 pretrial hearing within one month?
25    A.    Okay.

Case 2:06-cv-04701-DMC -MF    Document 99-14    Filed 01/07/10    Page 26 of 47 PageID: 1565

KANDIL v. YURKOVIC, et al.                                                Testimony of R. ROBIN, ESQ. - 6-2-09

232

1    Q.    Can we agree on that?
2    A.    Well, no, I'm not -- you got to be a
3    little bit careful on what you mean by pretrial
4    hearing. Oh, this is the 9th? I'm not sure what kind
5    of date he's setting. See, he's got something on
6    November 18th to filing motions. I get confused by
7    these new court rules. You know what I mean?
8    Q.    I understand. But the question is this:
9    Is there any reference, do you see anything in the
10   transcript of the October 18th,'05 hearing that
11   specifically makes reference to a pretrial hearing
12   within one month?
13   A.    The phrase is not used. There is a date
14   in there for November 18th.
15   Q.    And the purpose for my question is that
16   if those references that I just read to you -- strike
17   that. The references in Ms. Reed's notes, "PTI"
18   hyphen "but" question mark "waive civil suit",
19   "pretrial hearing within one month", "trial January or
20   February", since they don't appear in the transcript
21   of October 18th, that those are items that were
22   discussed during the -- what was referenced as a
23   recess that would have taken place in Judge DeVesa's
24   chambers between Judge DeVesa, Ms. Reed, and Marcia
25   Silva?

233

1    A.    I can't answer that since I really wasn't
2    there. There is a November the 18th to file any
3    motions, and I'm not sure under these court rules, but
4    you know what? I lost track long ago about all these
5    pretrial status conferences. There's a reference to
6    be in court in a month. There's a reference to a
7    December date. There's absolutely no reference -- I
8    think there's two December dates kicked around. There
9    is absolutely no reference in here, in this
10   transcript, to a January or February date which, you
11   know, which I find somewhat unusual for this type of a
12   conference, but maybe the judge --
13   Q.    Well, it may be unusual, but the fact
14   that those references appear in Ms. Reed's notes and
15   the references don't appear in the transcript and
16   there is some conference that took place it looks like
17   in Judge DeVesa's chambers which there is no record
18   that those items would have been discussed in chambers
19   with Judge DeVesa?
20   A.    You're really going to have to ask her.
21   Q.    Well, we will.
22   A.    Because if you look on these notes, it
23   says "hearing on motions in third week of December".
24   That's almost like a quote from the transcript.
25   MR. CONNELL: Yeah. After the recess all

234

1    of those things are revealed including the dates of
2    December where they're crossed out because you can see
3    several -- they're talking about those dates and
4    they're crossing them out when somebody's not
5    available on those dates and they come up with
6    November 9th.
7    A.    But I'm saying obviously, she goes down,
8    she got "hearing on motions in third week of
9    December." That's right out of the transcript.
10   MR. CONNELL: Right after the recess.
11   A.    And down at the bottom of that -- yeah, I
12   understand what you're saying, but you know, you're
13   going to have to ask her. But these are notes, guys.
14   So you're going to have to ask her. Does it make
15   sense that maybe that was said in a conference? But
16   why would a judge be talking about that in a
17   conference when, at least the overview I'm getting or
18   the flavor I'm getting after reading this and going
19   through all this nonsense was that the judge wasn't
20   really in conference talking about trial. That's the
21   flavor I get, but then he says trial.
22   Q.    Twice. There's a reference to a trial
23   January or February. Right?
24   A.    Yeah. So I have no idea what it is.
25   MR. SPAGNOLA: That's all I have.

235

1    MS. O'CONNOR: Are you finished, Mike?
2    MR. STONE: Yes.
3    CROSS-EXAMINATION BY MS. O'CONNOR:
4    Q.    Susan Reed is an associate here?
5    A.    Yes.
6    Q.    And you're a partner here?
7    A.    Yes.
8    Q.    And Susan Reed worked on this file under
9    your direction?
10   A.    Well, yes, that's correct.
11   Q.    Do you know whether or not your client
12   had any conversations with anyone in the Hunterdon
13   County Probation Department where he told them he
14   signed a release?
15   A.    I don't know that one way or another.
16   Q.    Okay. Did you do the actual research on
17   release dismissal agreements and their validity or did
18   you have Susan Reed do it?
19   A.    It depends on what you mean by that.
20   What generally she would do, I would have an idea and
21   I would say take a look at this, and then she would
22   give me something. I would say pull up this, the
23   mechanics of it definitely are done by her. Some of
24   the reading is done by her. The writing is done by
25   her. So she would pull things and I would say this,

**236**

1  this or this and then proceed. So I don't know how
2  you define it, you know.
3      Q.    So she'd do the actual preliminary
4  research, present it to you, you would read it, have
5  perhaps more ideas on what other cases she should look
6  at, she would go get the other cases and you would
7  read the entire thing. Correct?
8      A.    Yeah, if I felt like reading the entire
9  thing, but, you know.
10     Q.    And is that what happened in this case?
11     A.    What happened in this case is I had my
12  idea and she might have had her own ideas, some I'm
13  sure she did about when this was initially discussed,
14  what it was about. I was generally aware of an ethics
15  opinion. I did some preliminary research, I think
16  it's the Rumery case that I recall reading early on.
17     Q.    And that would be in September of '06
18  which is what you testified to?
19     A.    No, no, no. Earlier on than that.
20     Q.    When did you read the Rumery case?
21     A.    I don't recall, but it was sooner than
22  September of '06.
23     Q.    In relation to November of 2005 and the
24  filing of the complaint in October of 2006, when did
25  you read the Rumery case?

**237**

1      A.    That's what I can't -- I don't know. I
2  don't know if it was -- and I'm using the 9th as a
3  demarcation point -- I don't know if I read it before
4  the 9th or after the 9th.
5      Q.    You don't know if you do any research
6  before November 9th, 2005?
7      A.    Depending on how you define "research".
8      Q.    Did you read the Rumery case before
9  November 9th?
10     A.    I just told you that's what I can't tell
11  you.
12     Q.    Because you just don't have a
13  recollection?
14     A.    I can't tell you I read the Rumery case
15  before November 9th of 2005.
16     Q.    Do you have any research that you did do
17  relative to the release dismissal agreement? Is that
18  contained in your Kandil file?
19     A.    Not the early research and not the Rumery
20  case because the Rumery case I read early on so.
21     Q.    But when you're saying "early on", are
22  you talking about in terms of this case or are you
23  talking about in terms of your career?
24     A.    In terms of this case.
25     Q.    And when you say "early on", was it prior

**238**

1  to November of 2005 or after?
2      A.    I'm using November 9th as my demarcation
3  point, so I don't know if I read it before November
4  9th or after November 9th.
5      Q.    Did you ever have a discussion with
6  either Judge DeVesa or with anyone from the
7  prosecutor's office concerning the Rumery case?
8      A.    Ever?
9      Q.    Ever.
10     A.    Certainly not before November 9th, that I
11  know. I don't recall -- I had a few discussions, at
12  least one discussion with Abramowitz. I may have had
13  two discussions with Abramowitz.
14     Q.    And that was after November 9th of 2005?
15     A.    No. I think I had a discussion with
16  Mr. Abramowitz somewhat earlier during the course of
17  the criminal case.
18     Q.    When you had the conversation with
19  Mr. Abramowitz which you believe happened prior to
20  November 9th of 2005, did you have a discussion with
21  him at that time about release dismissal agreements
22  and your legal research whether or not it included the
23  Rumery case?
24     A.    No. There was no discussion up to that
25  point about this topic. I mean it was in the early

**239**

1  stages of the criminal litigation.
2      Q.    But I'm only interested in the early
3  research with respect to release dismissal agreement.
4  Did you have any discussions with Mr. Abramowitz or
5  anyone in the Middlesex County Prosecutor's Office
6  concerning your research of release dismissal
7  agreements?
8      A.    I certainly did not have that discussion
9  with DeVesa. I certainly didn't have that discussion
10  with Silva. Or did I mention something along the
11  lines of ethics or the Rumery thing with Abramowitz at
12  some point? I don't recall. I'm giving you the
13  different flows and I'm giving you the one I recall.
14  I had a somewhat heated discussion with
15  Mr. Abramowitz.
16     Q.    But you just don't have a recollection
17  whether or not it included your research on release
18  dismissal agreements?
19     A.    Yeah, you know, it probably -- I don't
20  even know if it included the topic of a -- I don't
21  know whether it even included the topic of the general
22  ethics or general voidability of this agreement. I
23  can't tell you that.
24     Q.    You don't remember?
25     A.    Right.

240

1   Q.   Okay.
2   A.   Right.
3   Q.   That's fine.
4   A.   I don't want you now to just be specific
5   to Rumery because I don't even call it covering the
6   general topic.
7   Q.   Do you have e-mail in this office?
8   A.   Yeah, of course we do.
9   Q.   Do you and Ms. Reed communicate by e-mail
10   and have you done so relative to this case?
11   A.   No and no.
12   Q.   Therefore, any discussions you would have
13   had with Ms. Reed -- sorry -- any information you
14   would have obtained from Ms. Reed would have been
15   orally?
16   A.   Can't say that.
17   Q.   You told us you don't remember reading
18   these notes before November 9th of 2005.
19   A.   Correct, I don't remember reading the
20   notes.
21   Q.   So the only way you received information
22   relative to this release dismissal agreement was in
23   her conversation with you; is that right?
24   A.   I don't think the two necessarily follow.
25   I don't remember reading the notes.  I remember some

241

1   of this information, having this information prior to
2   November 9th of '05.
3   Q.   Yes.
4   A.   Whether I received that by flipping
5   through notes when I got that from her.
6   Q.   You said that she had a conversation with
7   you between October 18th and November 9th.
8   A.   Of course she did.
9   Q.   Okay.  That's what I'm saying.
10   A.   Yes.
11   Q.   Okay.  And that's the only way you got
12   the information.  Right?
13   A.   Look, I don't recall looking at these
14   notes.
15   Q.   Fine.
16   A.   That doesn't exclude the fact that I
17   looked at these notes.
18   Q.   Did you have any discussions with Marcia
19   Silva between October 18th and November 9th of 2005?
20   A.   The answer is no.
21   Q.   Did you have any discussions with your
22   client, Mr. Kandil, between October 18th and
23   November 9th of 2005?
24   A.   I had a discussion with him on
25   November 9th.

242

1   Q.   Prior to November 9th.  Between
2   October 18th and --
3   A.   I don't think I did.
4   Q.   When pretrial was denied on October 31 of
5   2005, do you know whether Mr. Kandil spoke with Ms.
6   Reed about that denial of the PTI application?
7   A.   I think they spoke, yeah.
8   Q.   Do you know what was said during that
9   conversation?
10   A.   Not exactly, no.  I'm sure he was
11   informed that they had denied PTI.
12   Q.   Well, he had been informed that by
13   receiving the letter, but the conversation is what I'm
14   really after.  Do you know what was said during that
15   conversation?
16   A.   Well, you know, you're ask -- there's a
17   standard thing; you say you've been rejected from PTI,
18   we have a court day for the 9th, we have to see if the
19   prosecutor.  So do I know -- I don't suppose she
20   talked to him about, you know, what he had for dinner.
21   There's a standard thing that we all say and I mean, I
22   don't know.
23   Q.   I appreciate that there's a standard
24   thing that you all say.
25   A.   I wouldn't ask her when there's a

243

1   standard thing what she said to the client.  I assume
2   she said what any one would say.
3   Q.   Okay.  Did she tell you what she had said
4   to him?  I just want to know if you have any factual
5   knowledge as opposed to making assumptions as to what
6   was said to the client.
7       MR. CONNELL:  And what his reaction might
8   have been.
9   A.   I don't know.  I don't know what exactly
10   she said to Mr. Kandil.
11   Q.   What --
12   A.   But just let me -- when you say do I have
13   any facts or do I have any basis --
14   Q.   I haven't even asked for the facts and
15   basis yet.
16   A.   That's how you premise it and I have to
17   say, you know, she's an attorney.  That's what -- this
18   is what attorneys say.  If you just stuck with what
19   did she say to you?  It makes life simple.
20   Q.   You're confusing me with other people.  I
21   have not asked you about facts or basis yet.
22   A.   Go ahead.
23   Q.   Between October 31 of 2005 when the PTI
24   was dismissed and November 9th of 2005, did you have
25   any conversations with Ms. Reed concerning

Case 2:06-cv-04701-DMC -MF   Document 99-14   Filed 01/07/10   Page 29 of 47 PageID: 1596

KANDIL V. YURKOVIC, et al.                                        Testimony of R. Cosby 6-2-09

244

1   conversations that she may have had with Mr. Kandil?
2       A.    Between October 31st when PTI was denied?
3       Q.    Yes.
4       A.    First of all, I think you need to get Ms.
5   Reed -- you know, I should get our thing in the file
6   because I think she pointed out to me last night when
7   we received that document and I think it was like the
8   2nd perhaps.
9       Q.    Fine.
10      A.    So between -- so we get it on the 2nd.
11  Now that's the denial from probation?
12      Q.    Correct.
13      A.    On the 2nd of November. Now there's
14  seven days that go by when I need -- that basically
15  he's out, all right. So then we need to know -- we
16  don't know then if anybody's doing PTI at all, okay.
17  At least I don't. You can ask Susan Reed what her
18  impression was. Then you got this 11/9 date. So
19  somewhere in here there's something done at the
20  prosecutor's office which, you know, we kind of know
21  what it is and we kind of assume what it is, there's
22  some testimony to what it is, but that occurs in here
23  which is then told to us as to what that determination
24  is. If you take a look at the letter on the 9th,
25  they're literally handed a letter on the 9th. So do I

245

1   recall something on the 8th? Yes, maybe there was
2   some communication on the 8th but, you know, that's
3   the time frame. So between the 2nd and the 9th --
4   what do you want to know?
5       Q.    You ready?
6       A.    Yeah.
7       Q.    Okay. Good. From the time that you
8   received the denial of the PTI to November 9th of
9   2005, did you have any discussions with Susan Reed
10  concerning what she may or may not have said to
11  Mr. Kandil?
12      A.    In that time frame?
13      Q.    In that time frame, that's it. That's
14  seven days.
15      A.    No.
16      Q.    Okay.
17      A.    I just don't recall having any.
18      Q.    Between November 2nd and November 9th of
19  2005, and November 2nd is the -- I think the date
20  we're using for the denial of PTI?
21          MR. CONNELL: His receipt of the denial.
22      Q.    Yeah. Did you have any discussions with
23  Susan Reed concerning any conversations that she may
24  have had with the Middlesex County Prosecutor's Office
25  concerning what action they were going to take?

246

1       A.    Give me the dates again; November 2nd and
2   the 9th?
3       Q.    November 9th. Seven days.
4       A.    Yes, I recall there being a discussion on
5   the evening of the 8th. That's my recall, that there
6   was a discussion on the 8th.
7       Q.    That you had a discussion on the 8th with
8   Susan Reed and she said to you that they were going to
9   make a condition of PTI that they waive the civil suit
10  and you said, "yeah, right"?
11      A.    I don't know if it was that strong from
12  her or it was more like they're talking about this
13  condition or they're going to make it part of it or --
14  but that came to my attention, that concept, on the
15  8th.
16      Q.    Did you ever learn from her any other
17  information other than what you've already told us --
18  in other words --
19      A.    After?
20      Q.    No. During that week before
21  November 9th, 2005.
22      A.    I've tried to relay to you what I recall.
23      Q.    Okay.
24      A.    That's what I've tried to do.
25      Q.    That's it. That's all I'm trying to do.

247

1       A.    Yeah, that's all I can -- if I recall
2   something else, I'll let you know.
3          MR. BITTERMAN: I just want to clarify.
4   By November 8th you knew the prosecutor had, in fact,
5   overruled the program and was going to admit your
6   client to PTI. You did testify to that previously.
7   Correct?
8          THE WITNESS: I would say that that is my
9   best recollection that I knew that.
10         MR. BITTERMAN: Okay, counsel.
11  BY MS. O'CONNOR:
12      Q.    Do you know whether or not Ms. Reed makes
13  prep notes? In other words, prior to going on an
14  appearance, she reviews the file and writes notes to
15  herself concerning important dates or dates she wants
16  to communicate to the Court?
17      A.    Yeah. It depends on what the appearance
18  is, but yes, I think she does. I think if she's going
19  to an argument, I think that's what these handwritten
20  four things might be. I don't know.
21      Q.    You've seen prep notes in the file from
22  Sue Reed. Right?
23      A.    I've seen her do prep notes for
24  various -- for motions that she's going to go on or
25  for deps that she's going to take, things like that.

248

1   Q.     How was it decided that Ms. Reed would be
2   going on the October 18, 2005 conference?
3   A.     No, I would say it's more that would be
4   the normal procedure. How is it decided that I was
5   down there on 11/9 is the question.
6   Q.     That's my next question. But
7   October 18th of 2005 she is the associate working on
8   your file and she would be the one handling
9   appearances and conferences. Right?
10  A.     She would be handling most of the things,
11  generally speaking, up until a trial.
12  Q.     Okay. November 9th of 2005 why -- how is
13  it that you went as opposed to Ms. Reed?
14  A.     That's a good question and having
15  reviewed -- that question is of direct concern to me
16  and that is I don't know why. And now I look at this
17  conference and I see that everybody at this status
18  conference was concerned about things they had to do.
19         MR. CONNELL: Right. Page 7 talks about
20  her conflicts, not yours.
21         THE WITNESS: Actually, ask Susan Reed
22  about that, whether they're Ms. Silva's or Ms. Reed's
23  or both of theirs.
24         MR. CONNELL: Both.
25  A.     Seemed to be of great concern of theirs.

249

1   The fact that I was going to have a rejection on the
2   2nd and oh, Mr. Kobin can be down there on the 9th,
3   and oh, by the way, maybe they can try this case on
4   January or February.
5   Q.     So you don't know how you went on
6   November 9th as opposed to Susan Reed?
7   A.     Apparently, I was free that day.
8   Q.     So there was no specific idea that you
9   needed to go on the November 9th appearance because it
10  was going to resolve that day?
11  A.     No. There was no idea that when they
12  were setting that date at that point that I would need
13  to be there. Now --
14         MR. CONNELL: There was no outrage of you
15  on November 8th upon hearing about this release and
16  hold harmless agreement that you, the boss, was going
17  to go down and take care of this and straighten
18  everybody out down there, was there?
19         THE WITNESS: Well, I was going to try to
20  finish the thought that as of the 8th when I was
21  informed of this --
22         MR. CONNELL: Well, you certainly knew by
23  the 8th. You may have known it before.
24         THE WITNESS: Right. But then I would
25  have been given this issue, okay, and given the fact

250

1   that there was between these dates no real time to
2   talk to the client, you're right, that I would have
3   had to go down on the 9th and I would not have been
4   happy at that point about being boxed in. And now
5   that when I look at this and see how all this
6   happened, being boxed into this date --
7          MR. CONNELL: But all the question is
8   does the fact that the release and hold harmless
9   agreement came up on November 8th and your obvious
10  outrage about that whole condition, was that the
11  premise upon which you said I'll handle this
12  appearance tomorrow, I'm going and I'll take care of
13  everybody? Did you have that discussion?
14         THE WITNESS: That was -- first of all, I
15  apparently had to go that day anyway for coverage.
16  That would have been a conversation, Mr. Connell,
17  that's a very fair statement. The other consideration
18  would have been that I would have had to have been the
19  one who spoke to the client about this.
20         MR. CONNELL: Even though Sue Reed has in
21  her notes on October 18th "waive civil suit", you
22  don't think she spoke to the client about waiving the
23  civil suit on October 18th?
24         THE WITNESS: See, Mr. Connell, that's
25  different. I'm not saying she didn't speak to him.

251

1   I'm saying that given the condition, I would have felt
2   and Sue would have felt that I had to speak to him,
3   okay.
4          MR. CONNELL: Did Ms. Reed appear to be
5   outraged to you when she ultimately told you about
6   this waiver of the civil suit? Was she outraged that
7   it was a condition?
8          THE WITNESS: I don't know the answer.
9   Was Sue Reed outraged?
10         MR. CONNELL: Yeah, because she knew
11  about it on October 18th. Did she come back in an
12  outrage about the facts that the condition of PTI was
13  going to be a waiver of the civil suit?
14         THE WITNESS: She certainly didn't
15  communicate with me on the 18th.
16         MR. CONNELL: Did you ask her once she
17  did communicate with you on at least the 18th, it may
18  have been earlier, but you say certainly by the 8th I
19  knew about it because now I'm going down on the 9th,
20  did you ask her did you do any research on this thing?
21  Did you get me the documentation so I could be loaded
22  for bear when I go down there on the 9th and put the
23  judge in his place and put the prosecutor in his
24  place?
25         THE WITNESS: I -- hold it. When I spoke

**252**

1 to her on the 8th, did I ask her if she had done
2 research?
3     MR. CONNELL: Yeah.
4     THE WITNESS: No, because I just told you
5 Mr. Connell --
6     MR. CONNELL: Just answer my question.
7 You didn't ask her that, so she didn't express outrage
8 to you on her own part. You're the one who expressed
9 the outrage about this, but she wasn't outraged about
10 this condition, at least she didn't express it to you
11 since October 18th since it's in her notes?
12     THE WITNESS: I don't know that she
13 wasn't outraged.
14     MR. CONNELL: She didn't express it to
15 you, her outrage about this condition?
16     THE WITNESS: Miss Reed has expressed her
17 opinion about this condition to me.
18     MR. CONNELL: Did she do it between
19 October 18th and November 8th?
20     THE WITNESS: It's not my recollection
21 that I had any discussions with her until the 8th.
22     MR. CONNELL: So then she didn't express
23 that she was outraged about the condition. You were
24 the first one to express outrage between the two of
25 you to each other about the condition?

**253**

1     THE WITNESS: No. I would say she
2 expressed however you define "outrage" when she said
3 to me -- when she mentioned the condition to me.
4     MR. CONNELL: So she didn't say that she
5 wasn't taken back by it, she disagreed with it, she
6 objected to it, she was outraged by it; none of that
7 stuff?
8     THE WITNESS: Oh, she was absolutely
9 found it to be a horrendous type of situation.
10     MR. CONNELL: So when she knew that a
11 court appearance was on November 9th, does she tell
12 you and by the way, I've done all the research on this
13 thing, here's the ethics opinions, here's the
14 research, here's the cases that tell them they can't
15 be doing this so when you go down there, Mr. Kobin,
16 here's the stuff and you can set them straight on; she
17 never did that and didn't give that information to
18 you?
19     THE WITNESS: We've now -- first off, I
20 worked with Miss Reed for 11 years. Miss Reed and I
21 know and we know that all the prosecutors in this
22 state know that this is an unethical thing to do, that
23 this is an improper thing to do and a void act. We
24 all know.
25     MR. CONNELL: And she waited three weeks

**254**

1 to tell you this?
2     THE WITNESS: What was she going to tell
3 me?
4     MR. CONNELL: About this condition
5 that --
6     THE WITNESS: You're saying she waited
7 three weeks. You can add up the dates.
8     MR. CONNELL: Between October 18th and
9 November 9th.
10     THE WITNESS: Miss Reed and I don't
11 necessarily have to do research to know about this
12 type of request.
13     MR. CONNELL: If it's so obvious to you
14 and so outrageous, why didn't you say something to
15 them on November 9th without your research?
16     THE WITNESS: Because I would have run my
17 client up the tank to a five-year NERA flagpole, Mr.
18 Connell.
19     MR. CONNELL: He was offered probation.
20     THE WITNESS: They were going to yank it.
21     MR. CONNELL: They were also offering
22 a --
23     THE WITNESS: Because he wasn't guilty.
24 He couldn't give a factual basis, sir.
25     MR. CONNELL: Therefore, you could have

**255**

1 gone to trial.
2     THE WITNESS: Great, and run him up the
3 NERA flagpole with a five-year sentence. That's why I
4 didn't do it, Mr. Connell, and that's why my client
5 didn't do it.
6     MR. BITTERMAN: Can I just ask a
7 question, counsel?
8     MR. CONNELL: Exactly why.
9     MR. BITTERMAN: You keep talking about
10 November the 8th. Is that the day you're saying you
11 found out --
12     THE WITNESS: You know --
13     MR. BITTERMAN: Can I finish the
14 question?
15     THE WITNESS: Yes.
16     MR. BITTERMAN: Because you keep saying
17 the 8th today. Is that the day you found out that
18 Prosecutor Silva overruled the program was allowing
19 your client into PTI?
20     THE WITNESS: I think it is.
21     MR. BITTERMAN: Is your memory better now
22 than during the first part of your deposition? I
23 think it was May 28th.
24     THE WITNESS: No. Go ahead.
25     MR. BITTERMAN: Because on May 28th you

Case 2:06-cv-04791-DMC -MF  Document 99-14  Filed 01/07/10  Page 32 of 47 PageID: 1571

KRNBIL v. TURKOVIC, et al.                    Testimony of R. ROBIN, ESQ. - 6-2-09

256

1    said it was somewhere between October 31st. "It was
2    before the 9th, but I can't say whether it was on the
3    8th." That's your testimony.
4              THE WITNESS: Right. And my recollection
5    is --
6              MR. BITTERMAN: You specifically said
7    "but I can't say whether it was on the 8th." Do you
8    see that? And you can look at anything you want to
9    see if I put that in proper context.
10             THE WITNESS: Well, now I know we didn't
11   get the letter 'til the 2nd which I didn't have then.
12             MR. BITTERMAN: The question I have, did
13   you testify under oath that you didn't know whether it
14   was the 8th when I asked you that on May 28th?
15             THE WITNESS: Yeah, I did say that, "but
16   I can't say whether it was on the 8th."
17             MR BITTERMAN: Is your memory now better
18   today than it was last week?
19             THE WITNESS: My memory isn't better, but
20   I've sat down and given some thought to this, looked
21   at some calendars, and I'm pretty sure that the 9th
22   was -- in other words, it wasn't a Monday, okay, which
23   I didn't know before. So I think it was like a
24   working week, so -- and I know that I'd only gotten it
25   on the 2nd, I think so, you know, that part helps me

257

1    out with those dates, yeah. So now I think that it
2    was the 8th.
3              MR. BITTERMAN: Okay. That's all.
4              THE WITNESS: So my memory is not better,
5    but I've excluded some days in there that helped me
6    out a little.
7              MR. BITTERMAN: Okay.
8              THE WITNESS: That's what I think
9    happens.
10             MS. O'CONNOR: Let me finish.
11   CONTINUING CROSS-EXAMINATION BY MS. O'CONNOR:
12       Q.    On November 9th, 2005 when Silva handed
13   the documents to you, did you have any discussions
14   with her at that time?
15       A.    No, I don't think I really -- anything
16   substantial, no. And I'm not sure she handed me the
17   documents, but go ahead. I thought some clerk did
18   maybe.
19       Q.    On November 9th, 2005 prior to going on
20   the record, did you have any conversations with Marcia
21   Silva concerning executing a hold harmless agreement?
22       A.    Any discussions about it?
23       Q.    Yeah.
24       A.    Don't remember.
25       Q.    Prior to November 9th, 2005 and going on

258

1    the record, do you have any discussions with Judge
2    DeVesa concerning the hold harmless agreement?
3        A.    No.
4        Q.    When you and your client signed the
5    agreement, which has been previously marked as DMS-3,
6    you had your client read the document. Correct?
7        A.    Yes.
8        Q.    And the document specifically says, "I
9    consent to the above conditions", and one of the
10   conditions was that the defendant was to execute a
11   hold harmless agreement. Right?
12       A.    Yes.
13       Q.    Okay. And it further indicates that the
14   client and, of course, you signed it as well, that you
15   agree to a postponement of the trial period as well.
16   Correct?
17       A.    Postponement on prosecution, is that what
18   it says?
19       Q.    Well, it says actually "postponement of
20   further proceedings."
21       A.    There we go.
22       Q.    Okay. Right?
23       A.    Yes.
24       Q.    Okay. Did you point out that language to
25   your client before he signed it?

259

1        A.    The postponement of further proceedings?
2        Q.    No. The whole paragraph concerning
3    consent and agree to the conditions.
4        A.    Yeah. I mean we went over the general
5    thing that he was consenting, that he was -- I even
6    told him I'm sure at that point they're calling it a
7    hold harmless, but what they really mean is a release
8    and dismissal agreement and they want you to sign one.
9        Q.    What steps did you take to determine that
10   no one in this office provided Silva with the
11   information that the agreement had been signed and
12   filed?
13       A.    Say that again.
14       Q.    You previously testified that no one in
15   this office, that you have no information in this
16   office that anyone told Silva that the documents --
17   meaning the release and dismissal agreement -- was
18   done and filed. Right?
19       A.    Oh, what did I do to check on that?
20       Q.    Yeah.
21       A.    I asked, Did any of you girls tell her
22   that?
23       Q.    And who did you specifically ask?
24       A.    I probably didn't ask anyone
25   specifically. I probably went by, they're all

260

1  standing there and said, You girls remember that?
2      Q.    Who is Eva?
3      A.    She's a secretary.  June's a secretary.
4      Q.    Eva Macarrico, is she your secretary?
5      A.    June is mine.
6      Q.    June is yours.  Eva, who does she work
7  for?
8      A.    She works for Sue specifically.
9      Q.    Sue Reed?
10     A.    Yeah, but I may ask someone to do
11  something here and there.
12     Q.    Did you prepare the release or did Susan
13  Reed prepare the release?
14     A.    To tell you the truth, it is somewhat of
15  a form document in a firm like this.  One of the girls
16  may have prepared it, spit it out.
17     Q.    And when Mr. Kandil signed the document,
18  did you meet with him to sign the document or was that
19  Ms. Reed who met with him when he signed the release?
20     A.    Don't remember who met with him.
21     Q.    Miss Macarrico is actually the individual
22  who certified to his signature.  Would that refresh
23  your recollection as to who would have met with him;
24  either you or Ms. Reed?
25     A.    It leans towards Ms. Reed, but I can

261

1  assure you that I discussed with Mr. Kandil what it
2  was and what the document meant.
3      Q.    Do you know if Susan Reed had any
4  discussions with Mr. Kandil concerning the release and
5  what the document meant after November 9th of 2005?
6      A.    Don't know if she did and you know -- but
7  I don't know if she did.  You'll have to ask her if
8  she did.
9      Q.    She didn't tell you if she did.  I'm
10  looking for your information.
11     A.    No, I wouldn't have -- she didn't tell me
12  and I wouldn't have asked her because I went over it
13  with him.  I went over the whole topic with him and
14  told him what I told you so far.
15     Q.    Did you ever discuss with your client
16  that perhaps you would need a different attorney, he
17  would need a different attorney than you to pursue the
18  civil suit?
19     A.    I told him that that's going to become an
20  issue at some point.  Perhaps we have to see how that
21  shakes out, whether it's a total conflict, how it
22  works out.
23     Q.    And did you do anything else other than
24  tell your client that we have to take a wait-and-see
25  attitude as to whether or not you, Mr. Kobin, would

262

1  have a conflict?
2      A.    First of all, you're way beyond what
3  we're doing here right now.
4      Q.    Okay.
5      A.    So we're done with that discussion.
6      Q.    All right.
7      A.    But it's -- obviously, I've already
8  broached this with Judge Arleo to a certain extent.
9  So I have spent some time with some of these summary
10  judgment cases over the last few days taking a look at
11  how these things have shaken out, you know, and it's a
12  topic I may have to broach with Judge Arleo real soon
13  because if another attorney comes in, you know, he's
14  going to need some time to do things.  So obviously,
15  another attorney is going to -- this had nothing to do
16  with the questioning, but obviously, another attorney
17  is going to have to argue this motion because if my
18  credibility is at issue and Ms. Reed's credibility is
19  at issue, then I can't very well stand up and say gee,
20  we should all believe Mr. Kobin, although I'd like to,
21  but I probably can't do that.
22     Q.    Did you, Ms. Reed or anyone in your
23  office have discussions with the prosecutor's office
24  after the motion to terminate PTI was filed?
25     A.    I didn't.

263

1      Q.    Do you know of anyone else in your office
2  who may have?
3      A.    Don't know if Ms. Reed --
4      Q.    Did you, Ms. Reed or anyone in your
5  office have any discussions with anyone in the
6  probation department after the motion to terminate was
7  filed?
8      A.    I don't know if she had discussions, but
9  she certainly sent them some correspondence.
10     Q.    Yes.  Did you have any discussions with
11  that probation department?
12     A.    No.  Well, I don't recall having them.
13  It would be unlikely.
14     Q.    At any point in time up to today did Ms.
15  Reed ever tell you that it was Judge DeVesa's idea to
16  premise PTI on a waiver of the civil suit?
17     A.    Up until when?
18     Q.    Today.
19     A.    No.  She didn't say that it was his idea.
20     Q.    Up until today, did Ms. Reed ever tell
21  you that it was the Middlesex County Prosecutor's idea
22  to premise the waiver of a civil suit on the PTI
23  application?
24     A.    Well, the answer to that is that that's
25  how I understood her communication to me.

264

1   Q.   And that would be on November 8th of 2005
2   or that would be subsequent thereto?
3   A.   That would be between November 8th of
4   2005 and when I recently began reviewing some of the
5   material in this case.
6   Q.   In preparation for your deposition, you
7   mean?
8   A.   Well, I don't know if it was in prep for
9   the deposition, but you know, when I started to take a
10  look at the case. But really, I would say as far as
11  some of these transcripts, yeah, this is really the
12  first time I've really taken a hard look at some of
13  these transcripts and some of these conferences.
14         MR. CONNELL:  Did she ever tell you that
15  it was not DeVesa's idea up until today?
16         THE WITNESS:  The reason I'm answering
17  that way is I don't know if she has a recollection of
18  who.  You see, when you say "idea" there's a question
19  I think you're going to get at or at least from my
20  conversations as to who first suggested it, okay.  If
21  that's what you mean by "idea", who first said dismiss
22  the suit.
23         MR. CONNELL:  Let's use that.  Did Ms.
24  Reed tell you before you ever got here today, after
25  you've now heard this is the story and the

265

1   prosecutor's deposition certainly affirms that, did
2   Ms. Reed up until today ever tell you that it was not
3   Judge DeVesa that initially suggested a waiver or
4   dismissal of the civil rights of Mr. Kandil?
5          THE WITNESS:  If that suggestion is first
6   mentioned, okay, then I don't know that.  She can give
7   you a yes or no on that.
8          MR. CONNELL:  I didn't ask you that.  I
9   asked you not what she's going to tell us.  Did she
10  ever tell you that it was not DeVesa that made this
11  initial suggestion?
12         THE WITNESS:  You know, since I only
13  remember the conversation I had with her yesterday
14  about it.
15         MR. CONNELL:  Should be pretty clear in
16  your mind then.
17         THE WITNESS:  That's what I'm telling
18  you.  She doesn't know one way or the other.
19         MS. O'CONNOR:  She just doesn't know.
20         THE WITNESS:  That's my -- yes, I think
21  that's what she's going to say, yeah, you know.
22         MR. CONNELL:  Fine.  Thank you.
23  CONTINUING CROSS-EXAMINATION MS. O'CONNOR:
24  Q.   Would Ms. Reed have had the authority on
25  this Kandil file to make an agreement on October 18,

266

1   2005 to consent to the waiver of the civil suit in
2   exchange for the PTI being granted?
3   A.   That would depend upon -- that's a broad
4   question.
5   Q.   Would she have had to consult with you
6   before consenting to waive a civil suit to agree --
7   strike that.
8          Would Ms. Reed have had to consult with
9   you prior to agreeing to waive a civil suit as a
10  condition of a successful PTI application?
11  A.   That it would depend, again, on the
12  circumstances.
13  Q.   I'm specifically talking about
14  Mr. Kandil's case.
15  A.   And the way it unfolded?
16  Q.   All I'm saying is would she have had the
17  authority to broker that deal on October 18, 2005
18  without your authority?
19  A.   If she had been down there on the 9th, if
20  she had been there on the 9th -- well, yes and no.  I
21  can't answer it that way.  If they had said to her on
22  that day on the 18th, under certain circumstances she
23  could do it.  If it was apparent that the State had us
24  over the barrel, if it was apparent that there was no
25  wiggle room and they were -- they had, you know, all

267

1   of this is in the context of mandatory sentencing and
2   NERA, so you know, yeah, she would be able to do it
3   under circumstances, and perhaps in the Kandil case
4   she could do it.
5   Q.   Without consulting you?  That's the
6   question.  Does she have to consult you before she
7   could make a deal?  That's it.
8   A.   In this case there was time to tell me
9   about it, okay.  So in this case given the time to
10  tell me about it, it's unlikely.  Yeah, I would not be
11  happy if I didn't know about it before she committed
12  to it.
13  Q.   Do you know --
14  A.   But authority to do things for a lawyer
15  depends upon a lot of things.  So I don't like to just
16  give a general statement, but apparently, in this
17  case, she had at least some time to get to me to
18  discuss this with me.
19  Q.   Between October 18th and November 9th of
20  2005, did Susan Reed ever tell you that she had
21  committed to if the prosecutor's office can get
22  Mr. Kandil into that PTI that Mr. Kandil would waive
23  his civil suit?
24  A.   Up until November 9th did she tell me
25  that?

Case 2:06-cv-04791-DMC -MF    Document 99-14    Filed 01/07/10    Page 35 of 47 PageID: 1574

KANDIL v. YURKOVIC, et al.                        Testimony of R. COBIN, ESQ. 6-2-09

268

1    Q.    Yes.

2    A.    That she had committed to that? No.

3    Q.    Since November 9th of 2005, has Ms. Reed
4    ever told you that on October 18th, 2005 she committed
5    to having Mr. Kandil waive his civil suit if the
6    prosecutor's office got him into PTI?

7    A.    No.

8    Q.    Did she ever tell you, in fact, the
9    opposite; that she never made such a commitment on
10   October 18th, 2005?

11   A.    She never used those words to me. I
12   never asked her the question. I didn't think she had,
13   so I didn't ask. It was never an impression in my
14   mind that she had committed on October 18th, 2005 to
15   anything other than to make me go down there on the
16   9th.

17        MR. CONNELL: Was that the kind of a
18   topic, this release and hold harmless agreement, that
19   you would expect that she would call you before she
20   would ever make that commitment, since it's your
21   client and your case?

22        THE WITNESS: Yeah. I wouldn't expect --
23   yeah. First of all, I wouldn't expect the time
24   scenario the way in this, so I would have expect to
25   have been consulted? Absolutely. The answer is I

269

1    would have expect to have been consulted. I would
2    have expect to have been consulted in -- well, if I
3    remember -- first of all, I wouldn't have expected the
4    date that came up, the 9th, and it looks like the
5    18th, the 9th. But you know, for this type of thing,
6    consultation is probably not the appropriate word.

7        MR. CONNELL: It's too weak a word, in
8    fact. It's not asking for your opinion. It's pretty
9    much asking for your authority to enter into this
10   agreement, was it not?

11        THE WITNESS: It was an extremely
12   truncated time scenario for what we were dealing with.

13        MR. CONNELL: Would it surprise you that
14   Susan Reed would have called you from the courthouse
15   on October 18th, '05 to ascertain your willingness to
16   get involved in that? Would that surprise you? That
17   she would at least have made that effort based upon
18   your relationship with her and the authority you give
19   her in regards to a criminal case of second and third
20   degree offenses?

21        THE WITNESS: No, I would not be
22   surprised that she would not have called me from the
23   courthouse on that date. You know, she's been doing
24   this for -- she was a prosecutor for longer than I was
25   and she actually handled police misconduct cases.

270

1        MR. STONE: Did she ever say that this
2    situation where a hold harmless agreement was
3    requested as part of entrance into PTI occurred before
4    in her work history?

5        THE WITNESS: I asked her that question
6    because we were in the same office and we overlapped
7    for a period of time. I was there before her, she was
8    there after me, and she was literally in the
9    quote/unquote I think, you know, the Investigation
10   Unit. So I asked her that question. And I think she
11   said the topic had come up while she was a prosecutor,
12   but it's the same answer; nobody does these things.

13        MR. STONE: I didn't ask the topic. Did
14   she ever say that there was an instance in a case
15   where regarding PTI it was conditioned upon waiver of
16   a civil suit?

17        THE WITNESS: If your question is was she
18   ever involved in something? Based on my question, her
19   answer she told me is no.

20        MR. STONE: You said numerous times that
21   because of these time constraints. Are you talking
22   about the time between October 18th and November 9th?

23        THE WITNESS: I'm talking about the time
24   between October 18th and November 9th. I'm talking
25   about the time between November 2nd really and the

271

1    9th.

2        MR. STONE: Well, if on October 18th the
3    issue of PTI waiver civil suit first came up, did you
4    ask Susan Reed why she waited until the 8th of
5    November to bring it to your attention?

6        THE WITNESS: I didn't ask her that
7    specific question.

8        MR. STONE: Okay.

9        MR. CONNELL: We're done.

10       MS. O'CONNOR: I'm through.

11       (The deposition is concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

272

## C E R T I F I C A T E

I, MARYANNE DELPOME BONIELLO, a Certified
Court Reporter of the State of New Jersey, do hereby
certify that prior to the commencement of the
examination

ROBERT D. KOBIN, ESQ.

was duly sworn by me to testify to the truth, the
whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is
a true and accurate transcript of the testimony as
taken stenographically by and before me at the time,
place and on the date hereinbefore set forth, to the
best of my ability.

I DO FURTHER CERTIFY that I am neither a
relative nor employee nor attorney nor counsel for any
of the parties to this action, and that I am neither a
relative nor employee of such attorney or counsel, and
that I am not financially interested in this action.

MARYANNE DELPOME BONIELLO, C.C.R.
Certified Court Reporter of the State of New Jersey
License No. XI07110

— KEYWORD INDEX - KANDIL v. YURKOVIC, et al. —

1

'05 [10] - 205:24, 207:12,
208:17, 223:10, 230:15,
230:19, 231:12, 241:2,
269:15
'06 [8] - 161:7, 161:12,
161:20, 162:4, 162:7,
222:24, 236:17, 236:22
'07 [12] - 165:8, 172:20,
179:4, 201:5, 201:7,
202:10, 207:7, 207:13,
221:13, 221:15, 221:16,
223:11

0

06CV4701 [1] - 132:2
07657 [1] - 132:25

1

1 [1] - 231:17
1-10 [3] - 132:14, 132:14
10 [1] - 210:6
10-18-05 [4] - 223:20, 226:1,
227:15, 231:23
11 [1] - 253:20
11-4-05 [2] - 206:15, 210:2
11-9-05 [1] - 218:22
11/9 [3] - 209:3, 244:18,
248:5
12-17-08 [1] - 151:23
132-141 [1] - 132:9
134 [1] - 133:19
15 [3] - 152:23, 156:10,
157:16
18 [5] - 207:18, 210:18,
211:11, 248:2, 265:25,
266:17
180 [1] - 133:20
18th [46] - 205:22, 205:23,
205:24, 209:10, 209:14,
209:22, 212:10, 217:16,
217:24, 218:16, 219:25,
220:10, 220:19, 222:10,
224:3, 230:6, 230:15,
230:19, 231:12, 232:6,
232:14, 232:21, 233:2,
241:7, 241:19, 241:22,
242:2, 248:7, 250:21,
250:23, 251:11, 251:15,
251:17, 252:11, 252:19,
254:8, 266:22, 267:19,
268:4, 268:10, 268:14,
269:5, 269:15, 270:22,
270:24, 271:2
18th,'05 [1] - 232:10
19th [1] - 205:21
1:35 [1] - 132:20

2

2 [2] - 132:9, 201:16
20 [2] - 132:20, 134:2
2005 [68] - 134:15, 134:18,
143:21, 152:25, 154:18,
159:25, 172:4, 180:25,
182:5, 183:1, 183:10,
187:20, 188:3, 188:10,
188:21, 189:23, 196:9,
205:21, 207:18, 207:19,
208:5, 208:8, 208:11,
208:15, 209:22, 210:18,
211:11, 217:16, 217:20,
218:16, 218:19, 220:1,
220:10, 220:19, 222:10,
224:3, 236:23, 237:6,
237:15, 238:1, 238:14,
238:20, 240:18, 241:19,
241:23, 242:5, 243:23,
243:24, 245:9, 245:19,
246:21, 248:2, 248:7,
248:12, 257:12, 257:19,
257:25, 261:5, 264:1,
264:4, 266:1, 266:17,
267:20, 268:3, 268:4,
268:10, 268:14

2006 [6] - 160:11, 160:13,
162:15, 162:16, 183:11,
236:24
2007 [12] - 159:21, 159:25,
160:20, 183:3, 188:20,
200:22, 201:3, 201:25,
202:11, 204:9, 220:20,
222:12
2009 [1] - 132:20
201 [1] - 132:25
206 [1] - 133:25
20th [3] - 187:9, 222:13,
222:14
21st [1] - 188:22
224 [1] - 133:21
235 [1] - 133:22
25 [1] - 157:17
27 [3] - 168:8, 168:15, 169:14
28 [1] - 132:20
28th [3] - 255:23, 255:25,
256:14
2nd [11] - 244:8, 244:10,
244:13, 245:3, 245:18,
245:19, 246:1, 249:2,
256:11, 258:25, 270:25

3

3 [1] - 133:25
31 [2] - 242:4, 243:23
31st [2] - 244:2, 256:1

5

5 [4] - 158:25, 159:1, 224:9,
224:13
52 [1] - 158:25
59 [6] - 151:13, 151:14,
152:21, 152:22, 153:16,
154:9

6

6 [2] - 224:16
60 [4] - 153:16, 154:9, 156:9,
157:17
61 [2] - 153:16, 154:9
612 [1] - 132:24
62 [3] - 153:17, 158:25, 159:1

7

7 [2] - 222:12, 248:19
7th [1] - 221:8

8

8-4-05 [1] - 210:5
8th [31] - 186:17, 186:18,
196:15, 212:20, 213:9,
245:1, 245:2, 246:5, 246:6,
246:7, 246:15, 247:4,
249:15, 249:20, 249:23,
250:9, 251:18, 252:1,
252:19, 252:21, 255:10,
255:17, 256:3, 256:7,
256:14, 256:16, 257:2,
264:1, 264:3, 271:4

9

9 [16] - 134:18, 143:20,
158:25, 159:1, 180:25,
183:1, 189:23, 196:9,
207:19, 208:5, 208:8,
208:11, 208:15, 209:18,
217:19, 218:19
941-1550 [1] - 132:25
99 [1] - 194:6
9:00 [2] - 218:21, 218:25
9th [81] - 134:15, 152:25,
153:8, 154:18, 161:22,
163:12, 164:16, 170:19,
172:4, 186:16, 191:22,
196:17, 208:17, 209:10,
209:13, 209:18, 211:24,
217:16, 217:24, 218:16,
220:1, 220:10, 230:6,

232:4, 234:6, 237:2, 237:4,
237:6, 237:9, 237:15,
238:2, 238:4, 238:10,
238:14, 238:20, 240:18,
241:2, 241:7, 241:19,
241:23, 241:25, 242:1,
242:18, 243:24, 244:24,
244:25, 245:3, 245:8,
245:18, 246:2, 246:3,
246:21, 248:12, 249:2,
249:6, 249:9, 250:3,
251:19, 251:22, 253:11,
254:9, 254:15, 256:2,
256:21, 257:12, 257:19,
257:25, 261:5, 266:19,
266:20, 267:19, 267:24,
268:3, 268:16, 269:4,
269:5, 270:22, 270:24,
271:1

A

a" [1] - 219:3
a.m [3] - 209:18, 218:21,
218:25
ABC [1] - 132:14
abide [1] - 162:10
ability [2] - 169:10, 272:15
able [1] - 267:2
abnormal [1] - 178:25
Abode [1] - 133:8
ABODE [1] - 132:9
Abramowitz [11] - 150:9,
150:12, 150:14, 201:17,
238:12, 238:13, 238:16,
238:19, 239:4, 239:11,
239:15
absolutely [14] - 137:4,
158:5, 158:10, 158:12,
158:17, 165:19, 184:8,
196:18, 211:16, 213:4,
233:7, 233:9, 253:8,
268:25
accurate [4] - 158:7, 160:23,
184:19, 272:12
acknowledge [1] - 158:2
Act [1] - 166:4
act [1] - 253:23
action [4] - 182:22, 245:25,
272:18, 272:20
actions [1] - 199:17
activity [1] - 182:23
actual [3] - 155:5, 235:16,
236:3
add [1] - 254:7
additional [1] - 146:3
admissions [1] - 178:7
admit [1] - 247:5
admitted [2] - 158:7, 139:16
advise [2] - 162:16, 182:6
affirmatively [2] - 164:20,
192:5
affirms [1] - 265:1
afternoon [1] - 134:6
ago [2] - 184:17, 233:4
agree [29] - 136:23, 137:2,
137:10, 156:13, 175:13,
175:24, 176:6, 176:8,
176:9, 183:16, 194:13,
202:23, 202:24, 213:15,
214:11, 214:12, 214:16,
214:23, 214:24, 227:6,
229:3, 229:12, 231:22,
232:1, 258:15, 259:3,
266:6
agreed [5] - 141:7, 142:9,
145:4, 189:23
agreeing [1] - 266:9
agreement [64] - 137:17,
137:22, 138:3, 141:7,
142:17, 142:18, 146:10,
146:16, 147:2, 147:11,
147:21, 147:24, 148:11,
149:20, 150:11, 150:18,
151:2, 151:8, 153:1,
154:19, 158:24, 162:18,
162:19, 162:24, 163:10,
163:17, 163:19, 163:20,

164:12, 165:11, 165:12,
168:18, 170:5, 170:17,
171:10, 173:4, 175:11,
175:14, 177:3, 177:12,
177:13, 178:12, 201:21,
203:6, 223:12, 229:6,
230:15, 237:17, 239:3,
239:22, 240:22, 249:16,
250:9, 257:21, 258:2,
258:5, 258:11, 259:8,
259:11, 259:17, 265:25,
268:18, 269:10, 270:2
agreements [5] - 164:23,
235:17, 238:21, 239:7,
239:18
ahead [13] - 159:4, 168:11,
194:3, 201:8, 211:6, 211:7,
211:13, 211:18, 212:3,
224:6, 243:22, 255:24,
257:17
alleged [1] - 159:6
allow [4] - 145:5, 166:1,
178:12, 226:10
allowed [2] - 177:14, 179:21
allowing [2] - 178:22, 255:18
almost [1] - 233:24
alone [2] - 219:19, 219:22
amazing [1] - 195:17
ANSWER [2] - 153:2, 153:5
answer [51] - 137:9, 140:25,
141:16, 143:6, 144:2,
146:7, 149:8, 149:10,
149:14, 149:22, 153:15,
153:19, 153:23, 155:25,
156:9, 157:16, 162:14,
163:11, 168:10, 171:5,
172:1, 172:14, 173:11,
176:19, 177:19, 189:5,
190:3, 191:25, 193:22,
195:19, 199:21, 200:11,
200:14, 200:15, 200:18,
214:4, 214:19, 214:21,
215:1, 216:10, 217:4,
233:1, 241:20, 251:8,
252:6, 263:24, 266:21,
268:25, 270:12, 270:19
answered [4] - 136:11,
136:20, 137:7, 200:4
answering [7] - 141:15,
153:21, 153:24, 184:3,
184:4, 214:22, 264:16
answers [2] - 141:1, 141:18
Anthony [1] - 133:8
ANTHONY [1] - 132:9
anyway [1] - 250:15
app [1] - 226:10
App" [1] - 209:22
apparent [2] - 266:23,
266:24
appeal [11] - 166:5, 173:2,
192:23, 192:24, 193:1,
193:11, 193:14, 193:17,
193:21, 219:9, 219:12
appeals [1] - 166:7
appear [6] - 230:13, 231:4,
232:20, 233:14, 233:15,
251:4
appearance [7] - 134:15,
205:21, 247:14, 247:17,
249:9, 250:12, 253:11
appearances [1] - 248:9
appeared [1] - 164:19
appearing [1] - 217:19
Appellate [4] - 193:9, 193:16,
194:5, 194:8
application [28] - 137:21,
165:22, 178:9, 179:7,
179:8, 179:9, 179:11,
180:9, 186:5, 187:7,
188:23, 195:6, 195:9,
199:25, 201:10, 201:12,
201:22, 202:14, 216:15,
216:24, 217:3, 217:6,
217:20, 226:23, 226:24,
242:6, 263:23, 266:10
applied [1] - 139:11
apply [2] - 138:20, 217:1
apply" [1] - 216:25

appointment [1] - 139:23
appreciate [1] - 242:23
appropriate [1] - 269:6
argue [1] - 262:17
argument [7] - 166:11, 174:23, 193:8, 194:16, 194:19, 203:22, 247:19
arguments [1] - 177:18
Arleo [2] - 262:8, 262:12
arrow [3] - 215:7, 229:15, 231:15
ascertain [1] - 269:15
aside [1] - 141:12
aspects [1] - 166:15
associate [2] - 235:4, 248:7
associates [2] - 204:22, 205:1
assume [9] - 146:22, 154:14, 172:12, 175:2, 200:2, 200:5, 211:16, 243:1, 244:21
assumptions [1] - 243:5
assure [1] - 261:1
attach [2] - 229:14, 229:19
attached [1] - 178:25
attend [1] - 208:23
attention [14] - 144:9, 145:10, 145:12, 145:16, 152:19, 171:7, 172:5, 173:6, 189:16, 206:14, 207:25, 223:16, 246:14, 271:5
attitude [1] - 261:25
Attorney [1] - 133:14
attorney [8] - 243:17, 261:16, 261:17, 262:13, 262:15, 262:16, 272:17, 272:19
Attorneys [5] - 133:3, 133:5, 133:8, 133:10, 133:12
attorneys [1] - 243:18
authority [4] - 265:24, 266:17, 266:18, 267:14, 269:9, 269:18
availability [2] - 209:10, 219:17
available [2] - 209:3, 234:5
avoided [1] - 177:24
aware [1] - 236:14

**B**

bad [1] - 171:22
bail [4] - 166:4, 166:5, 166:6, 192:25
bar [1] - 175:16
bargain [10] - 177:6, 177:16, 177:20, 177:21, 177:22, 178:5, 178:9, 178:10, 178:13, 179:1
bargains [2] - 178:7
barrel [1] - 266:24
base [1] - 162:4
based [12] - 145:5, 148:3, 162:2, 182:11, 182:22, 204:3, 207:14, 221:9, 221:10, 225:24, 269:17, 270:18
basis [6] - 173:24, 193:10, 243:13, 243:15, 243:21, 254:24
BASSEM [1] - 132:4
bear [3] - 229:25, 251:22
become [3] - 183:5, 183:23, 261:19
began [3] - 140:7, 161:8, 264:4
begin [1] - 140:1
beginning [1] - 159:2
behaved [1] - 202:21
belong [1] - 177:15
below [3] - 226:5, 231:11, 231:14
benefit [1] - 177:11
Bergen [1] - 132:24
Bessam [1] - 210:5
best [5] - 139:4, 212:14, 225:18, 247:9, 272:15
better [5] - 173:9, 255:21,

256:17, 256:19, 257:4
between [37] - 134:22, 178:5, 187:19, 209:10, 217:15, 217:24, 218:16, 219:25, 220:9, 221:5, 222:10, 223:14, 224:23, 225:6, 230:4, 230:6, 232:24, 241:7, 241:19, 241:22, 242:1, 243:23, 244:2, 244:10, 245:3, 245:18, 250:1, 252:18, 252:24, 254:8, 256:1, 264:3, 267:19, 270:22, 270:24, 270:25
beyond [1] - 262:2
big [6] - 161:4, 227:9, 227:15, 231:4, 231:11, 231:12
Bill [1] - 168:11
bingo [1] - 180:12
biology [1] - 175:2
bit [5] - 140:15, 160:15, 181:10, 193:5, 232:3
BITTERMAN [42] - 133:13, 137:7, 153:22, 171:5, 171:14, 172:1, 172:9, 172:14, 180:7, 180:13, 180:22, 184:6, 184:9, 184:14, 184:21, 185:3, 185:6, 185:9, 185:12, 185:15, 185:20, 196:8, 196:12, 196:14, 196:19, 196:23, 197:1, 200:7, 206:19, 247:3, 247:10, 255:6, 255:9, 255:13, 255:16, 255:21, 255:25, 256:6, 256:12, 256:17, 257:3, 257:7
Bitterman [1] - 166:8
bitterman [1] - 172:13
blame [1] - 213:13
blowing [1] - 139:8
Bob [1] - 205:14
bore [1] - 193:24
boring [1] - 194:1
boss [1] - 249:16
bottom [4] - 201:16, 224:9, 224:13, 234:11
Boulevard [3] - 132:20, 132:24, 134:2
boxed [2] - 250:4, 250:6
BOYLAN [1] - 133:7
brain [2] - 200:3, 200:5
brief [7] - 156:17, 156:18, 156:20, 156:23, 157:3, 157:19, 157:22
Brief [1] - 206:1
bring [11] - 144:9, 145:9, 165:21, 170:17, 171:7, 171:11, 171:17, 172:4, 195:10, 223:16, 271:5
bringing [4] - 145:15, 166:21, 169:15, 173:5
broach [1] - 262:12
broached [1] - 262:8
broad [2] - 190:10, 266:3
broker [1] - 266:17
BRONSTEIN [2] - 132:19, 133:2
brought [7] - 145:12, 152:19, 168:6, 207:25, 217:10, 217:12, 224:12
BRUNSWICK [1] - 132:11
Brunswick [3] - 133:10, 133:10, 198:18
BS [1] - 175:2
building [5] - 138:6, 138:9, 138:16, 138:22, 138:24, 140:5
bulk [1] - 138:11
bunch [1] - 216:19
busy [1] - 156:15
BY [19] - 133:3, 133:5, 133:7, 133:9, 134:5, 157:13, 168:12, 172:19, 180:16, 180:23, 186:1, 195:1, 199:13, 206:4, 221:19, 224:1, 235:3, 247:11,

257:11

**C**

C.C.R [1] - 272:23
calendars [2] - 209:11, 256:21
cannot [4] - 156:2, 175:12, 218:23, 220:2
care [3] - 140:9, 249:17, 250:12
career [3] - 184:2, 212:21, 237:23
careful [1] - 232:3
CASE [1] - 132:2
case [45] - 140:19, 144:12, 149:5, 151:16, 161:9, 166:13, 166:16, 170:25, 176:8, 179:20, 191:12, 192:20, 195:24, 202:15, 202:21, 203:10, 209:17, 226:23, 228:15, 236:10, 236:11, 236:16, 236:20, 236:25, 237:8, 237:14, 237:20, 237:22, 237:24, 238:7, 238:17, 238:23, 240:10, 249:3, 264:5, 264:10, 266:14, 267:3, 267:8, 267:9, 267:17, 268:21, 269:19, 270:14
cases [7] - 161:11, 162:5, 236:5, 236:6, 263:14, 262:10, 269:25
Catanese [1] - 133:11
certain [7] - 152:14, 183:18, 183:23, 184:1, 194:7, 262:8, 266:22
certainly [13] - 158:14, 178:16, 182:7, 202:3, 231:9, 238:10, 239:8, 239:9, 249:22, 251:14, 251:18, 263:9, 265:1
Certified [1] - 132:24
certified [1] - 260:22
certify [1] - 272:6
CERTIFY [2] - 272:11, 272:16
cetera [3] - 152:15, 221:2, 222:2
chambers [14] - 197:20, 224:22, 225:4, 225:11, 225:22, 227:2, 227:5, 227:12, 228:20, 228:21, 230:4, 232:24, 233:17, 233:18
chance [1] - 175:21
change [3] - 143:13, 166:9, 166:12
characterized [1] - 190:22
charges [1] - 180:17
check [4] - 219:15, 219:16, 226:25, 259:19
checked [1] - 209:9
CHIEF [1] - 132:10
Circuit [1] - 203:2
circumstance [1] - 145:2
circumstances [9] - 140:21, 171:15, 171:21, 172:3, 183:14, 183:15, 266:12, 266:22, 267:3
CITY [1] - 132:10
City [1] - 133:10
civil [63] - 166:13, 166:14, 168:17, 169:16, 173:14, 175:17, 194:11, 199:6, 203:19, 203:20, 203:21, 203:22, 203:23, 204:4, 210:19, 211:20, 212:1, 212:15, 212:23, 213:17, 214:14, 214:25, 215:5, 215:9, 215:13, 215:23, 216:6, 216:17, 217:7, 217:23, 218:1, 218:4, 218:15, 220:11, 227:5, 228:3, 228:17, 228:18, 229:5, 229:16, 230:2, 230:3, 230:13, 231:14, 232:18,

246:9, 250:21, 250:23, 251:6, 251:13, 261:18, 263:16, 263:22, 265:4, 266:1, 266:6, 266:9, 267:23, 268:5, 270:16, 271:3
claim [2] - 133:15, 169:20
claims [4] - 157:20, 169:3, 203:19, 204:5
clarify [3] - 137:19, 142:6, 247:3
classified [1] - 214:23
clear [3] - 135:11, 164:21, 265:15
clearly [1] - 228:6
clerical [2] - 221:22, 222:1
clerk [1] - 257:17
client [80] - 134:19, 135:1, 135:15, 137:23, 138:1, 138:7, 142:1, 142:3, 142:8, 142:21, 143:1, 143:24, 145:5, 145:21, 146:12, 145:19, 146:22, 147:9, 162:18, 162:24, 163:20, 164:14, 165:11, 165:17, 165:20, 166:19, 171:9, 172:6, 172:22, 172:25, 177:6, 177:11, 177:24, 178:13, 179:2, 179:16, 179:21, 180:5, 180:8, 180:10, 180:13, 183:3, 189:15, 189:22, 190:16, 191:21, 192:4, 193:20, 194:1, 194:7, 194:15, 195:13, 198:15, 198:20, 196:16, 200:18, 201:24, 202:1, 204:11, 204:12, 235:11, 241:22, 243:1, 243:6, 247:6, 250:2, 250:19, 250:22, 254:17, 255:4, 255:19, 258:4, 258:6, 258:14, 258:25, 261:15, 261:24, 268:21
client's [3] - 141:12, 179:20, 229:7
close [2] - 172:10, 172:12
coercion [2] - 176:7, 176:11
cognizant [1] - 171:23
coming [6] - 151:25, 162:7, 164:6, 164:10, 168:25, 197:24
commencement [1] - 272:6
commencing [1] - 132:20
comment [2] - 156:2, 184:15
Commerce [2] - 132:20, 134:2
commitment [2] - 268:9, 268:20
committed [7] - 219:22, 219:24, 267:11, 267:21, 268:2, 268:4, 268:14
communicate [5] - 205:18, 240:9, 247:16, 251:15, 251:17
communication [2] - 245:2, 263:25
compare [1] - 214:1
compendium [1] - 183:1
complaining [1] - 177:11
complaint [1] - 236:24
complaints [1] - 137:3
complete [1] - 191:3
completed [4] - 177:7, 179:22, 180:13, 209:22
completely [2] - 160:16, 191:10
completing [1] - 160:12
comply [1] - 187:16
concentrating [1] - 169:12
concept [1] - 246:14
concern [2] - 248:15, 248:25
concerned [2] - 229:6, 248:18
concerning [25] - 136:18, 137:16, 138:1, 140:4, 148:11, 153:1, 153:17, 154:18, 155:1, 169:14, 173:14, 199:16, 223:7,

238:7, 239:6, 243:25, 245:10, 245:23, 245:25, 247:15, 257:21, 258:2, 259:2, 261:4
**conclude** [1] - 198:4
**concluded** [1] - 271:11
**conclusion** [3] - 145:13, 145:15, 148:3
**condition** [72] - 134:21, 135:3, 135:6, 135:12, 135:19, 136:2, 136:8, 136:19, 137:12, 137:16, 138:25, 139:3, 139:10, 140:4, 140:13, 140:17, 140:24, 141:5, 141:23, 143:3, 144:8, 144:16, 144:22, 144:24, 145:1, 145:7, 146:4, 162:10, 163:22, 164:17, 164:25, 165:23, 165:24, 165:25, 166:1, 170:12, 171:2, 171:8, 171:18, 172:5, 175:14, 177:15, 178:25, 179:2, 186:14, 191:6, 191:9, 194:11, 196:3, 196:10, 196:16, 211:21, 212:19, 228:2, 229:7, 230:2, 230:3, 230:8, 246:9, 246:13, 250:10, 251:1, 251:7, 251:12, 252:10, 252:15, 252:17, 252:23, 252:25, 253:3, 254:4, 266:10
**conditioned** [1] - 270:15
**conditions** [5] - 134:18, 145:6, 258:9, 258:10, 259:3
**CONF** [1] - 227:8
**conf** [1] - 231:4
**conference** [24] - 211:11, 211:17, 218:18, 218:21, 218:25, 224:11, 225:1, 225:4, 225:11, 225:22, 226:6, 226:20, 227:16, 228:6, 228:14, 228:19, 233:12, 233:16, 234:15, 234:17, 234:20, 248:2, 248:17, 248:18
**conference"** [2] - 209:19, 226:2
**conferences** [4] - 219:16, 233:5, 248:9, 264:13
**confidence** [1] - 231:7
**conflict** [2] - 261:21, 262:1
**conflicts** [1] - 248:20
**conforms** [1] - 226:8
**confronted** [2] - 186:16, 186:19
**confused** [1] - 232:6
**confusing** [3] - 162:11, 162:12, 243:20
**conjunction** [2] - 225:19, 228:7
**Connell** [24] - 133:19, 139:18, 139:24, 142:1, 147:14, 149:7, 152:16, 153:9, 161:11, 161:19, 162:12, 163:5, 164:8, 169:9, 170:21, 176:5, 193:23, 197:20, 221:18, 250:16, 250:24, 252:5, 254:18, 255:4
**CONNELL** [91] - 133:4, 133:5, 134:5, 151:18, 157:13, 168:3, 168:8, 168:12, 172:8, 172:18, 172:19, 180:16, 180:20, 188:6, 190:24, 191:3, 193:1, 193:13, 193:19, 194:3, 194:21, 197:6, 197:9, 197:15, 197:21, 198:2, 198:6, 198:22, 199:2, 199:12, 200:11, 201:6, 201:9, 201:15, 201:18, 202:10, 205:24, 207:4, 207:9, 210:3, 211:14, 215:3, 216:25, 218:7, 219:1, 221:6,

221:12, 222:13, 223:5, 223:14, 223:21, 223:24, 225:15, 231:9, 233:25, 234:10, 243:7, 245:21, 248:19, 248:24, 249:14, 249:22, 250:7, 250:20, 251:4, 251:10, 251:16, 252:3, 252:6, 252:14, 252:18, 252:22, 253:4, 254:8, 254:13, 254:19, 254:21, 254:24, 255:8, 264:18, 264:23, 265:8, 265:15, 265:22, 268:17, 269:7, 269:13, 271:9
**consent** [9] - 141:12, 216:15, 216:23, 217:1, 217:2, 217:5, 258:9, 259:3, 266:1
**consenting** [2] - 259:5, 266:6
**consequences** [1] - 179:16
**consider** [2] - 171:6, 184:5
**consideration** [1] - 250:17
**considered** [1] - 143:12
**constraints** [1] - 270:21
**consult** [3] - 266:5, 266:8, 267:6
**consultation** [4] - 146:23, 147:1, 148:7, 269:6
**consulted** [3] - 268:25, 269:1, 269:2
**consulting** [2] - 142:3, 267:5
**contact** [5] - 153:4, 153:17, 154:17, 162:9, 163:16
**contacting** [1] - 188:7
**contain** [1] - 228:1
**contained** [3] - 152:14, 154:25, 237:18
**contemplate** [1] - 144:23
**context** [5] - 199:4, 222:8, 228:12, 256:9, 267:1
**continue** [3] - 134:8, 141:22, 149:10
**continues** [1] - 157:17
**CONTINUING** [5] - 168:12, 186:1, 199:13, 257:11, 265:23
**cONTINUING** [1] - 195:1
**conversation** [42] - 138:4, 138:11, 138:24, 139:3, 139:10, 140:6, 140:10, 147:8, 150:12, 150:16, 150:19, 150:21, 150:24, 151:3, 154:23, 155:5, 155:6, 155:7, 155:11, 155:19, 155:20, 155:23, 156:2, 158:8, 158:21, 159:6, 159:7, 164:3, 164:5, 197:14, 199:7, 217:18, 217:22, 220:9, 238:18, 240:23, 241:6, 242:9, 242:13, 242:15, 250:16, 265:13
**conversations** [13] - 147:4, 150:13, 154:3, 164:1, 204:7, 218:15, 223:8, 235:12, 243:25, 244:1, 245:23, 257:20, 264:20
**conviction** [1] - 178:1
**copies** [1] - 218:22
**cops** [1] - 195:23
**copy** [8] - 158:5, 158:11, 158:13, 158:15, 158:17, 182:4, 207:22, 223:24
**CORE** [1] - 132:14
**correct** [46] - 137:3, 146:25, 147:12, 147:14, 165:12, 165:13, 172:16, 179:4, 179:22, 180:11, 180:12, 180:14, 180:18, 183:19, 183:20, 184:12, 184:17, 184:18, 185:4, 185:7, 185:13, 185:17, 185:22, 188:1, 189:2, 205:19, 206:8, 207:4, 209:22, 210:20, 211:8, 211:11, 220:11, 221:18, 227:12, 228:3, 228:4, 228:22,

229:7, 235:10, 236:7, 240:19, 244:12, 247:7, 258:6, 258:16
**CORRECTIONAL** [1] - 132:13
**correspondence** [1] - 263:9
**counsel** [4] - 247:10, 255:7, 272:17, 272:19
**counts** [1] - 187:12
**COUNTY** [2] - 132:12, 132:12
**County** [6] - 204:2, 221:13, 235:13, 235:9, 245:24, 263:21
**couple** [3] - 149:5, 149:20, 163:23
**course** [10] - 176:2, 176:21, 199:18, 202:23, 202:25, 209:9, 238:16, 240:8, 241:8, 258:14
**Court** [29] - 132:24, 141:8, 143:2, 145:3, 147:3, 162:9, 164:13, 164:14, 164:21, 166:25, 174:23, 175:16, 176:14, 181:3, 181:14, 183:2, 183:9, 184:11, 187:8, 187:16, 188:23, 195:25, 201:13, 202:14, 202:19, 224:10, 224:17, 224:23, 247:16
**court** [29] - 146:17, 147:21, 156:17, 156:22, 164:22, 166:24, 170:18, 175:13, 177:18, 181:18, 183:17, 183:22, 184:9, 186:19, 188:14, 196:3, 196:9, 203:18, 205:20, 209:5, 214:2, 217:19, 224:17, 227:17, 232:7, 233:3, 233:6, 242:18, 253:11
**COURT** [2] - 132:1, 132:23
**Court's** [2] - 171:7, 172:5
**courthouse** [13] - 134:14, 137:18, 137:25, 138:15, 138:18, 140:7, 141:20, 142:10, 142:15, 143:20, 145:20, 269:14, 269:23
**courtroom** [7] - 137:14, 137:21, 138:17, 138:21, 142:9, 172:4, 180:24
**courts** [3] - 173:6, 203:17, 203:24
**cover** [1] - 204:24
**coverage** [1] - 250:15
**covering** [1] - 240:5
**credibility** [2] - 262:18
**crime** [1] - 166:3
**criminal** [7] - 164:22, 166:16, 203:8, 212:22, 238:17, 239:1, 269:19
**CROSS** [8] - 180:23, 186:1, 195:1, 199:13, 224:1, 235:3, 257:11, 265:23
**Cross** [2] - 133:20, 133:21
**CROSS-EXAMINATION** [8] - 180:23, 186:1, 195:1, 199:13, 224:1, 235:3, 257:11, 265:23
**crossed** [1] - 234:2
**crossing** [1] - 234:4
**Crosss** [1] - 133:22
**curious** [1] - 144:25

**D**

**damages** [1] - 133:14
**danger** [2] - 192:14, 192:16
**dangers** [1] - 192:13
**dash** [7] - 210:19, 214:25, 215:4, 215:7, 215:9, 215:10
**date** [27] - 144:1, 144:4, 153:5, 171:4, 183:18, 183:23, 184:2, 201:4, 206:6, 209:1, 209:4, 209:5, 222:11, 224:12, 230:18, 231:12, 232:5, 232:13, 233:7, 233:10, 244:18, 245:19, 249:12, 250:6,

269:4, 269:23, 272:14
**dates** [17] - 200:23, 200:24, 207:17, 207:20, 208:2, 209:2, 221:5, 233:8, 234:1, 234:3, 234:5, 246:1, 247:15, 250:1, 254:7, 257:1
**day-to-day** [1] - 139:15
**days** [7] - 153:7, 199:8, 244:14, 245:14, 246:3, 257:5, 262:10
**deal** [11] - 161:18, 161:21, 161:24, 195:12, 203:19, 207:5, 207:11, 216:2, 221:11, 266:17, 267:7
**dealing** [3] - 173:13, 188:20, 269:12
**deals** [3] - 154:3, 154:17, 223:11
**dealt** [2] - 223:16
**December** [15] - 147:20, 182:5, 183:10, 187:20, 188:3, 188:10, 188:21, 208:12, 223:10, 230:24, 233:7, 233:8, 234:2, 234:9
**December"** [1] - 233:23
**decided** [20] - 135:9, 144:3, 146:14, 147:10, 147:23, 147:25, 173:3, 173:15, 187:22, 187:24, 191:18, 194:9, 194:16, 194:17, 194:19, 194:21, 201:11, 204:3, 248:1, 248:4
**decision** [6] - 146:10, 146:21, 146:23, 172:11, 173:2, 204:13
**decisions** [1] - 146:19
**defendant** [4] - 158:4, 158:9, 169:16, 258:10
**Defendant** [3] - 133:5, 133:8, 133:12
**Defendant's** [1] - 224:4
**Defendants** [2] - 132:15, 133:10
**defense** [2] - 193:17, 202:14
**defensible** [1] - 192:19
**define** [3] - 236:2, 237:7, 253:2
**definitely** [1] - 235:23
**definition** [2] - 177:22, 183:25
**degree** [6] - 166:3, 176:8, 177:24, 177:25, 193:7, 269:20
**demarcation** [2] - 237:3, 238:2
**denial** [5] - 242:6, 244:11, 245:8, 245:20, 245:21
**denied** [3] - 242:4, 242:11, 244:2
**dep** [4] - 137:6, 152:2, 152:15, 168:2
**DEPARTMENT** [1] - 132:11
**department** [9] - 140:1, 142:15, 160:13, 160:20, 165:9, 176:24, 195:22, 263:6, 263:11
**Department** [4] - 133:10, 198:18, 221:14, 235:13
**deposition** [29] - 134:7, 134:8, 134:9, 134:11, 151:9, 151:22, 152:12, 152:22, 153:20, 154:7, 154:16, 155:1, 156:5, 157:16, 168:4, 168:8, 168:14, 169:8, 169:13, 169:21, 169:25, 198:8, 199:10, 209:7, 255:22, 264:6, 264:9, 265:1, 271:11
**DEPOSITION** [1] - 132:5
**deps** [1] - 247:25
**description** [1] - 184:20
**DESCRIPTION** [1] - 133:24
**desire** [1] - 166:13
**determination** [1] - 187:14,

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

4

244:23
determine [3] - 189:12, 203:4, 259:9
determined [3] - 160:16, 189:10, 193:4
determining [1] - 142:3
DeVesa [40] - 134:16, 135:12, 136:1, 136:3, 136:7, 136:10, 137:11, 137:22, 162:17, 164:24, 166:12, 166:17, 166:18, 167:16, 168:5, 168:16, 168:21, 168:23, 169:3, 169:8, 169:15, 169:21, 170:4, 184:10, 224:3, 225:5, 225:11, 225:23, 227:3, 227:4, 230:5, 230:14, 230:19, 232:24, 233:19, 238:6, 239:9, 258:2, 265:3, 265:10
DeVesa's [5] - 224:22, 232:23, 233:17, 263:15, 264:15
different [9] - 156:7, 190:21, 204:25, 205:1, 209:2, 239:13, 250:25, 261:16, 261:17
difficult [1] - 193:5
dig [2] - 200:3, 200:5
dinner [1] - 242:20
Direct [1] - 133:19
direct [1] - 248:15
DIRECT [2] - 134:5, 168:12
direction [1] - 235:9
directly [1] - 154:3
Director [1] - 133:10
disagreed [1] - 253:5
disagrees [1] - 228:15
discovery [5] - 151:16, 154:1, 154:2, 166:16, 199:6
discuss [11] - 146:21, 166:8, 166:9, 189:15, 189:19, 203:1, 213:23, 224:20, 224:25, 261:15, 267:18
discussed [26] - 144:4, 166:4, 166:5, 166:6, 173:3, 173:5, 173:7, 181:1, 181:5, 189:21, 190:9, 192:7, 193:25, 200:17, 200:21, 202:3, 203:23, 222:8, 225:3, 225:6, 225:17, 229:5, 230:4, 230:10, 232:22, 233:18, 236:13, 261:1
discussing [2] - 143:23, 207:18
discussion [38] - 144:6, 150:8, 151:19, 165:17, 179:17, 190:16, 190:20, 190:22, 197:6, 197:16, 199:16, 204:11, 209:2, 209:4, 209:6, 212:19, 213:2, 213:5, 221:10, 225:12, 226:22, 227:4, 230:17, 238:5, 238:12, 238:15, 238:20, 238:24, 239:8, 239:9, 239:14, 241:24, 246:4, 246:6, 246:7, 250:13, 262:5
discussions [28] - 137:15, 148:4, 151:17, 190:5, 191:2, 191:4, 191:16, 201:24, 204:3, 204:15, 225:25, 238:11, 238:13, 239:4, 240:12, 241:18, 241:21, 245:9, 245:22, 252:21, 257:13, 257:22, 258:1, 261:4, 262:23, 263:5, 263:8, 263:10
dismiss [3] - 168:18, 169:16, 264:21
dismissal [11] - 169:22, 235:17, 237:17, 238:21, 239:3, 239:6, 239:18, 240:22, 259:8, 259:17, 265:4
dismissed [2] - 180:17,

243:24
dispute [1] - 173:25
distinction [1] - 142:6
DISTRICT [1] - 132:1
dISTRICT [1] - 132:1
Division [4] - 193:10, 193:16, 194:5, 194:8
DMS-2 [2] - 223:23, 224:5
DMS-3 [1] - 258:5
DO [2] - 272:11, 272:16
document [70] - 134:25, 141:21, 142:8, 142:9, 142:22, 142:25, 143:21, 144:1, 146:11, 151:20, 151:25, 157:15, 159:8, 160:12, 161:17, 173:15, 174:1, 174:4, 174:8, 174:10, 174:19, 174:21, 174:22, 174:25, 175:1, 175:22, 176:4, 176:16, 176:22, 179:13, 191:15, 191:16, 201:5, 202:13, 202:17, 202:19, 204:4, 209:21, 209:25, 210:1, 210:2, 210:7, 210:8, 210:9, 211:5, 213:16, 213:20, 213:21, 213:25, 214:1, 214:5, 214:12, 214:17, 214:23, 214:25, 216:5, 216:11, 216:14, 216:21, 222:11, 244:7, 258:6, 258:8, 260:15, 260:17, 260:18, 261:2, 261:5
documentation [1] - 251:21
documents [6] - 200:25, 201:2, 205:10, 257:13, 257:17, 259:16
DOE [1] - 132:13
DOES [1] - 132:14
done [27] - 134:7, 139:24, 158:14, 158:24, 159:9, 159:13, 159:16, 180:6, 182:1, 182:12, 191:7, 198:11, 198:19, 200:12, 209:14, 223:18, 228:11, 235:23, 235:24, 240:10, 244:19, 252:1, 253:12, 259:18, 262:5, 271:9
dots [1] - 215:8
double [2] - 229:17, 229:18
DOUKAS [1] - 133:9
down [21] - 161:8, 192:8, 195:12, 199:19, 209:25, 227:16, 228:14, 229:17, 234:7, 234:11, 248:5, 249:2, 249:17, 249:18, 250:3, 251:19, 251:22, 253:15, 256:20, 266:19, 268:15
DRA [1] - 201:16
DRA-2 [1] - 201:17
DRA-3 [1] - 201:18
DRA-4 [1] - 201:19
duly [1] - 272:9
DUNST [1] - 133:9
during [13] - 160:13, 199:23, 220:23, 225:1, 225:4, 225:22, 226:19, 232:22, 238:16, 242:8, 242:14, 246:20, 255:22
DWYER [1] - 133:4

**E**

e-mail [2] - 240:7, 240:9
early [14] - 147:20, 189:24, 189:25, 236:16, 237:19, 237:20, 237:21, 237:25, 238:25, 239:2
Early [1] - 186:5
effect [5] - 202:2, 202:4, 202:5, 203:5, 223:2
effort [1] - 269:17
efforts [1] - 154:18
either [7] - 157:6, 158:19, 205:9, 208:1, 221:25, 238:6, 260:24
employee [2] - 272:17,

272:19
end [1] - 179:12
enforce [2] - 195:6, 195:10
enforceable [1] - 191:5
enforced [1] - 191:9
engage [1] - 191:14
English [2] - 175:1, 175:3
entails [1] - 216:1
enter [2] - 162:25, 269:9
entered [2] - 165:11, 178:23
enters [1] - 199:10
entire [4] - 210:1, 212:21, 236:7, 236:8
entitled [1] - 207:5
entrance [1] - 270:3
entry [8] - 135:20, 136:2, 136:8, 212:23, 229:7, 230:3, 231:11, 231:13
ergo [1] - 170:9
ESQ [10] - 132:8, 133:3, 133:5, 133:7, 133:9, 133:12, 133:13, 133:18, 134:1, 272:8
ESQS [1] - 133:4
essentially [1] - 193:12
et [3] - 152:15, 221:2, 222:2
ethical [1] - 171:17
ethics [4] - 236:14, 239:11, 239:22, 253:13
Eva [3] - 260:2, 260:4, 260:6
evening [2] - 206:14, 246:5
event [1] - 170:10
events [1] - 204:23
eventually [1] - 192:7
exact [1] - 167:13
exactly [10] - 161:9, 168:16, 174:15, 190:11, 190:13, 212:13, 228:25, 242:10, 243:9, 255:8
EXAMINATION [11] - 132:6, 134:5, 168:12, 180:23, 186:1, 195:1, 199:13, 224:1, 235:3, 257:11, 265:23
examination [1] - 272:7
examined [1] - 134:3
except [2] - 168:20, 205:12
exchange [1] - 266:2
exclude [1] - 241:16
excluded [1] - 257:5
excuse [1] - 227:25
execute [19] - 141:13, 141:25, 142:4, 147:10, 147:23, 148:1, 158:4, 158:10, 162:18, 163:9, 163:19, 163:20, 191:18, 194:19, 194:22, 201:12, 258:10
execute" [1] - 219:5
executed [4] - 147:15, 154:14, 165:12, 220:20
executes [1] - 142:1
executing [2] - 192:17, 204:8, 257:21
execution [2] - 138:2, 146:12, 179:20, 202:1, 223:12, 229:6
Exhibit [2] - 206:2, 224:4
exists [1] - 229:13
expect [6] - 268:19, 268:22, 268:23, 268:24, 269:1, 269:2
expected [1] - 269:3
experience [3] - 170:15, 216:13, 217:9
explain [1] - 179:16
explained [3] - 165:23, 203:17, 226:7
express [5] - 252:7, 252:10, 252:14, 252:22, 252:24
expressed [5] - 140:18, 198:8, 252:8, 252:16, 253:2
extent [2] - 205:7, 262:8
extremely [4] - 172:10, 172:12, 269:11

**F**

FACILITY [1] - 132:13
facing [1] - 170:24
fact [19] - 168:19, 177:23, 180:8, 181:16, 187:7, 187:15, 191:12, 193:4, 198:10, 229:4, 229:15, 233:13, 241:16, 247:4, 249:1, 249:25, 250:8, 268:8, 269:8
facts [14] - 167:1, 167:14, 168:10, 169:24, 170:2, 170:14, 170:15, 171:15, 171:17, 243:13, 243:14, 243:21, 251:12
factual [2] - 243:4, 254:24
fair [9] - 135:13, 136:19, 146:24, 152:17, 169:3, 186:25, 198:6, 204:1, 250:17
familiar [1] - 179:9
family [3] - 203:8, 203:9, 203:15
far [6] - 141:1, 154:1, 158:7, 213:24, 261:14, 264:10
fashion [1] - 152:19
favor [1] - 177:17
February [21] - 165:8, 172:20, 179:4, 183:3, 200:22, 201:3, 201:5, 201:6, 201:25, 202:10, 202:11, 204:9, 221:13, 221:15, 230:18, 230:23, 231:3, 232:20, 233:10, 234:23, 249:4
February/March [1] - 188:20
federal [11] - 156:17, 156:21, 173:6, 173:13, 173:14, 175:13, 177:18, 203:17, 203:18, 203:24, 204:4
Federal [2] - 165:25, 175:16
feet [2] - 186:22, 186:23
felt [6] - 174:24, 204:18, 236:8, 251:1, 251:2
female [2] - 158:23, 159:8
few [2] - 238:11, 262:10
figure [1] - 161:8
file [32] - 148:17, 148:20, 159:10, 161:7, 162:2, 162:23, 172:23, 205:14, 206:7, 206:10, 206:17, 206:18, 206:20, 206:23, 206:25, 207:1, 207:10, 220:19, 220:24, 221:1, 221:11, 221:21, 221:25, 222:15, 233:2, 235:8, 237:18, 244:5, 247:14, 247:21, 248:8, 265:25
filed [9] - 161:6, 162:8, 176:9, 182:22, 222:23, 259:12, 259:18, 262:24, 263:7
files [1] - 204:23
filing [3] - 193:20, 232:6, 236:24
finally [3] - 195:4, 220:20, 222:15
financially [1] - 272:20
fine [9] - 139:1, 139:25, 142:5, 146:22, 151:5, 240:3, 241:15, 244:9, 265:22
finish [7] - 186:7, 217:4, 221:7, 227:25, 249:20, 255:13, 257:10
finished [2] - 153:14, 235:1
firm [1] - 260:15
firms [1] - 205:14
first [35] - 135:9, 141:13, 141:24, 146:8, 146:16, 147:19, 149:9, 149:14, 149:15, 153:3, 168:24, 181:13, 187:10, 189:21, 196:2, 200:7, 210:22, 213:1, 213:19, 214:21, 214:22, 227:4, 244:4,

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

250:14, 252:24, 253:19,
255:22, 262:2, 264:12,
264:20, 264:21, 265:5,
268:23, 269:3, 271:3
five [2] - 254:17, 255:3
five-year [2] - 254:17, 255:3
flagpole [2] - 254:17, 255:3
flavor [1] - 234:18, 234:21
flipped [2] - 221:1, 231:19
flipping [1] - 241:4
floating [1] - 185:19
FLORA [1] - 132:4
flows [1] - 239:13
flying [1] - 216:19
focused [1] - 221:2
folks [3] - 170:25, 206:12,
222:19
follow [1] - 240:24
following [1] - 214:9
follows [1] - 134:4
force [1] - 203:5
foregoing [1] - 272:11
forget [3] - 186:13, 186:14,
189:9
forgot [2] - 147:16, 200:6
forgotten [1] - 186:4
form [6] - 143:9, 143:25,
186:7, 187:8, 215:21,
260:15
formal [3] - 189:13, 189:14,
195:6
formulate [1] - 161:9
formulated [3] - 134:19,
135:4, 142:16
forth [1] - 272:14
forum [2] - 173:9, 203:21
forward [2] - 140:24, 171:11
forwarded [1] - 164:14
four [2] - 195:3, 247:20
frame [15] - 147:16, 147:18,
148:5, 148:8, 189:2, 189:6,
192:1, 192:8, 202:8, 207:2,
222:21, 222:22, 245:3,
245:12, 245:13
frames [1] - 196:5
free [1] - 249:7
frightening [4] - 166:20,
166:21, 166:25, 168:20
front [4] - 144:19, 184:10,
200:25, 201:2
FURTHER [2] - 272:11,
272:16

**G**

Gary [1] - 133:5
GARY [2] - 132:8, 133:7
gee [1] - 262:19
Gelade [3] - 166:15, 199:4
Gelade's [2] - 166:13, 199:5
general [5] - 239:21, 239:22,
240:6, 259:4, 267:16
generally [10] - 140:11,
170:8, 174:5, 200:17,
222:7, 225:9, 226:21,
235:20, 236:14, 248:11
generated [1] - 182:23
gentleman [1] - 229:11
gentlemen [1] - 222:17
girls [3] - 259:21, 260:1,
261:5
given [19] - 141:18, 146:3,
148:13, 150:22, 160:22,
161:6, 161:24, 166:12,
170:14, 171:15, 171:21,
172:2, 191:12, 192:21,
249:25, 251:1, 256:20,
267:9
glad [2] - 166:22, 166:23
glaringly [1] - 157:25
Goddamn [1] - 197:4
GOLDEN [1] - 133:6
GOLDSTEIN [2] - 132:19,
133:2
granted [3] - 192:23, 202:25,
266:2
great [6] - 161:18, 161:21,
161:24, 216:1, 248:25,
255:2
grounds [1] - 153:23
guarantee [1] - 175:12
guess [7] - 161:24, 182:8,
200:16, 204:14, 222:11,
226:24, 229:8
guidelines [2] - 194:10,
194:12
guilty [2] - 178:2, 254:23
gumption [1] - 197:11
gun [2] - 177:14, 203:13
guts [3] - 195:6, 195:9,
195:16
guy [5] - 170:24, 194:9,
194:10, 195:12
guys [6] - 167:8, 200:9,
200:23, 222:22, 231:6,
234:13

**H**

half [2] - 147:7, 210:13
hallway [1] - 229:1
hand [3] - 205:7, 226:1
hand-in-hand [1] - 205:7
handed [4] - 134:23, 244:25,
257:12, 257:16
handle [2] - 222:6, 250:11
handled [1] - 269:25
handling [3] - 212:22, 248:8,
248:10
handwriting [3] - 208:21,
211:15
Handwritten [1] - 133:25
handwritten [3] - 206:2,
213:22, 247:19
happy [2] - 250:4, 267:11
hard [3] - 161:5, 183:7,
264:12
harmless [25] - 137:17,
138:3, 142:18, 146:15,
146:20, 147:11, 147:24,
150:18, 151:1, 151:7,
153:1, 162:19, 163:9,
164:12, 171:10, 223:12,
229:6, 249:16, 250:8,
257:21, 258:2, 258:11,
259:7, 268:18, 270:2
head [3] - 177:14, 186:20,
203:13
hear [2] - 219:9, 219:12,
230:23
heard [2] - 198:23, 264:25
hearing [16] - 146:17,
147:21, 208:5, 208:9,
208:23, 231:16, 231:20,
231:23, 231:24, 232:4,
232:10, 232:11, 232:19,
233:23, 234:8, 249:15
heated [1] - 239:14
helped [2] - 138:20, 257:5
helps [1] - 256:25
hereby [1] - 272:5
hereinbefore [1] - 272:14
herself [2] - 149:19, 247:15
hiatus [1] - 224:21
himself [2] - 166:18, 173:1
history [1] - 270:4
HOAGLAND [1] - 133:9
hold [29] - 137:17, 138:2,
142:18, 146:15, 146:20,
147:11, 147:23, 150:18,
151:1, 151:7, 153:1,
162:11, 162:18, 163:9,
163:24, 164:12, 171:10,
187:24, 223:12, 229:6,
249:16, 250:8, 251:25,
257:21, 258:2, 258:11,
259:7, 268:18, 270:2
holidays [1] - 192:2
hope [1] - 203:16
hoped [1] - 145:17
hoping [1] - 186:4
horrendous [1] - 253:9
Hunterdon [4] - 199:14,
201:10, 221:13, 235:12
hyphen [4] - 228:8, 230:12,
231:14, 232:18

**I**

idea [14] - 197:17, 197:23,
198:1, 234:24, 235:20,
236:12, 249:8, 249:11,
263:15, 263:19, 263:21,
264:15, 264:18, 264:21
ideas [2] - 236:5, 236:12
identification [2] - 151:21,
206:3
Ill [3] - 132:10, 133:12,
133:14
illegal [6] - 171:2, 171:8,
171:19, 172:6, 191:9,
191:15
immediately [1] - 212:6
Impacting [1] - 171:4
impinging [1] - 171:3
implication [1] - 218:20
important [1] - 247:15
imposed [1] - 172:5
impression [2] - 140:19,
244:18, 268:13
improper [1] - 253:23
in-chambers [3] - 225:4,
225:11, 225:22
inappropriate [2] - 140:21,
145:8
inappropriately [1] - 203:14
INC [1] - 132:23
include [1] - 217:22
included [4] - 238:22,
239:17, 239:20, 239:21
including [3] - 221:12,
223:11, 234:1
incorrect [1] - 225:25
indicate [2] - 167:2, 167:14
indicated [6] - 144:14, 182:8,
182:10, 206:7, 206:9,
222:5
indicates [1] - 258:13
indicating [2] - 148:9, 163:17
indication [2] - 159:10,
163:18
individual [2] - 170:9, 260:21
information [24] - 150:22,
152:2, 152:14, 152:16,
152:18, 156:3, 159:5,
159:23, 164:6, 164:10,
204:22, 216:19, 218:12,
230:9, 240:13, 240:21,
241:1, 241:12, 246:17,
253:17, 259:11, 259:15,
261:10
informed [5] - 150:9, 158:22,
242:11, 242:12, 249:21
initial [2] - 139:18, 265:11
inquire [1] - 202:1
inquired [1] - 168:16
instance [2] - 183:21, 270:14
instruct [4] - 142:8, 142:11,
142:21, 159:12
intend [1] - 142:7
intended [2] - 135:8, 162:10
intent [4] - 144:1, 144:3,
160:11, 160:14
intention [7] - 143:19,
143:22, 162:17, 162:20,
162:21, 170:18, 180:25
intentional [1] - 160:5
intentions [1] - 151:2
interested [2] - 239:2,
272:20
interests [2] - 173:10, 203:20
interfered [1] - 209:11
interject [1] - 184:7
interjected [2] - 138:5,
166:18
Interjection [2] - 167:4,
167:5
interlocutory [1] - 166:7,
192:22, 193:1, 193:10,
193:14, 193:17, 193:21
internal [1] - 205:13
interpret [4] - 216:14,
216:18, 217:5, 217:8
interpretation [1] - 216:2
intervention [2] - 177:12,
178:24
Intervention [1] - 180:11
interview [1] - 139:18
invalid [2] - 165:23, 202:16
investigation [1] - 270:9
involved [13] - 148:15,
163:13, 166:14, 170:13,
192:2, 198:5, 198:9,
198:11, 216:15, 216:17,
222:25, 269:16, 270:18
issue [14] - 163:8, 169:15,
197:23, 204:19, 207:2,
208:25, 209:12, 215:20,
249:25, 261:20, 262:18,
262:19, 271:3
issues [4] - 139:5, 146:7,
172:21, 207:11
item [1] - 209:21
items [3] - 187:1, 232:21,
233:18
itself [7] - 210:9, 213:16,
213:20, 213:22, 214:12,
214:17, 214:24

**J**

JAG [1] - 132:2
jail [4] - 194:7, 194:15,
194:18, 198:20
January [7] - 230:18, 230:22,
231:3, 232:19, 233:10,
234:23, 249:4
JERSEY [1] - 132:1
Jersey [8] - 132:19, 132:20,
132:25, 134:2, 176:25,
178:14, 272:5, 272:24
JOHN [1] - 132:13
joke [3] - 196:25, 197:2,
197:5
JON [1] - 132:14
Joseph [1] - 133:11
judge [36] - 135:7, 135:16,
135:17, 135:18, 140:16,
144:7, 144:9, 144:11,
149:11, 166:1, 166:22,
173:14, 181:22, 183:5,
183:17, 184:10, 184:15,
184:22, 185:10, 185:20,
195:9, 198:5, 198:9,
198:10, 198:12, 198:16,
198:17, 198:23, 202:23,
202:24, 203:4, 216:16,
233:12, 234:16, 234:19,
251:23
Judge [40] - 134:15, 135:12,
136:1, 136:3, 136:7, 136:9,
137:11, 137:22, 162:17,
164:24, 166:12, 167:16,
168:16, 168:21, 168:23,
169:3, 169:7, 169:14,
169:21, 170:4, 184:10,
224:3, 224:22, 225:5,
225:11, 225:23, 230:5,
230:14, 230:19, 232:23,
232:24, 233:17, 233:19,
238:6, 258:1, 262:8,
262:12, 263:15, 265:3
judge's [4] - 173:2, 197:17,
197:23, 198:1
judges [2] - 175:12, 191:11
judgment [2] - 202:25,
262:10
juncture [1] - 191:17
June [2] - 260:5, 260:6
June's [1] - 260:3

**K**

KANDIL [2] - 132:4, 132:5
Kandil [24] - 137:15, 140:4,
144:7, 144:15, 147:22,
165:9, 175:19, 210:5,
212:7, 237:18, 241:22,
242:5, 243:10, 244:1,
245:11, 260:17, 261:1,
261:4, 265:4, 265:25,
267:3, 267:22, 268:5

5

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

6

Kandil's [1] - 266:14
keep [5] - 144:18, 176:12, 197:19, 255:9, 255:16
kept [1] - 188:7
kick [1] - 170:11
kicked [1] - 233:8
kids [1] - 203:11
kind [10] - 139:8, 166:10, 185:19, 187:7, 190:8, 205:5, 232:4, 244:20, 244:21, 268:17
kinds [2] - 204:25, 205:1
knowing [2] - 174:4, 203:4
knowledge [3] - 216:14, 220:18, 243:5
known [3] - 166:19, 170:23, 249:23
knows [1] - 167:21
Kobin [18] - 134:6, 142:5, 143:13, 143:19, 151:20, 152:25, 153:4, 168:22, 196:5, 201:16, 205:14, 206:5, 223:5, 224:2, 249:2, 253:15, 261:25, 262:20
KOBIN [4] - 132:8, 133:3, 133:18, 272:8
Kobin-1 [6] - 133:25, 206:6, 216:5, 218:18, 218:20, 231:2
KRON [2] - 132:20, 133:2

**L**

lack [1] - 176:7
lacks [1] - 176:11
lady [3] - 149:24, 222:18, 222:19
language [1] - 258:24
last [14] - 137:4, 141:9, 168:9, 199:8, 201:7, 206:10, 206:11, 206:14, 207:22, 209:20, 220:6, 244:6, 256:18, 262:10
law [6] - 140:19, 144:12, 158:7, 161:9, 170:15, 203:23
Law [2] - 161:12, 162:4
LAWRENCE [1] - 133:13
lawsuit [7] - 161:6, 162:8, 163:14, 175:17, 182:23, 194:11, 222:23
lawsuits [1] - 216:18
lawyer [1] - 267:14
lean [1] - 220:4
leans [1] - 260:25
learn [1] - 246:16
least [17] - 139:2, 139:9, 167:8, 182:8, 190:9, 222:9, 228:17, 228:18, 230:11, 234:17, 238:12, 244:17, 251:17, 252:10, 264:19, 267:17, 269:17
leave [2] - 164:7, 166:9
leaving [3] - 137:25, 138:15, 138:17
left [14] - 134:14, 137:14, 137:17, 138:18, 138:21, 141:19, 142:10, 142:14, 143:20, 144:5, 145:20, 180:24, 226:1, 229:15
left-hand [1] - 226:1
legal [1] - 238:22
less [2] - 231:6, 231:7
letter [5] - 221:14, 242:13, 244:24, 244:25, 256:11
letting [1] - 192:17
LEVITT [1] - 133:6
License [1] - 272:24
lie [7] - 155:2, 155:7, 155:9, 155:10, 160:4, 160:6, 160:8
life [1] - 243:19
lift [1] - 164:25
lifted [4] - 165:22, 165:25, 166:1
light [1] - 195:10
likely [1] - 192:24
Line [4] - 152:23, 156:9,
157:16, 157:17
line [19] - 192:24, 218:24, 219:1, 219:2, 219:8, 219:10, 219:11, 220:1, 226:9, 226:10, 226:13, 227:9, 227:15, 228:8, 229:17, 229:18, 231:4, 231:11, 231:12
lines [5] - 215:7, 226:4, 226:5, 239:11
Lines [2] - 158:25, 159:1
LISBONA [1] - 133:4
listen [2] - 135:23, 150:2
literally [2] - 244:25, 270:8
litigation [3] - 212:22, 223:1, 239:1
!Kobin-1 [1] - 206:2
LLP [1] - 133:9
loaded [1] - 251:21
local [2] - 173:10, 203:20
LONGO [1] - 133:9
look [22] - 148:18, 148:22, 156:22, 161:11, 207:24, 216:22, 220:24, 221:1, 222:9, 226:1, 228:10, 233:22, 235:21, 236:5, 241:13, 244:24, 248:16, 250:5, 256:8, 262:10, 264:10, 264:12
looked [8] - 148:17, 161:7, 199:4, 206:12, 223:3, 228:11, 241:17, 256:20
looking [21] - 146:9, 147:21, 148:25, 149:2, 149:20, 150:17, 150:23, 156:5, 162:2, 163:16, 163:23, 164:7, 164:12, 182:25, 199:7, 225:20, 227:20, 230:23, 241:13, 261:10
looks [3] - 231:13, 233:16, 269:4
lost [2] - 169:9, 233:4
LUNDELL [1] - 133:6

**M**

Macarrico [2] - 260:4, 260:21
mail [2] - 240:7, 240:9
main [3] - 138:24, 139:2, 139:9
man [1] - 176:17
management [1] - 209:17
mandatory [1] - 204:17
March [13] - 201:21, 201:25, 202:11, 204:9, 207:7, 207:12, 220:19, 221:8, 221:16, 222:12, 222:13, 222:14, 223:11
Marcia [24] - 146:9, 147:19, 148:10, 148:25, 149:2, 149:19, 150:3, 150:17, 151:9, 151:15, 152:22, 154:23, 160:19, 163:15, 164:11, 182:20, 223:9, 224:23, 225:23, 230:5, 232:24, 241:18, 257:20
mark [10] - 137:5, 210:1, 210:19, 215:4, 215:8, 215:10, 228:8, 229:16, 230:13, 232:18
MARK [1] - 132:9
Mark [1] - 133:8
marked [5] - 151:21, 157:15, 206:3, 206:6, 209:25, 210:1, 210:2, 210:14, 211:5, 223:20, 223:21, 224:4, 231:2, 258:5
material [1] - 264:5
matter [5] - 170:4, 173:6, 204:17, 212:7, 224:11
mean [18] - 144:17, 150:21, 152:3, 179:10, 182:2, 195:18, 205:11, 217:5, 222:3, 232:3, 232:7, 235:19, 238:25, 242:21, 259:4, 259:7, 264:7, 264:21
meaning [2] - 158:24, 259:17
meaningful [1] - 202:13
meant [4] - 138:19, 159:25, 261:2, 261:5
mechanics [1] - 235:23
meet [1] - 260:18
member [1] - 223:8
memo [6] - 151:15, 167:15, 167:18, 167:19, 167:25, 170:9, 205:13, 205:14
memorandum [1] - 205:13
memory [6] - 213:3, 213:5, 255:21, 256:17, 256:19, 257:4
mention [5] - 135:18, 136:17, 137:10, 217:22, 239:10
mentioned [4] - 162:2, 230:23, 253:3, 265:6
message [2] - 148:25, 149:3
messages [4] - 148:19, 148:21, 221:2, 222:2
met [3] - 260:19, 260:20, 260:23
method [1] - 205:12
MICHAEL [1] - 133:12
middle [3] - 156:16, 157:21
MIDDLESEX [2] - 132:11, 132:12
Middlesex [5] - 191:11, 204:2, 239:5, 245:24, 263:21
might [8] - 141:2, 180:5, 186:6, 186:8, 227:11, 236:12, 243:7, 247:20
Mike [1] - 235:1
mind [20] - 139:2, 139:6, 139:9, 141:6, 145:6, 165:3, 165:4, 183:24, 184:6, 184:24, 185:19, 186:15, 187:6, 187:14, 188:15, 189:11, 190:7, 224:11, 265:16, 268:14
mindset [5] - 184:20, 185:12, 185:16, 185:18
mine [2] - 212:2, 260:5
minimum [1] - 182:10
minute [2] - 184:17, 231:10
misconduct [1] - 269:25
misrepresentation [12] - 181:3, 181:8, 181:14, 181:25, 182:3, 183:5, 183:12, 183:14, 183:24, 184:1, 184:5, 185:1
misrepresented [1] - 184:2
miss [3] - 252:16, 253:20, 260:21
Miss [2] - 253:20, 254:10
missing [1] - 161:4
MO [1] - 231:17
mom [1] - 203:11
moment [1] - 180:21
Monday [1] - 256:22
money [1] - 146:5
month [10] - 146:18, 147:20, 159:17, 159:19, 231:18, 231:21, 231:24, 232:12, 232:19, 233:6
months [4] - 163:23, 189:25, 195:3, 221:15
MORAN [1] - 133:9
morning [1] - 134:18
most [2] - 192:24, 248:10
mother [1] - 135:2
motion [21] - 145:13, 160:21, 161:2, 161:4, 162:23, 164:24, 165:6, 165:8, 165:13, 166:21, 172:23, 172:24, 176:25, 186:11, 191:8, 201:22, 230:24, 262:17, 262:24, 263:6
motions [5] - 232:6, 233:3, 233:23, 234:8, 247:24
move [2] - 141:12, 182:12
MR [155] - 134:5, 136:22, 137:2, 137:7, 151:18, 153:22, 156:24, 157:4, 157:6, 157:13, 162:14, 167:1, 167:5, 167:11,
167:24, 168:3, 168:7, 168:8, 168:9, 168:12, 171:5, 171:14, 172:1, 172:8, 172:9, 172:14, 172:18, 172:19, 180:7, 180:13, 180:16, 180:20, 180:22, 180:23, 184:6, 184:8, 184:9, 184:14, 184:21, 185:3, 185:6, 185:9, 185:15, 185:20, 186:1, 188:6, 190:24, 191:3, 193:1, 193:13, 193:19, 194:3, 194:21, 194:23, 195:1, 196:8, 196:12, 196:14, 196:19, 197:1, 197:6, 197:9, 197:15, 198:6, 198:22, 199:13, 200:7, 200:11, 201:6, 201:9, 201:15, 201:18, 202:10, 205:24, 206:4, 206:19, 207:4, 207:7, 207:9, 209:24, 210:3, 211:14, 215:3, 216:25, 217:4, 218:7, 219:1, 221:6, 221:12, 221:19, 222:13, 223:5, 223:14, 223:19, 223:21, 223:24, 224:1, 225:15, 231:9, 233:25, 234:10, 234:25, 235:2, 243:7, 245:21, 247:3, 247:10, 248:19, 248:24, 249:14, 249:22, 250:7, 250:20, 251:4, 251:10, 251:16, 252:3, 252:6, 252:14, 252:18, 252:22, 253:4, 253:10, 253:25, 254:4, 254:13, 254:19, 254:21, 254:25, 255:6, 255:8, 255:9, 255:13, 255:16, 255:21, 255:25, 256:6, 256:12, 256:17, 257:3, 257:7, 264:14, 264:23, 265:8, 265:15, 265:22, 268:17, 269:7, 269:13, 270:1, 270:13, 270:20, 271:2, 271:8, 271:9
MS [13] - 150:6, 162:15, 219:19, 223:18, 223:23, 235:1, 235:3, 247:11, 257:10, 257:11, 265:19, 265:23, 271:10

**N**

narrow [1] - 205:3
nature [2] - 191:4, 222:25
necessarily [4] - 150:14, 198:13, 240:24, 254:11
need [12] - 141:17, 158:4, 158:8, 158:9, 173:23, 244:4, 244:14, 244:15, 249:12, 261:16, 261:17, 262:14
needed [3] - 181:11, 249:9
needs [1] - 139:23
NERA [7] - 170:25, 176:8, 176:18, 179:5, 254:17, 255:3, 267:2
never [13] - 141:24, 162:11, 164:24, 183:6, 190:19, 199:5, 201:1, 216:15, 253:17, 268:9, 268:11, 268:12, 268:13
new [4] - 191:21, 191:22, 219:16, 232:7
NEW [2] - 132:1, 132:11
New [11] - 132:19, 132:20, 132:25, 133:10, 134:2, 176:25, 178:14, 198:17, 272:5, 272:24
next [14] - 173:24, 190:11, 197:12, 198:12, 209:1, 209:5, 210:6, 215:10, 215:11, 218:24, 219:1, 219:2, 219:8, 248:6
night [6] - 161:22, 206:10, 206:11, 207:22, 220:7,

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

7

244:6
NO [2] - 132:2, 133:24
nobody [2] - 209:9, 270:12
none [3] - 205:15, 205:16, 253:6
nonsense [1] - 234:19
normal [2] - 178:24, 194:10, 248:4
normally [3] - 157:8, 157:10, 157:11
notation [1] - 209:13
note [3] - 148:18, 222:6, 222:7
notes [89] - 133:25, 148:9, 148:13, 158:20, 162:3, 205:9, 205:10, 206:2, 206:7, 206:9, 206:11, 206:16, 206:18, 206:20, 206:22, 206:24, 207:1, 207:5, 207:10, 207:15, 207:19, 207:21, 207:23, 208:1, 208:4, 208:14, 208:22, 208:24, 209:5, 210:23, 211:8, 213:18, 213:22, 214:15, 215:13, 215:17, 220:5, 220:6, 220:18, 220:21, 220:22, 221:2, 221:3, 221:4, 221:8, 221:9, 221:13, 221:15, 221:25, 222:15, 222:20, 222:24, 223:2, 223:3, 223:7, 223:15, 225:21, 226:1, 226:8, 227:7, 227:11, 227:14, 227:16, 227:17, 228:5, 230:12, 231:1, 231:7, 231:9, 231:18, 232:17, 233:14, 233:22, 234:13, 240:18, 240:20, 240:25, 241:5, 241:14, 241:17, 247:13, 247:14, 247:21, 247:23, 250:21, 252:11
nothing [12] - 157:24, 164:20, 165:2, 176:10, 180:22, 192:4, 194:12, 205:16, 215:11, 262:15, 272:10
notice [6] - 165:15, 165:16, 169:2, 169:7, 176:9, 187:2
Notice [1] - 132:21
noticed [2] - 165:14
notified [2] - 160:20, 199:14
November [89] - 134:15, 134:18, 143:20, 152:25, 153:8, 154:18, 164:16, 170:19, 172:4, 180:24, 182:5, 183:1, 187:20, 188:21, 189:23, 196:9, 196:15, 196:17, 207:19, 208:5, 208:8, 208:10, 208:15, 208:17, 209:13, 211:24, 217:16, 217:19, 218:16, 218:19, 220:1, 220:10, 223:10, 232:6, 232:14, 233:2, 234:6, 236:23, 237:6, 237:9, 237:15, 238:1, 238:2, 238:3, 238:4, 238:10, 238:14, 238:20, 240:18, 241:2, 241:7, 241:19, 241:23, 241:25, 242:1, 243:24, 244:13, 245:8, 245:18, 245:19, 246:1, 246:3, 246:21, 247:4, 248:12, 249:6, 249:9, 249:15, 250:9, 252:19, 253:11, 254:9, 254:15, 255:10, 257:12, 257:19, 257:25, 261:5, 264:1, 264:3, 267:19, 267:24, 268:3, 270:22, 270:24, 270:25, 271:5
November/December [2] - 190:1, 192:8
null [2] - 202:7, 202:18
number [3] - 186:3, 186:6, 186:8
numerous [2] - 163:16,
270:20
NUSBAUM [2] - 132:19, 133:2

**O**

O'CONNOR [14] - 133:9, 150:6, 162:15, 219:19, 223:18, 223:23, 235:1, 235:3, 247:11, 257:10, 257:11, 265:19, 265:23, 271:10
O'Connor [1] - 133:22
oath [3] - 134:11, 196:10, 256:13
object [9] - 134:21, 135:5, 135:6, 135:12, 136:3, 136:6, 143:9, 143:16, 171:2
objected [2] - 135:19, 253:6
objection [2] - 190:24, 192:9
objective [1] - 146:1
obligated [1] - 172:15
obligation [6] - 171:7, 171:11, 171:12, 171:17, 171:24, 172:2
obligations [5] - 170:25, 171:2, 171:3, 171:13, 171:23
obtained [1] - 240:14
obvious [2] - 250:9, 254:13
obviously [10] - 134:10, 135:22, 172:11, 187:17, 191:17, 203:25, 234:7, 262:7, 262:14, 262:16
occasions [1] - 163:16
occur [5] - 141:11, 159:20, 159:22, 227:15
occurred [16] - 148:7, 148:8, 169:3, 191:20, 204:2, 212:9, 213:2, 224:21, 224:22, 225:10, 225:22, 226:19, 227:12, 227:17, 270:3
occurs [1] - 244:22
October [53] - 161:7, 162:7, 162:15, 162:16, 205:20, 205:24, 207:12, 207:18, 209:15, 209:21, 210:18, 211:11, 212:10, 217:16, 218:16, 219:25, 220:10, 220:19, 222:10, 222:23, 224:3, 230:15, 230:19, 231:12, 232:10, 232:21, 236:24, 241:7, 241:19, 241:22, 242:2, 242:4, 243:23, 244:2, 248:2, 248:7, 250:21, 250:23, 251:11, 252:11, 252:19, 254:8, 256:1, 265:25, 266:17, 267:19, 268:4, 268:10, 268:14, 269:15, 270:22, 270:24, 271:2
Oels [3] - 133:12, 133:14, 133:14
OELS [2] - 132:9, 132:10
OF [4] - 132:1, 132:10, 132:7
Off-the-record [1] - 151:19
offense [3] - 177:24, 178:1, 178:2
offenses [2] - 177:25, 269:20
offered [1] - 254:19
offering [1] - 254:21
office [34] - 146:9, 148:10, 148:14, 149:20, 153:17, 158:20, 158:22, 158:23, 159:8, 159:12, 159:23, 163:16, 164:11, 166:2, 176:24, 177:2, 187:2, 188:7, 197:2, 204:6, 205:2, 238:7, 240:7, 244:20, 259:10, 259:15, 259:16, 262:23, 263:1, 263:5, 267:21, 268:6, 270:6
OFFICE [1] - 132:12
Office [2] - 239:5, 245:24
officer [2] - 139:19, 184:11
OFFICER [3] - 132:8, 132:8,
132:9
officers [4] - 174:8, 174:14, 175:10, 175:24
OFFICERS [1] - 132:13
offices [1] - 132:19
often [1] - 184:2
old [2] - 186:3, 229:18
once [5] - 138:7, 187:5, 187:6, 199:14, 251:16
one [51] - 144:18, 144:20, 147:15, 149:8, 149:16, 149:17, 150:14, 158:9, 164:18, 165:5, 166:2, 168:5, 168:16, 169:21, 170:5, 170:12, 170:24, 175:15, 185:10, 186:2, 186:4, 188:23, 192:6, 192:11, 195:2, 195:8, 210:1, 214:24, 217:10, 220:5, 229:10, 229:11, 231:21, 231:24, 232:12, 232:19, 235:15, 238:12, 239:13, 243:2, 248:8, 250:19, 252:8, 252:24, 258:9, 259:8, 259:10, 259:14, 260:15, 265:18
one's [2] - 195:8, 229:10
open [2] - 183:17, 183:22
opens [1] - 215:20
opinion [4] - 178:10, 236:15, 252:17, 269:8
opinions [2] - 168:23, 253:13
opportunity [3] - 152:4, 152:24, 200:2
opposed [3] - 243:5, 248:13, 249:6
opposite [1] - 268:9
option [4] - 165:4, 189:7, 189:11, 189:12, 189:20, 189:22, 192:13, 192:15, 192:16, 200:6, 200:19
options [31] - 135:3, 143:11, 143:23, 143:24, 144:4, 144:18, 144:20, 164:18, 165:5, 172:22, 173:1, 173:12, 173:13, 175:16, 185:19, 185:21, 186:2, 186:9, 186:21, 187:1, 187:6, 187:13, 187:25, 188:15, 188:24, 190:6, 190:8, 192:7, 192:12, 199:20, 199:22
ORAL [1] - 132:6
orally [1] - 240:15
order [1] - 139:17
ordinary [1] - 212:5
original [1] - 214:8
out-of-town [1] - 195:12
outlined [1] - 151:16
outrage [10] - 198:7, 249:14, 250:10, 251:12, 252:7, 252:9, 252:15, 252:24, 253:2
outraged [8] - 197:24, 251:5, 251:6, 251:9, 252:9, 252:13, 252:23, 253:6
outrageous [1] - 254:14
outside [3] - 135:1, 137:24, 154:1
overlapped [1] - 270:6
overruled [2] - 247:5, 255:18
overview [1] - 234:17
own [2] - 145:15, 236:12, 252:8

**P**

P.A [2] - 132:20, 133:2
P.C [1] - 133:7
p.m [1] - 132:21
P.O [3] - 133:5, 133:8, 133:12, 133:14
page [6] - 151:13, 168:8, 210:6, 218:22, 231:19, 248:19
PAGE [2] - 133:17, 133:24
Page [12] - 151:14, 152:21, 152:22, 156:9, 157:17,
158:25, 168:15, 169:13, 224:9, 224:13, 224:16
Pages [1] - 153:16
pages [8] - 132:9, 154:17, 155:15, 206:3, 210:4, 210:12, 210:13, 226:8
paid [1] - 146:5
paper [3] - 196:3, 197:4, 197:12
paragraph [1] - 259:2
parameters [2] - 134:10, 174:5
part [21] - 135:20, 136:8, 141:20, 149:14, 149:15, 151:12, 153:15, 182:24, 198:23, 209:7, 209:14, 214:19, 214:22, 215:1, 217:22, 246:13, 252:8, 255:22, 256:25, 270:3
particular [1] - 200:8
particularly [1] - 160:9
parties [1] - 272:18
partner [1] - 235:6
parts [2] - 151:11, 154:15
pay [2] - 189:16, 206:14
pending [4] - 149:12, 166:4, 166:5, 218:7
people [6] - 193:11, 209:2, 219:23, 221:24, 226:25, 243:20
per [1] - 158:25
percent [1] - 194:6
percentages [1] - 192:20
perhaps [8] - 173:9, 193:7, 200:19, 236:5, 244:8, 261:16, 261:20, 267:3
period [4] - 220:23, 231:3, 258:15, 270:7
person [2] - 158:23, 166:17
pertaining [1] - 230:9
pgs [1] - 133:25
phone [12] - 146:8, 148:19, 148:21, 148:25, 149:3, 149:11, 150:16, 182:21, 209:16, 221:2, 222:1, 223:8
photocopied [2] - 210:17
phrase [3] - 176:5, 204:14, 232:13
phrases [1] - 190:19
piece [3] - 196:3, 197:4, 197:12
place [6] - 138:11, 232:23, 233:16, 251:23, 251:24, 272:14
placed [1] - 137:21
places [1] - 152:15
placing [1] - 135:7
plaintiff [2] - 204:7, 207:12
Plaintiffs [2] - 132:6, 133:3
plan [3] - 145:19, 145:25, 146:4
plan" [1] - 145:25
plea [2] - 178:7, 178:9
plead [1] - 178:2
PMS-2 [1] - 151:21
point [34] - 141:6, 142:24, 145:19, 146:11, 148:4, 157:4, 159:15, 160:12, 160:16, 160:18, 160:19, 162:21, 166:10, 166:22, 171:16, 176:23, 181:12, 188:16, 191:18, 191:19, 203:18, 209:1, 216:9, 228:17, 237:3, 238:3, 238:25, 239:12, 249:12, 250:4, 258:24, 259:6, 261:20, 263:14
pointed [1] - 244:6
Police [2] - 133:10, 198:18
POLICE [5] - 132:8, 132:8, 132:9, 132:10, 132:11
police [2] - 202:20, 269:25
policy [7] - 140:13, 171:18, 172:7, 176:12, 191:6, 202:8, 202:18
poor [1] - 170:8
position [6] - 134:20, 155:4,

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

171:23, 202:21, 202:24, 205:6
postponement [4] - 258:15, 258:17, 258:19, 259:1
potential [1] - 143:24
potentially [1] - 172:24
preliminary [3] - 223:1, 236:3, 236:15
premise [6] - 147:6, 164:6, 243:16, 250:11, 263:16, 263:22
premising [1] - 143:4
prep [4] - 247:13, 247:21, 247:23, 264:8
preparation [2] - 179:19, 264:6
prepare [23] - 141:21, 142:7, 142:17, 142:25, 143:21, 146:11, 146:15, 163:19, 163:21, 180:25, 181:4, 181:15, 181:23, 184:11, 184:16, 185:22, 185:24, 186:9, 187:15, 189:1, 189:6, 260:12, 260:13
prepared [5] - 173:4, 173:16, 186:10, 187:17, 260:16
preparing [2] - 156:21, 199:24
present [5] - 135:2, 137:23, 137:24, 236:4
presented [3] - 134:17, 171:16, 172:3
presiding [2] - 198:16, 198:17
press [10] - 141:5, 141:22, 143:3, 144:16, 144:22, 144:25, 145:7, 163:22, 164:17, 188:4
pressed [2] - 140:24, 187:25
presume [2] - 165:17, 173:4
pretrial [9] - 178:23, 231:15, 231:20, 231:24, 232:3, 232:11, 232:19, 233:5, 242:4
Pretrial [1] - 180:10
pretty [6] - 168:20, 213:12, 221:4, 256:21, 265:15, 269:8
prevail [1] - 192:21
previously [8] - 134:3, 152:20, 165:23, 223:22, 224:4, 247:6, 258:5, 259:14
printed [1] - 161:12
printouts [1] - 162:4
prison [1] - 192:22
privileged [1] - 147:3
probation [30] - 139:16, 139:19, 139:21, 140:1, 142:15, 158:25, 159:9, 159:14, 160:13, 160:20, 160:21, 164:15, 164:21, 165:9, 165:10, 172:25, 176:24, 177:7, 178:3, 178:4, 179:12, 179:21, 179:22, 195:22, 199:15, 201:10, 244:11, 254:19, 263:6, 263:11
Probation [2] - 221:14, 235:13
problem [3] - 136:18, 168:10, 169:11
problems [1] - 136:7
procedure [2] - 178:25, 248:4
proceed [1] - 236:1
proceeded [1] - 202:17
proceeding [2] - 134:7, 230:14, 230:19
proceedings [3] - 224:3, 258:20, 259:1
process [3] - 140:1, 161:5, 218:10
processes [2] - 193:24, 193:25
produce [1] - 206:21
produced [5] - 206:5, 206:23, 210:4, 222:11,

222:16
Program [1] - 180:11
program [4] - 138:8, 178:24, 247:5, 255:18
promise [1] - 178:19
promised [5] - 156:13, 157:23, 164:13, 165:12, 178:17
proper [1] - 256:9
prosecution [4] - 144:16, 177:24, 192:18, 258:17
prosecutor [2] - 137:23, 145:4, 166:3, 170:23, 187:25, 192:4, 193:15, 195:22, 216:4, 216:6, 216:14, 216:20, 217:1, 217:6, 217:10, 217:11, 242:19, 247:4, 251:23, 269:24, 270:11
Prosecutor [1] - 255:18
Prosecutor's [3] - 239:5, 245:24, 263:21
prosecutor's [13] - 146:9, 166:2, 176:24, 187:2, 197:2, 216:23, 223:9, 238:7, 244:20, 262:23, 265:1, 267:21, 268:6
PROSECUTOR'S [1] - 132:12
prosecutors [2] - 191:12, 253:21
prospect [1] - 166:7
protect [1] - 198:17
prove [1] - 198:21
provide [7] - 143:2, 179:2, 182:6, 182:8, 182:11, 182:16, 204:22
provided [9] - 151:15, 177:3, 178:21, 179:6, 183:6, 190:2, 201:21, 209:21, 259:10
providing [3] - 137:16, 180:1, 190:17
PTI [89] - 134:18, 135:4, 135:20, 136:2, 136:8, 137:22, 138:8, 138:20, 139:6, 139:11, 139:21, 145:5, 146:2, 160:22, 161:23, 162:25, 165:10, 172:25, 177:6, 177:12, 177:14, 177:15, 177:16, 177:20, 177:21, 177:22, 178:6, 178:7, 178:13, 178:18, 178:22, 179:8, 179:12, 180:14, 183:4, 189:17, 190:18, 190:25, 191:3, 193:6, 193:10, 193:11, 194:9, 194:10, 194:12, 195:3, 207:11, 209:22, 210:19, 211:21, 212:1, 212:7, 212:16, 212:19, 212:24, 213:18, 214:14, 215:4, 215:7, 217:20, 219:9, 219:12, 226:11, 226:22, 226:24, 228:2, 228:6, 228:8, 229:7, 229:16, 230:4, 230:12, 231:14, 232:17, 242:6, 242:11, 242:17, 243:23, 244:2, 244:16, 245:8, 245:20, 246:9, 247:6, 251:12, 255:19, 262:24, 263:16, 263:22, 266:2, 266:10, 267:22, 268:6, 270:3, 270:15, 271:3
punished [2] - 195:13, 195:14
punitive [1] - 133:14
purpose [2] - 203:23, 232:15
pursuant [2] - 132:21, 178:24
pursue [3] - 194:17, 204:4,

261:17
put [12] - 164:5, 171:22, 197:4, 197:11, 203:13, 203:15, 209:25, 213:13, 226:15, 251:22, 251:23, 256:9
putting [2] - 195:11, 226:16

Q

QUESTION [2] - 153:3, 214:11
question's [1] - 200:4
questioning [1] - 262:16
questions [9] - 139:8, 153:23, 169:10, 175:4, 175:6, 177:9, 196:5, 200:13, 210:25
quite [2] - 183:7, 189:10
quote [1] - 233:24
quote/unquote [1] - 270:9

R

racing [1] - 186:20
rain [1] - 170:21
raise [1] - 143:18
rarely [1] - 192:23
rate [1] - 156:19
rather [2] - 139:7, 201:12
re [1] - 200:1
re-asking [1] - 200:1
react [3] - 213:8, 213:10, 213:11, 213:12
reaction [3] - 213:7, 213:12, 243:7
read [59] - 134:24, 149:9, 149:12, 150:1, 151:9, 151:11, 152:5, 152:6, 152:7, 152:10, 152:13, 153:10, 153:19, 154:7, 154:8, 154:9, 154:15, 154:16, 154:20, 159:2, 168:14, 168:24, 169:5, 169:6, 169:13, 169:17, 174:25, 175:1, 175:3, 210:7, 210:22, 211:1, 211:3, 214:7, 214:8, 214:9, 215:16, 215:18, 215:19, 215:21, 215:25, 216:21, 218:23, 219:10, 219:12, 219:13, 220:2, 227:7, 232:16, 236:4, 236:7, 236:20, 236:25, 237:3, 237:8, 237:14, 237:20, 238:3, 258:6
reading [18] - 151:14, 151:24, 152:8, 152:11, 153:12, 153:16, 155:14, 156:11, 169:24, 210:25, 211:2, 234:18, 235:24, 236:8, 236:16, 240:17, 240:19, 240:25
ready [1] - 245:5
real [5] - 166:20, 204:10, 222:2, 250:1, 262:12
realize [1] - 166:11
realized [1] - 199:19
really [24] - 140:14, 140:25, 157:12, 161:8, 170:12, 193:18, 194:18, 195:10, 195:16, 202:18, 203:18, 203:24, 206:14, 216:16, 233:1, 233:20, 234:20, 242:14, 257:15, 259:7, 264:10, 264:11, 264:12, 270:25
reason [4] - 138:5, 138:14, 195:14, 264:16
reasons [1] - 220:5
receipt [3] - 161:4, 221:12, 245:21
received [10] - 146:8, 161:2, 165:8, 178:3, 179:12, 179:14, 240:21, 241:4, 244:7, 245:8
receiving [2] - 187:2, 242:13
recently [2] - 198:4, 264:4

recess [6] - 206:1, 224:14, 226:9, 232:23, 233:25, 234:10
recision [2] - 172:24, 172:25
recognize [2] - 175:19, 211:14
recollect [1] - 225:18
recollected [1] - 226:19
recollection [33] - 139:4, 139:25, 153:10, 154:11, 154:22, 155:15, 155:22, 155:25, 160:7, 170:8, 170:10, 197:13, 211:2, 211:19, 211:22, 212:11, 212:14, 212:20, 218:17, 220:6, 220:8, 225:19, 225:20, 226:18, 229:24, 230:7, 237:13, 239:16, 247:9, 252:20, 256:4, 260:23, 264:17
recommend [1] - 192:10
recommendation [1] - 192:3
recommendations [1] - 140:22
recommended [1] - 192:11
record [41] - 135:7, 135:12, 135:13, 135:19, 135:22, 136:4, 136:6, 136:10, 136:14, 136:23, 136:24, 137:3, 137:5, 137:6, 137:11, 137:22, 151:18, 151:19, 153:13, 181:19, 201:15, 209:24, 210:8, 211:13, 221:6, 224:10, 224:18, 226:14, 227:19, 227:21, 227:22, 228:1, 228:22, 228:24, 228:25, 229:2, 229:13, 233:17, 257:20, 258:1
recount [1] - 155:6
Reed [87] - 156:19, 163:2, 163:5, 167:7, 167:12, 186:17, 196:19, 197:10, 197:15, 197:22, 198:9, 198:24, 198:25, 199:8, 204:14, 204:20, 205:4, 205:6, 205:9, 206:7, 207:15, 207:19, 208:8, 211:10, 211:20, 212:5, 213:21, 217:11, 217:19, 217:25, 219:15, 220:1, 220:9, 221:10, 221:20, 221:25, 222:4, 224:20, 229:22, 229:25, 230:1, 232:24, 235:4, 235:8, 235:18, 240:9, 240:13, 240:14, 242:6, 243:25, 244:5, 244:17, 245:9, 245:23, 246:8, 247:12, 247:22, 248:1, 248:13, 248:21, 249:6, 250:20, 251:4, 251:9, 252:16, 253:20, 254:10, 260:9, 260:13, 260:19, 260:24, 260:25, 261:3, 262:22, 263:3, 263:4, 263:15, 263:20, 264:24, 265:2, 265:24, 266:8, 267:20, 268:3, 269:14, 271:4
Reed's [12] - 134:9, 213:18, 214:15, 220:22, 227:16, 228:5, 230:12, 231:1, 232:17, 233:14, 248:22, 262:18
refer [2] - 151:14, 152:21
reference [19] - 213:17, 214:13, 224:13, 227:23, 228:2, 228:6, 231:2, 231:22, 232:9, 232:11, 233:5, 233:6, 233:7, 233:9, 234:22
referenced [2] - 214:5, 232:22
references [4] - 232:16, 232:17, 233:14, 233:15
referred [2] - 156:8, 227:8
referring [3] - 152:22, 153:15, 157:15

8

*SUPERIOR COURT REPORTERS, INC.   (201) 941-1550*

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

9

reflects [1] - 229:4
refresh [6] - 153:10, 154:22, 155:15, 155:22, 155:25, 260:22
refreshes [1] - 154:10
regard [1] - 136:18
regarding [22] - 167:3, 167:5, 167:15, 190:16, 201:25, 204:8, 204:23, 207:2, 207:17, 207:20, 208:1, 208:14, 210:18, 211:11, 212:15, 212:16, 213:18, 214:14, 217:20, 219:16, 220:10, 270:15
regards [1] - 269:19
regret [1] - 166:10
rehash [1] - 141:17
rejected [1] - 242:17
rejection [1] - 249:1
relate [1] - 222:16
relates [1] - 156:4
relation [1] - 236:23
relationship [1] - 269:18
relative [6] - 151:2, 237:17, 240:10, 240:22, 272:17, 272:19
relay [1] - 246:22
relayed [1] - 156:3
Release [1] - 166:4
release [98] - 135:20, 136:3, 137:16, 138:2, 140:4, 140:12, 141:25, 142:17, 146:15, 146:20, 147:10, 147:23, 150:17, 151:1, 158:10, 162:18, 163:9, 164:7, 164:12, 166:14, 167:6, 171:9, 179:3, 179:6, 179:20, 180:1, 180:9, 180:25, 181:4, 181:16, 181:23, 182:5, 182:16, 183:2, 184:11, 184:17, 184:22, 184:25, 185:22, 185:24, 186:9, 186:10, 187:3, 187:15, 187:18, 188:1, 188:5, 188:8, 189:1, 189:6, 189:8, 189:16, 189:22, 190:5, 190:17, 191:5, 191:13, 191:19, 192:5, 194:14, 194:20, 194:22, 195:4, 199:15, 199:24, 201:12, 202:1, 202:2, 202:5, 202:7, 203:5, 204:8, 204:15, 207:11, 220:20, 222:14, 222:16, 223:12, 229:6, 235:14, 235:17, 237:17, 238:21, 239:3, 239:6, 239:17, 240:22, 249:15, 250:8, 259:7, 259:17, 260:12, 260:13, 260:19, 261:4, 268:18
releases [3] - 142:1, 142:4
relevance [1] - 153:23
relief [3] - 186:7, 187:8, 199:25
remained [1] - 199:23
remember [21] - 150:11, 150:13, 188:14, 190:15, 209:6, 212:13, 212:18, 213:6, 220:16, 220:17, 239:24, 240:17, 240:19, 240:25, 257:24, 260:1, 260:20, 265:13, 269:3
remembering [1] - 160:8
render [2] - 169:25, 170:3
repeat [3] - 141:10, 147:17, 170:20
rephrase [5] - 143:17, 155:3, 159:3, 159:4, 180:7
report [2] - 139:20, 139:21
Reporter [2] - 149:13, 214:10
REPORTERS [1] - 132:23
Reporters [1] - 132:24
represent [1] - 183:17
representation [3] - 182:15, 183:22, 187:16
representative [3] - 158:22, 159:8, 223:10

representatives [1] - 146:11
representing [1] - 183:18
request [7] - 177:2, 189:14, 191:7, 191:8, 211:25, 222:9, 254:12
requested [3] - 182:4, 212:23, 270:3
requesting [1] - 148:16
requests [2] - 189:16, 206:12
required [2] - 146:2, 199:15
requirement [2] - 212:6, 212:15
requiring [1] - 171:9
Res [1] - 219:4
research [25] - 145:21, 146:3, 148:3, 148:8, 162:2, 163:3, 222:20, 222:24, 223:6, 235:16, 236:4, 236:15, 237:5, 237:16, 237:19, 238:22, 239:3, 239:6, 239:17, 251:20, 252:2, 253:12, 253:14, 254:11, 254:15
research" [1] - 237:7
resolve [1] - 249:10
respect [8] - 135:4, 151:1, 151:7, 162:22, 168:13, 193:20, 230:8, 239:3
respond [1] - 170:11
responded [1] - 220:14
response [2] - 201:19, 201:20
responsive [1] - 140:17
result [17] - 146:23, 147:1, 147:8, 155:14, 163:15, 164:1, 164:6, 164:10, 164:15, 165:16, 165:24, 176:23, 179:19, 180:1, 180:8, 209:4, 209:5
results [2] - 172:23, 193:2
resumes [1] - 224:17
reveal [1] - 148:21
revealed [1] - 234:1
review [6] - 137:5, 205:10, 205:11, 207:14, 208:4, 221:10
reviewed [2] - 206:13, 248:15
reviewing [1] - 264:4
reviews [1] - 247:14
reward [1] - 202:20
rid [1] - 216:17
Ridgefield [1] - 132:25
rights [9] - 175:21, 194:11, 203:19, 203:20, 203:21, 203:22, 203:23, 204:5, 265:4
risk [1] - 176:18
ROBERT [4] - 132:8, 133:3, 133:18, 272:8
room [2] - 199:11, 266:25
ROTHSCHILD [1] - 133:6
routine [1] - 139:7
ruled [1] - 147:3
rules [6] - 154:1, 154:2, 193:12, 193:16, 232:7, 233:3
Rumery [11] - 236:16, 236:20, 236:25, 237:8, 237:14, 237:19, 237:20, 238:7, 238:23, 239:11, 240:5
run [2] - 254:16, 255:2
runs [1] - 229:17

**S**

sat [1] - 256:20
satisfied [1] - 178:4
save [2] - 174:22, 176:13
saw [8] - 179:7, 196:3, 196:9, 199:5, 201:7, 211:5, 211:7, 223:3
scary [1] - 193:6
scenario [2] - 268:24, 269:12
scheduled [1] - 219:16
scheduling [1] - 209:1
second [9] - 166:3, 176:7,

177:24, 181:13, 193:7, 194:9, 214:19, 215:1, 269:19
secretary [6] - 148:14, 148:16, 148:24, 260:3, 260:4
section [1] - 227:7
See [2] - 193:15, 250:24
see [47] - 140:23, 141:4, 141:21, 143:1, 143:2, 144:15, 144:21, 146:7, 152:18, 157:11, 167:7, 177:15, 189:17, 191:13, 192:4, 192:22, 193:8, 200:3, 200:6, 201:5, 205:13, 210:21, 215:22, 218:25, 220:4, 220:24, 222:10, 223:13, 223:15, 224:9, 226:25, 227:1, 227:24, 230:22, 230:23, 231:18, 232:5, 232:9, 234:2, 242:18, 248:17, 250:5, 256:8, 256:9, 261:20, 261:24, 264:18
seeing [3] - 173:7, 190:17, 220:6
seeking [2] - 162:23, 165:10
send [5] - 158:5, 158:10, 158:12, 158:15, 158:17
sending [1] - 160:12
sense [11] - 141:25, 146:5, 162:6, 167:20, 189:25, 204:1, 204:10, 209:16, 213:5, 231:21, 234:15
sent [5] - 158:24, 159:9, 159:13, 222:15, 263:9
sentence [3] - 166:6, 192:21, 255:3
sentenced [1] - 139:20
sentencing [1] - 267:1
September [4] - 161:12, 161:20, 236:17, 236:22
Sergeant [1] - 133:14
SERGEANT [1] - 132:10
set [5] - 139:19, 141:12, 218:18, 253:16, 272:14
setting [2] - 232:5, 249:12
seven [3] - 244:14, 245:14, 246:3
several [6] - 136:21, 136:25, 150:13, 166:15, 199:8, 234:3
shake [1] - 204:1
shaken [1] - 262:11
shakes [1] - 261:21
shocked [10] - 195:2, 195:7, 195:19, 195:21, 195:25, 196:2, 196:8, 196:17, 196:22, 198:22
shocks [4] - 170:10, 170:11, 170:12, 170:16
show [3] - 151:12, 215:12
showed [2] - 201:16, 207:22
showing [1] - 151:20
shown [1] - 229:12
side [3] - 208:7, 220:4, 226:1
sides [2] - 178:5, 210:13
sign [2] - 138:9, 139:17, 139:22, 141:7, 142:8, 142:21, 143:1, 144:1, 146:1, 158:4, 158:8, 171:9, 173:4, 173:15, 173:25, 176:15, 191:15, 194:14, 204:4, 259:8, 260:18
signature [2] - 176:3, 260:22
signature's [2] - 173:17, 174:22
signed [16] - 141:8, 174:3, 174:8, 174:20, 174:25, 175:7, 176:22, 180:9, 203:6, 235:14, 258:4, 258:14, 258:25, 259:11, 260:17, 260:19
significance [2] - 229:14, 229:19
significant [1] - 166:11
signing [4] - 136:2, 174:4, 175:5, 175:22

Silva [40] - 146:9, 147:19, 148:10, 148:25, 149:2, 149:19, 150:3, 150:17, 151:15, 154:23, 156:4, 158:21, 159:6, 159:13, 160:19, 164:11, 166:18, 166:23, 167:2, 167:15, 168:15, 169:3, 182:20, 209:7, 223:9, 224:23, 225:23, 226:25, 227:3, 230:5, 232:25, 239:10, 241:19, 255:18, 257:12, 257:21, 259:10, 259:16, 260:22
Silva's [9] - 151:9, 151:22, 152:22, 154:15, 163:15, 169:14, 169:25, 199:7, 248:22
simple [2] - 169:12, 243:19
simply [2] - 191:9, 212:18
sit [3] - 161:8, 198:3, 200:18
sits [1] - 194:15
sitting [3] - 147:7, 148:23, 170:24
situation [4] - 140:12, 216:16, 253:9, 270:2
slash [1] - 231:17
slip [2] - 190:18, 190:24
solidified [4] - 186:21, 187:1, 187:6, 187:14
someone [3] - 138:10, 195:4, 260:10
sometimes [3] - 205:11, 219:21, 219:23
somewhat [9] - 140:16, 156:7, 178:24, 178:25, 205:5, 233:11, 238:16, 239:14, 260:14
somewhere [2] - 244:19, 256:1
soon [1] - 262:12
sooner [1] - 236:21
sorry [4] - 159:1, 205:23, 229:21, 240:13
sort [4] - 190:9, 209:8, 215:10, 223:1
sought [1] - 192:5
SPAGNOLA [5] - 133:6, 133:7, 223:19, 224:1, 234:25
Spagnola [2] - 133:21, 199:10
sparse [1] - 215:22
speaking [11] - 149:1, 149:23, 163:24, 164:4, 213:21, 225:9, 248:11
speaks [6] - 210:9, 213:16, 213:20, 214:12, 214:17, 214:24
special [1] - 183:21
specific [10] - 196:5, 206:11, 207:2, 213:2, 213:5, 221:3, 240:4, 249:8, 271:7
specifically [15] - 156:9, 190:4, 190:15, 205:20, 207:17, 208:6, 230:21, 230:22, 232:11, 256:6, 258:8, 259:23, 259:25, 260:8, 266:13
specificity [1] - 230:7
specifics [1] - 230:9
spend [1] - 198:20
spending [1] - 194:18
spent [2] - 194:7, 262:9
spirals [1] - 148:22
split [1] - 260:16
spoken [3] - 163:11, 164:2, 191:21
square [1] - 166:2
staff [6] - 182:9, 182:14, 182:18, 221:22, 222:1, 223:9
stages [1] - 239:1
stand [2] - 177:25, 262:19
standard [4] - 242:17, 242:21, 242:23, 243:1
standing [1] - 260:1
start [4] - 134:16, 151:13, 186:17, 199:6

*KEYWORD INDEX - KANDIL v. YURKOVIC, et al.*

10

**started** [1] - 264:9
**starting** [1] - 227:15
**starts** [2] - 199:6, 210:5
**state** [2] - 192:21, 253:22
**State** [15] - 132:19, 143:3, 165:9, 176:25, 178:14, 178:17, 178:21, 180:5, 180:9, 193:12, 202:17, 202:20, 266:23, 272:5, 272:24
**State's** [2] - 178:18, 179:11
**statement** [6] - 156:8, 156:14, 157:14, 183:4, 250:17, 267:16
**statements** [1] - 157:11
**STATES** [1] - 132:1
**states** [2] - 155:4, 168:15
**status** [8] - 209:19, 211:17, 218:18, 218:21, 218:25, 227:16, 233:5, 248:17
**statute** [1] - 162:7
**stay** [3] - 179:21, 213:3, 213:4
**STEIN** [2] - 132:19, 133:2
**stenographic** [2] - 229:2, 229:13
**stenographically** [1] - 272:13
**step** [1] - 161:5
**steps** [2] - 223:1, 259:9
**still** [6] - 134:11, 159:21, 183:11, 195:19, 203:5, 204:4
**STONE** [30] - 133:12, 136:22, 137:2, 156:24, 157:4, 157:6, 162:14, 167:1, 167:5, 167:11, 167:24, 168:7, 168:9, 180:23, 184:8, 186:1, 194:23, 195:1, 199:13, 206:4, 207:7, 209:24, 217:4, 221:19, 235:2, 270:1, 270:13, 270:20, 271:2, 271:8
**stone** [3] - 133:20, 168:14, 184:15
**story** [1] - 264:25
**straight** [1] - 253:16
**straighten** [1] - 249:17
**strategy** [20] - 134:20, 135:5, 135:22, 138:1, 141:1, 141:2, 141:20, 142:2, 142:16, 142:18, 142:20, 142:24, 143:5, 143:7, 143:10, 143:14, 143:22, 144:3
**strategy''** [1] - 143:17
**street** [1] - 140:8
**stricken** [1] - 162:24
**strike** [8] - 134:16, 162:13, 170:17, 187:5, 190:13, 227:7, 232:16, 266:7
**strong** [2] - 213:12, 246:11
**stuck** [1] - 243:18
**study** [1] - 161:9
**stuff** [6] - 139:15, 186:16, 203:11, 205:16, 253:7, 253:16
**subject** [4] - 144:12, 161:6, 167:9, 170:4
**subjecting** [1] - 173:1
**subjects** [3] - 162:12, 223:17
**submitted** [2] - 173:18, 187:18
**subsequent** [6] - 158:21, 179:17, 182:12, 182:22, 209:16, 264:2
**subsequently** [1] - 135:8
**substance** [5] - 147:4, 161:1, 161:3, 204:10, 222:3
**substantial** [1] - 257:16
**Succasunna** [2] - 132:20, 134:2
**successful** [1] - 266:10
**successfully** [1] - 178:3
**sue** [4] - 174:7, 174:14, 175:9, 175:22
**Sue** [34] - 156:19, 186:17,

196:16, 197:7, 197:10, 199:8, 207:19, 208:8, 211:10, 211:19, 212:5, 213:18, 213:20, 214:15, 217:11, 217:18, 217:25, 219:15, 220:1, 220:8, 220:22, 221:10, 221:20, 221:25, 222:3, 230:1, 230:12, 247:22, 250:6, 251:2, 251:9, 260:8, 260:9
**suggest** [6] - 168:19, 176:13, 215:20, 215:25, 217:9, 231:16
**suggested** [21] - 140:20, 167:20, 169:22, 170:5, 201:21, 213:17, 214:6, 214:13, 215:12, 215:23, 216:4, 216:6, 217:7, 217:25, 218:4, 218:14, 228:18, 228:19, 230:10, 264:20, 265:3
**suggesting** [3] - 150:4, 153:8, 208:16
**suggestion** [6] - 167:16, 168:2, 170:13, 215:22, 265:5, 265:11
**suggests** [5] - 216:3, 216:5, 216:11, 216:16, 218:20
**suit** [47] - 168:17, 169:17, 173:14, 210:19, 211:20, 212:1, 212:16, 212:23, 213:18, 214:14, 214:25, 215:5, 216:9, 215:13, 215:23, 216:17, 217:23, 218:1, 218:4, 218:15, 220:11, 227:5, 228:3, 228:7, 228:18, 229:5, 229:16, 230:2, 230:3, 230:13, 232:18, 246:9, 250:21, 250:23, 251:6, 251:13, 261:18, 263:16, 263:22, 264:22, 266:1, 266:6, 266:9, 267:23, 268:5, 270:16, 271:3
**suit''** [2] - 228:9, 231:15
**suit's** [1] - 228:13
**summary** [2] - 202:24, 262:9
**SUPERIOR** [1] - 132:23
**SUPERVISING** [1] - 132:13
**suppose** [1] - 242:19
**supposed** [2] - 146:6, 190:2
**surprise** [3] - 269:13, 269:16
**surprised** [3] - 140:16, 144:7, 269:22
**Susan** [32] - 134:9, 196:19, 197:15, 197:22, 198:9, 198:24, 198:25, 204:14, 204:20, 205:3, 205:6, 205:9, 206:7, 206:10, 224:20, 229:22, 229:24, 231:1, 235:4, 235:8, 235:18, 244:17, 245:9, 245:23, 246:8, 248:21, 249:6, 260:12, 261:3, 267:20, 268:14, 271:4
**SUSAN** [1] - 133:9
**sworn** [2] - 134:3, 272:9

**T**

**taker** [2] - 222:6, 222:7
**talks** [2] - 157:11, 248:19
**tank** [1] - 254:17
**ten** [5] - 153:7, 165:6, 170:24, 176:18, 200:4
**ten-year** [1] - 170:24
**term** [4] - 165:10, 171:8, 172:25, 178:3
**terminate** [8] - 160:21, 165:10, 179:8, 179:11, 180:10, 182:12, 262:24, 263:6
**termination** [2] - 176:9, 179:24
**terms** [7] - 155:5, 178:4, 179:9, 190:10, 237:22, 237:23, 237:24
**testified** [11] - 134:3, 134:25,

169:19, 175:8, 175:20, 196:10, 196:11, 211:22, 236:18, 259:14
**testify** [4] - 160:3, 247:6, 256:13, 272:9
**testifying** [1] - 152:8
**testimony** [13] - 141:17, 151:10, 154:7, 167:9, 168:15, 168:24, 169:14, 170:1, 170:3, 199:7, 244:22, 256:3, 272:12
**Thanksgiving** [2] - 153:6, 192:1
**THE** [101] - 136:25, 137:4, 153:25, 157:2, 157:5, 157:9, 167:4, 167:7, 167:17, 167:25, 168:5, 171:12, 171:20, 172:10, 172:17, 180:12, 180:15, 184:13, 184:19, 184:23, 185:2, 185:5, 185:8, 185:11, 185:14, 185:17, 185:23, 191:1, 193:3, 193:15, 193:22, 194:4, 196:11, 196:13, 196:18, 196:21, 196:24, 197:3, 197:8, 197:13, 197:19, 197:25, 198:3, 198:13, 198:25, 199:3, 200:9, 201:8, 201:17, 211:16, 215:6, 217:2, 219:21, 221:17, 223:13, 223:15, 247:8, 248:21, 249:19, 249:24, 250:14, 250:24, 251:8, 251:14, 251:25, 252:4, 252:12, 252:16, 252:20, 253:1, 253:8, 253:19, 254:2, 254:6, 254:10, 254:16, 254:20, 254:23, 255:2, 255:12, 255:15, 255:20, 255:24, 256:4, 256:10, 256:15, 256:19, 257:4, 257:8, 264:16, 265:5, 265:12, 265:17, 265:20, 268:22, 269:11, 269:21, 270:5, 270:17, 270:23, 271:6
**theirs** [2] - 248:23, 248:25
**therefore** [9] - 145:18, 148:2, 155:20, 156:1, 169:19, 175:15, 176:3, 240:12, 254:25
**thereto** [3] - 151:2, 179:1, 264:2
**thing's** [1] - 230:25
**thinking** [2] - 161:13, 195:8
**Third** [1] - 203:2
**third** [10] - 177:25, 189:7, 189:11, 189:12, 218:22, 230:24, 231:13, 233:23, 234:8, 269:19
**this''** [1] - 163:6
**thoughts** [1] - 166:25
**threatened** [3] - 179:3, 179:5, 183:3
**three** [20] - 141:11, 146:17, 164:18, 165:5, 185:18, 185:21, 186:8, 186:9, 187:1, 187:6, 187:13, 187:25, 188:15, 190:6, 190:7, 206:3, 210:4, 210:17, 253:25, 254:7
**throughout** [2] - 161:19, 198:8
**throw** [2] - 160:14, 194:11
**thrown** [2] - 183:4, 202:16
**Thursday** [1] - 132:20
**tied** [1] - 192:8
**today** [22] - 148:23, 151:10, 151:25, 152:9, 161:25, 168:25, 169:4, 169:5, 169:17, 169:20, 198:4, 200:19, 217:13, 227:3, 255:17, 256:18, 263:14, 263:18, 263:20, 264:15, 264:24, 265:2
**today's** [1] - 206:6
**together** [1] - 191:24

**tomorrow** [1] - 250:12
**ton** [1] - 175:6
**took** [4] - 138:11, 207:24, 225:21, 233:16
**top** [1] - 224:16
**topic** [13] - 138:24, 139:2, 139:9, 221:11, 238:25, 239:20, 239:21, 240:6, 261:13, 262:12, 268:18, 270:11, 270:13
**tossed** [1] - 194:14
**total** [2] - 153:25, 261:21
**totality** [2] - 171:21, 183:15
**towards** [1] - 260:25
**town** [1] - 195:12
**track** [1] - 233:4
**transcript** [24] - 136:15, 153:12, 153:16, 153:20, 156:3, 167:22, 185:24, 199:5, 214:2, 223:20, 224:2, 224:21, 226:17, 230:14, 230:18, 231:7, 231:23, 232:10, 232:20, 233:10, 233:15, 233:24, 234:9, 272:12
**transcripts** [2] - 264:11, 264:13
**treated** [1] - 203:14
**treatment** [1] - 191:11
**trial** [21] - 148:15, 156:21, 157:12, 173:1, 177:25, 179:4, 192:18, 193:2, 193:17, 203:8, 203:15, 230:17, 231:2, 232:19, 234:20, 234:21, 234:22, 248:11, 255:1, 258:15
**trial''** [1] - 231:19
**tried** [2] - 246:22, 246:24
**trouble** [1] - 160:6
**true** [7] - 156:4, 166:17, 166:23, 167:2, 167:16, 187:21, 272:12
**trumped** [2] - 171:13, 171:24
**truncated** [1] - 269:12
**trust** [3] - 167:13, 191:11, 201:1
**trusting** [1] - 200:24
**truth** [4] - 260:14, 272:9, 272:10
**try** [6] - 141:10, 202:15, 203:10, 214:4, 249:3, 249:19
**trying** [4] - 161:8, 198:17, 200:1, 246:25
**turn** [1] - 178:2
**twice** [1] - 234:22
**two** [28] - 146:16, 153:7, 159:19, 162:11, 162:12, 177:9, 178:5, 186:6, 194:7, 194:15, 194:18, 198:20, 199:20, 199:23, 207:17, 207:20, 210:12, 210:13, 215:7, 215:8, 221:15, 221:24, 223:14, 233:8, 238:13, 240:24, 252:24
**type** [11] - 182:23, 214:23, 220:22, 221:3, 221:4, 223:3, 230:7, 233:11, 253:9, 254:12, 269:5

**U**

**ultimately** [10] - 135:25, 149:4, 149:6, 150:3, 150:4, 173:15, 194:6, 194:15, 201:11, 251:5
**UNDER** [1] - 132:5
**under** [19] - 134:11, 140:18, 140:21, 145:2, 183:13, 183:14, 191:6, 193:16, 194:9, 196:10, 206:6, 215:8, 226:13, 228:8, 233:3, 235:8, 256:13, 266:22, 267:3
**underneath** [3] - 215:5, 215:9, 215:10
**understood** [3] - 179:15, 203:12, 263:25

**undoubtedly** [1] - 190:7
**unequivocally** [1] - 185:21
**unethical** [8] - 140:14,
  144:12, 144:24, 145:8,
  172:8, 172:9, 191:15,
  253:22
**unfair** [1] - 191:10
**unfolded** [1] - 266:15
**unheard** [1] - 212:3
**unique** [1] - 205:6
**Unit** [1] - 270:10
**UNITED** [1] - 132:1
**unless** [1] - 225:25
**unlikely** [3] - 157:2, 263:13,
  267:10
**unrelated** [1] - 207:5
**unsure** [1] - 140:15
**untrue** [2] - 170:1, 170:3
**unusual** [6] - 192:1, 211:25,
  212:2, 213:9, 233:11,
  233:13
**up** [55] - 139:17, 139:19,
  139:22, 146:1, 162:7,
  162:20, 163:12, 163:13,
  164:21, 168:6, 169:15,
  171:17, 174:7, 174:14,
  175:9, 175:21, 186:23,
  193:12, 193:16, 194:5,
  195:22, 196:20, 196:22,
  196:25, 199:22, 215:20,
  217:10, 217:12, 217:13,
  221:8, 223:10, 223:17,
  224:12, 228:13, 229:17,
  231:19, 234:5, 235:22,
  238:24, 248:11, 250:9,
  254:7, 254:17, 255:2,
  262:19, 263:14, 263:17,
  263:20, 264:15, 265:2,
  267:24, 269:4, 270:11,
  271:3
**up-to-date** [1] - 224:12
**uphold** [1] - 202:19
**upset** [1] - 143:18
**utilize** [1] - 204:13
**utilized** [2] - 204:12, 205:12

**V**

**vague** [2] - 160:15, 167:10
**valid** [1] - 175:12
**validity** [1] - 235:17
**vanished** [1] - 164:19
**various** [3] - 151:16, 172:22,
  247:24
**venue** [2] - 166:9, 166:12
**version** [2] - 155:1, 194:2
**view** [2] - 178:18, 179:1
**viewed** [1] - 195:15
**violated** [1] - 203:20
**violating** [1] - 177:7
**violation** [1] - 179:6
**voice** [1] - 143:18
**void** [5] - 175:14, 191:6,
  202:7, 202:18, 253:23
**voidability** [1] - 239:22
**VOLUME** [1] - 132:9
**voluntary** [4] - 176:4, 176:7,
  176:10, 176:13
**voluntary"** [1] - 176:6
**volunteer** [2] - 218:11,
  218:14
**volunteering** [1] - 218:11
**vs** [1] - 165:9

**W**

**wait** [6] - 138:10, 143:1,
  191:13, 194:8, 213:8,
  261:24
**wait-and-see** [1] - 261:24
**waited** [3] - 253:25, 254:6,
  271:4
**waive** [17] - 186:14, 210:19,
  214:25, 215:5, 215:9,
  228:9, 228:13, 229:16,
  230:13, 231:14, 232:18,
  246:9, 250:21, 266:6,
  266:9, 267:22, 268:5

**waived** [1] - 215:24
**waiver** [28] - 211:20, 211:25,
  212:15, 212:23, 213:17,
  214:14, 215:12, 216:6,
  217:7, 217:23, 218:1,
  218:4, 218:14, 220:11,
  228:2, 228:7, 228:18,
  229:5, 230:2, 230:3, 251:6,
  251:13, 263:16, 263:22,
  265:3, 266:1, 270:15,
  271:3
**waiving** [2] - 227:5, 250:22
**walk** [3] - 138:7, 138:15,
  161:15
**walked** [9] - 137:24, 138:8,
  138:23, 143:11, 161:22,
  161:25, 181:18, 196:2,
  196:9
**walking** [1] - 140:7
**wants** [4] - 200:5, 200:13,
  204:13, 247:15
**waste** [1] - 153:25
**ways** [1] - 204:25
**weak** [1] - 269:7
**week** [7] - 201:7, 230:24,
  233:23, 234:8, 246:20,
  256:18, 256:24
**weeks** [4] - 146:17, 153:7,
  253:25, 254:7
**West** [2] - 161:12, 162:4
**wet** [2] - 170:21, 170:22
**whatsoever** [1] - 162:3
**wherein** [3] - 150:17, 158:22,
  164:22
**whole** [14] - 140:12, 161:6,
  175:14, 181:10, 195:15,
  204:19, 215:20, 216:19,
  230:25, 250:10, 259:2,
  261:13, 272:10
**wife** [1] - 132:5
**wiggle** [1] - 266:25
**WILLIAM** [3] - 132:9, 132:10,
  133:5
**William** [3] - 133:12, 133:14,
  133:14
**willing** [1] - 169:16
**willingness** [1] - 269:15
**win** [1] - 194:16
**window** [3] - 189:7, 189:11,
  189:13
**winning** [1] - 194:18
**withdraw** [2] - 177:10,
  201:22
**withdrawing** [1] - 176:25
**withdrew** [1] - 180:9
**witness** [1] - 143:15
**WITNESS** [102] - 133:17,
  136:25, 137:4, 153:25,
  157:2, 157:5, 157:9, 167:4,
  167:7, 167:17, 167:25,
  168:5, 171:12, 171:20,
  172:10, 172:17, 180:12,
  180:15, 184:13, 184:19,
  184:23, 185:2, 185:5,
  185:8, 185:11, 185:14,
  185:17, 185:23, 191:1,
  193:3, 193:15, 193:22,
  194:4, 196:11, 196:13,
  196:18, 196:21, 196:24,
  197:3, 197:8, 197:13,
  197:19, 197:25, 198:3,
  198:13, 198:25, 199:3,
  200:9, 201:8, 201:17,
  211:16, 215:6, 217:2,
  219:21, 221:17, 223:13,
  223:15, 247:8, 248:21,
  249:19, 249:24, 250:14,
  250:24, 251:8, 251:14,
  251:25, 252:4, 252:12,
  252:16, 252:20, 253:1,
  253:8, 253:19, 254:2,
  254:6, 254:10, 254:16,
  254:20, 254:23, 255:2,
  255:12, 255:15, 255:20,
  255:24, 256:4, 256:10,
  256:15, 256:19, 257:4,
  257:8, 264:16, 265:5,
  265:12, 265:17, 265:20,

268:22, 269:11, 269:21,
  270:5, 270:17, 270:23,
  271:6
**woman** [1] - 166:18
**wonder** [1] - 166:19
**wondering** [1] - 147:6
**word** [15] - 141:3, 143:14,
  143:17, 145:25, 165:14,
  176:7, 176:12, 197:11,
  212:2, 212:4, 218:13,
  231:4, 231:16, 269:6,
  269:7
**words** [16] - 134:24, 177:23,
  183:9, 190:1, 191:10,
  203:14, 215:20, 217:9,
  220:17, 226:15, 226:16,
  229:15, 246:18, 247:13,
  256:22, 268:11
**works** [3] - 205:6, 260:8,
  261:22
**worried** [1] - 200:15
**writes** [2] - 156:19, 247:14
**writing** [6] - 156:17, 156:18,
  157:3, 157:18, 157:22,
  235:24
**written** [4] - 145:3, 210:12,
  210:13, 217:8

**Y**

**yank** [2] - 192:24, 254:20
**yanked** [2] - 166:6, 193:6
**year** [7] - 160:10, 170:24,
  191:21, 191:23, 195:2,
  254:17, 255:3
**years** [6] - 189:25, 194:7,
  194:16, 194:18, 198:20,
  253:20
**yesterday** [2] - 211:1, 265:13
**young** [1] - 149:24
**yourself** [2] - 204:7, 221:20
**YURKOVIC** [1] - 132:8
**Yurkovic** [2] - 133:5, 133:14

**Z**

**zoned** [1] - 230:1