POINT I

DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE AMENDED OMPLAINT AS THE RELEASE/HOLD HARMLESS AGREEMENT IS IN VIOLATION OF PUBLIC POLICY AND IN VIOLATION OF THE RULES OF PROFESSIONAL CONDUCT

The State of New Jersey conditioned the plaintiff's entry into the pre-trial intervention program on the plaintiff's representation that he waive his constitutional right to sue the defendants for injuries suffered as a result of his arrest and execute a written release/hold harmless agreement. Requiring the release/hold harmless agreement as a condition of the plaintiff's entry into the pre-trial intervention program is not only against public policy, but it is in clear violation of New Jersey's Rules of Professional Conduct. It is generally held that contracts against public policy are void and unenforceable. A contract is unenforceable where it is contrary to public policy. Manning Eng'g, Inc. v. Hudson County Park Comm'n, 74 N.J. 113, 138, (1977). While the best interests of society demand that persons should not be unnecessarily restricted in their freedom to contract, courts will not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 403-04 (1960). It is against public policy to compel an individual to give up his constitutional right to sue for redress in exchange for a particular result in a criminal action.

In the State of New Jersey it is clear and has always been clear that a prosecutor may not seek an advantage in a potential civil case by coercing criminal defendants to waive civil causes of action in connection with plea bargains. Advisory Committee on

Professional Ethics Opinion 661, 131 NJLJ 170, 1 NJL 740 (May 18, 1992).  In Opinion 661, the Advisory Committee was asked whether it was ethical for a municipal prosecutor to require as a condition precedent to a plea bargain that a defendant in a criminal, quasi-criminal or motor vehicle matter sign a form in which the defendant agrees that there existed probable cause to arrest, that no excessive force was used in effectuating the arrest, ant that any right to sue the arresting officer for a violation of his civil rights is waived.  The Advisory Committee noted that it is the prosecutor's duty to see that justice is done, not to secure convictions and that prosecutors are bound by 'special responsibilities' under the Rules of Professional Conduct.  The Advisory Committee explained that the New Jersey Rules of Professional Conduct, specifically R.P.C. 3.4(g), clearly prohibits the element of <u>quid pro quo</u> that is present when a defendant is presented with a choice of waiving certain constitutional and civil rights against accepting a plea bargain.  The Advisory Committee noted the sharply divided court's ruling in <u>Newton v. Rumery</u>, 480 U.S. 386 (1987), that such agreements were not held to be invalid or illegal <u>per se</u>, however the Advisory Committee held that such agreements in this state are unethical.  Furthermore, the Advisory Committee imposed a bright-line prophylactic rule forbidding conditions precedent in such situations.  The Advisory Committee further reasoned that an added benefit of such an opinion would benefit the criminal justice system from the unseemly spectacle of <u>Newton</u>-based attacks on the integrity of prosecutors and, incidentally, from attacks on the validity of the waivers themselves.  Opinion 661.  Clearly, the intent of Advisory Committee Ethics Opinion 661 was not met in this case.

The Advisory Committee on Professional Ethics issued Opinion 714, 194 NJLJ 451, 17 NJL 2084 (October 27, 2008). Opinion 714 directly confronted the release/hold harmless agreement in this case. The Advisory Committee considered whether conditioning entry of a plea or entry into pre trial intervention in a criminal, quasi-criminal, or motor vehicle matter on the defendant's release from civil liability and agreement to hold harmless any person or entity such as the police, the prosecutor or a governmental entity was permitted conduct. The Advisory Committee noted that it had previously decided that RPC 3.4(g) prohibits this conduct and extends to prosecutors and specifically cited to Opinion 661. The Advisory Committee confirmed that RPC 3.4(g) prohibits a prosecutor from conditioning entry of a plea of entry into pre trial intervention in a criminal, quasi criminal, or motor vehicle matter on the defendant's release from civil liability and agreement to hold harmless any person or entity such as the police, the prosecutor, or a governmental entity. "The prohibition applies in all situations, including when the defendant's release from liability and agreement to hold harmless is initially offered by defense counsel." Opinion 714, emphasis added. There can be no doubt that the conditioning of entry into the pre trial intervention program on the waiver of a defendant's civil rights, the waiver of the right to sue, and/or the execution of a release/hold harmless agreement is prohibited unethical conduct within the State of New Jersey.

This Court must abide by the New Jersey Rules of Professional Conduct and the Advisory Opinions issued therein. Local Rule 103.1(a) for the District of New Jersey provides that "the Rules of Professional Conduct of the American Bar association as revised by the New Jersey Supreme Court shall govern the conduct of the members of

the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law."  The Supreme Court of New Jersey has spoken on this issue through its implementation and enforcement of RPC 3.4(g) and the Advisory Opinions that interpret it.  Conditioning entry into pre trial intervention upon a releases and/or hold harmless agreement is prohibited and unethical.  In <u>Michaels v. Woodland, M.D.</u>, 988 F. Supp. 468 (D.N.J. 1997), the Court held that Rules of the New Jersey Supreme Court, specifically R. 4.2 an 1.13, shall govern the resolution of the dispute.  <u>Id.</u>, at 470.  In <u>In Re Prudential Insurance Company of America Sales Practices Litigation</u>, 911 F. Supp. 148 (D. N.J. 1995), the Court held similarly.  In <u>Prudential</u>, the Court held that the parties must comply with the New Jersey Rules of Professional Conduct and relied upon the New Jersey Supreme Court's interpretation of the Rules of Professional Conduct in an Advisory Opinion.  <u>Id.</u>, at 150.  There can be no doubt that in the State of New Jersey, a release/hold harmless agreement cannot be upheld if it was secured as a condition of entry into the pre trial intervention program.

    The matter before the court is a glaring example of the reasoning behind the prohibition set-forth in Opinion 661 and 714.  As argued by the defense, a man with a B.S. Degree, intelligent, involved in business, involved in the execution of Contracts, can by the very nature of the position he is put in agree to execute a Release and Hold Harmless Agreement when he strongly feels that his civil rights have been violated.  Again, the argument of the defense that the Plaintiff knew what he was doing, i.e., signing a Release and Hold Harmless Agreement knowing that the same would result in this very Summary Judgment Motion, when the Plaintiff felt strongly about his civil rights

case, is the clearest evidence that the Court could possibly have that public policy in the District Court of New Jersey should follow the ethical guidelines and should not enforce such Release/Hold Harmless Agreements. The Plaintiff's position is that he was behaving as a law abiding citizen, had the misfortune to engage in conversation with a police officer's girlfriend and subsequently was arrested, beaten, and charged with a second degree crime. Having had that occur, the Plaintiff did indeed, in the face of a second degree crime to which the No Early Release Act was applicable, agree to execute a Release/Hold Harmless Agreement. To characterize the execution of a Release/Hold Harmless Agreement in the context of a case such as this as voluntary is nothing but absurd. A rational person cannot suggest that when an individual is faced with a potential ten year State Prison term, a substantial portion of which will be without parole, that that individual should exercise his right to go to a criminal trial when he is offered an opportunity to be entered into Pre-Trial Intervention, not have a criminal record and not be prosecuted. Only an insane person would turn down that offer. So, yes, as the defense argues, from an objective standpoint, Mr. Bassem Kandil, being a rational individual, accepted what is in essence an offer that could not possibly be refused.

So the question is whether in the context of a criminal case of this nature, given the nature of the charges, and the extreme jeopardy in which the Plaintiff was placed, a rational person would do what the Plaintiff did. There is no doubt that the Plaintiff, at the time that he executed the Agreement was fully aware of the implications of the execution of the Agreement as he testified to at his deposition. While the timeframe between the October 18, 2005 status conference wherein this issue was first discussed

regardless of who first raised the issue, and November 9, 2005 was truncated and probably did not allow for sufficient evaluation of the request for the Release/Hold Harmless Agreement, by the time the Plaintiff actually executed it in March 2007, there had been plenty of time for research and discussion regarding the implications of executing the Release/Hold Harmless Agreement. Obviously, the execution of the Agreement was with the assistance of counsel, the Agreement was drafted by counsel, and as set-forth in the deposition of the Plaintiff, he understood generally that this motion would be brought and that the Release/Hold Harmless Agreement could potentially have an impact on the civil rights suit.

Therefore, it is conceded that at a certain level, the first prong of <u>Rumery</u> is met, i.e., the issue of the "voluntariness" of the execution of the Release/Hold Harmless Agreement. However, it is clear that public policy in the State of New Jersey is completely contrary to the validity of such Agreements in the context of the disposition of a criminal matter.

Notwithstanding these ethics opinions and the Rules of Professional Conduct, the Defendants, supposed third party beneficiaries of the supposed Agreement, i.e., the condition of entry into the PTI program, come before this Court and ask this Court to uphold the validity of the Release/Hold Harmless Agreement. It is suggested to the Court that the Defendants must do much more than merely present evidence that the Agreement was knowingly entered into. The usual contractual analysis is certainly not applicable. The only consideration for the Release/Hold Harmless Agreement was the entry into the PTI program. As the Release indicates, there were no monies paid in exchange for the Release.

Following up however, on the contractual analysis offered by the defense, it is not even clear who the Agreement was between. There is some evidence that Judge DeVesa is the individual who wanted the Agreement. First A.P. McClure states at one point of her testimony that the Prosecutor's Office would never request such an Agreement. What is clear is that the Prosecutor's Office is running away from this Agreement as fast as they can. However, now the Defendants are asking Your Honor to enforce an Agreement that the Prosecutor's Office, in the testimony submitted to the Court, clearly views as inappropriate. Obviously, given Opinion 714, these types of Agreements will most likely never again be utilized by a Prosecutor's Office in the State of New Jersey to extort an individual into giving up his civil rights.

In a sense it is unfortunate that because of the overreaching and abuse of power exhibited by this case, Release/Hold Harmless Agreements which may be useful in very limited unique situations such as Newton v. Rumery, 480 U.S. 386 (1987) are completely prohibited. Rumery dealt with a situation where the Prosecutor was protecting a victim of an alleged aggravated, felonious, sexual assault. The victim did not want to testify in the criminal matter. The Prosecutor would have had to, apparently, subpoena the victim and force her to testify against her will. Therefore, it made complete sense, under the circumstance of Rumery to seek the Release/Hold Harmless Agreement to protect a citizen witness. If the victim did not want to testify in the criminal case, and the Prosecutor was not willing to put the victim through the trauma of the criminal case, then certainly the Prosecutor would seek to protect that sex assault victim from the trauma of a civil case. Rumery clearly presented a unique situation where it

7

was in the public interest and in the interest of a traumatized sexual assault victim to seek the waiver of the right to sue in civil court.

This case presents an entirely different situation. Here we are dealing with police officers. The "victims" in this case are people who are used to testifying, and who brought the charges against the Plaintiff. There cannot possibly be any trauma to the Defendants in this case by their having to defend themselves in this civil action.

As often happens, a procedure with some legitimacy is abused by people in power such that that procedure ultimately is completely forbidden. A police brutality case is not the place for a Release/Hold Harmless Agreement such as that utilized in the Rumery matter.

## POINT TWO

## THE RELEASE/HOLD HARMLESS AGREEMENT EXECUTED IN THIS CASE BY THE PLAINTIFF IS NOT VALID AND ENFORCEABLE EVEN IF FOUND TO BE VOLUNTARILY ENTERED INTO

As stated above, Newton v. Rumery dealt with a very unique situation of a sexual assault victim that did not want to testify. Therefore, even if the Court found that this Agreement was entered into voluntarily, that only begins the inquiry. Because the Agreement was entered into in the context of a criminal prosecution, the Rumery Court and all Courts that have analyzed these types of Agreements, have stated that whether or not the Agreement was entered into voluntarily is only the beginning of an examination of whether the Release/Hold Harmless Agreement is valid.

As stated above in Rumery, the Court emphasized the public interest in the execution of a Release/Hold Harmless Agreement in the context of that case. The very nature of the criminal process suggests a lack of voluntariness in its real sense.

8

The defense completely ignores or refuses to discuss the overwhelming discrepancy in bargaining power with respect to the Release/Hold Harmless Agreement. The State was prosecuting the Defendant for a second degree crime. While a third degree plea offer was made, if the Plaintiff did not accept that, i.e., a criminal record, then he would have to go to trial on a second degree crime. The choice was not between PTI and a third degree conviction, the choice was between prosecution for a second degree with the No Early Release Act and PTI.

Much of the argument of the defense is irrelevant, immaterial and/or without a basis in fact. The defense argues that in violation of the representations made by the Plaintiff and his attorney and the Order of Postponement, Plaintiff filed a Complaint in this matter. There was never a representation made in this matter that a Complaint would not be filed. The representation was that a Release and Hold Harmless Agreement would be executed. That Agreement was executed. That is the reason for the Summary Judgment Motions. As set-forth in the Defendants' Statement of Undisputed Facts the Plaintiff continued through the PTI program and was granted a dismissal of his charges. Obviously it was not the State's position with respect to the Pre-Trial Intervention that there was an Agreement not to bring a suit. The Motion for Termination related to the execution of a Release/Hold Harmless Agreement, not to the bringing of a lawsuit.

Defendants' attack on counsel is designed to divert the Court's attention from an unethical request by the Prosecutor's Office with respect to the Release/Hold Harmless Agreement which is clearly against Public Policy in the State of New Jersey. The

Prosecutor's Office and the defense have also tried to lay this unethical conduct at the doorstep of the Judge in this matter.

The defense asserts in the deposition of counsel, that counsel conceded that he never intended to submit the Release/Hold Harmless Agreement. How this statement can be made when a Release/Hold Harmless Agreement was executed is beyond comprehension. The testimony of counsel makes it clear that there were various options being considered given the knowledge of counsel that the Agreement being requested in this matter was against Public Policy and unethical. Research was not necessarily to come to this conclusion. There is no lawyer in the State of New Jersey who would not immediately have significant questions about the validity of such a Release/Hold Harmless Agreement when confronted with a request to execute same as a condition of entry into PTI. The argument of the defense in this matter is nothing but a continuation of the heavy handed tactics used by the Middlesex County Prosecutor's Office to protect the police officers from a legitimate civil rights suit.

The Court in this Summary Judgment Motion is confronted with a situation where prohibited conduct is undertaken by the State of New Jersey in requesting a Release/Hold Harmless Agreement as a condition into the PTI program and the defense seeking to rely on that unethical conduct by means of this Summary Judgment Motion. The defense, following the lead of the Middlesex County Prosecutor's Office, refuses to even address the Rules of Professional Conduct and the opinions relating thereto. To suggest that counsel was somehow remiss in not researching a point that is patently clear to all lawyers in the State of New Jersey is an argument that the Court should reject out-of-hand.

The other argument of the defense is that an application should have been made to the Superior Court, Criminal Division to avoid or alter the condition regarding the Release/Hold Harmless Agreement. This completely ignores the position of the actual Plaintiff in this matter. He has been informed by his counsel that the Release/Hold Harmless Agreement condition is unethical and illegitimate. He has witnessed a Judge go along with what is clearly an unethical request of the Prosecutor's Office. His testimony reflects that he may himself have heard the Judge mention the Release/Hold Harmless Agreement as a condition of entry into PTI. The fact that the Plaintiff did not want to go back before that Judge on a motion and risk being placed back on the trial list is completely understandable. The fact that the Plaintiff decided to rely upon his civil rights suit to vindicate his rights as opposed to filing a motion before the same Judge that supposedly made a suggestion of a Release/Hold Harmless Agreement in the first place is a rational decision. Plaintiff's experience in Middlesex County is not one that engendered confidence with respect to fairness.

The investigation by the Plaintiff in the underlying criminal matter raised significant questions as to the integrity of Officer Yurkovic. There is significant evidence that was presented to the Prosecutor's Office that he was not being truthful when he communicated to the Prosecutor's Office that he did not know any individuals at the scene. Significantly, the Prosecutor's Office never attempted to interview Pam Radziweicz and/or "Lindsay" to test the credibility of Officer Yurkovic. However, A.P. Silva testified that the presence of non-presence of these two potential witnesses at the scene was a consideration of hers as to whether or not the Plaintiff should be allowed to enter PTI. In essence, one of the reasons why Mr. Kandil was allowed to enter into PTI

is that the Prosecutor's Office had questions about the credibility and integrity of the police officers in this matter. In the face of those questions, it was improper to request a Release/Hold Harmless Agreement.

The attempt to place this at Judge DeVesa's doorstep is inappropriate. First of all, Judge DeVesa was new to the case. Judge DeVesa knew nothing about the facts of the case. To suggest that Judge DeVesa somehow oversaw or somehow supervised this Release/Hold Harmless Agreement is without factual support. There is no indication that Judge DeVesa reviewed any police reports or any other discovery provided by the defense. Therefore, any "supervision" by Judge DeVesa of this Release/Hold Harmless Agreement is without substance.

For obvious reasons, the Middlesex County Prosecutor's Office is putting as much distance between themselves and this Release/Hold Harmless Agreement. Ms. McClure in her testimony states that the Prosecutor's Office would never request such a Release/Hold Harmless Agreement. As a matter of fact, the testimony is that they have never entered into a Release/Hold Harmless Agreement before. So the argument is in this one case, this one unique case, dealing with police brutality, an Agreement that was clearly against Public Policy was necessary. There is no support for Mr. Kandil being singled out for such heavy handed prosecution.

In <u>Livingston v. North Belle Vernon Borough,</u> 91 F.3d 515, 521 (3d Cir. 1996), there was an issue as to who initiated the "settlement negotiations" in that case leading to the Release/Hold Harmless Agreement. The Court found it immaterial as to who first suggested the Release/Hold Harmless Agreement.

## POINT THREE

## THE ENFORCEMENT OF THE RELEASE/HOLD HARMLESS AGREEMENT IN THIS MATTER IS CONTRARY TO THE PUBLIC INTEREST AND THE RELEASE/HOLD HARMLESS AGREEMENT SHOULD NOT BE ENFORCED

In Livingstone, the Court analyzed the concept of Public Interest in the context of Release/Hold Harmless Agreements in a criminal prosecution. The Public Interest prong of the analysis encompasses prosecutorial misconduct; however, it is not limited to prosecutorial misconduct. Id. at 527, citing Cain v. Darby Borough, 7 F.3d 377(3d Cir. 1993) in banc cert.den. 510 U.S. 1195 (1994). Referring to Cain, the Livingston Court stated that parties seeking to enforce the Release Dismissal Agreement based upon the Agreement being in the public interest, must make two distinct showings, one objective and one subjective.

The party seeking to enforce the Agreement must show that the facts known to the Prosecutor when the Agreement was reached support the Prosecutor's proffered Public Interest reason for concluding the Agreement and the Public Interest reason must be a legitimate one. Legitimate Public Interests include costs and disruptions associated with defending marginal or frivolous civil rights actions; however, they also include the countervailing interests in detecting and deterring official misconduct.

In the matter before the Court there is no argument made that the reason behind the insistence upon the Release/Hold Harmless Agreement in this matter was based upon an analysis of the merits of the underlying civil rights claims. The defense has submitted to the Court numerous police reports/internal investigation reports in this matter. They are attempting to have this Court conduct that analysis that was not conducted by the Prosecutor's Office and/or Judge DeVesa. The police reports, and

13

investigative reports attached to Defendants' moving papers are not material and not relevant to the consideration of this Court. The analysis that should have been conducted regarding the merits of the Plaintiff's claims were never undertaken by Judge DeVesa or the Middlesex County Prosecutor's Office. To the contrary, one of the facts that A.P. Silva, according to her testimony, considered in placing the Defendant into PTI, was that there was a real question as to the credibility of Officer Yurkovic, i.e., whether he was lying about the presence of the two female witnesses at the scene. In essence one of the reasons that Mr. Kandil was placed into PTI was because there was merit and substance to his civil rights claim. The defense does not submit to the Court the reciprocal discovery that was provided to the State. How can they possibly argue without the entire criminal file before the Court that there was an evaluation of the merits of the civil rights claim. The proffered reason by First A.P. McClure, i.e., that it would save the State resources with respect to the criminal prosecution is not a legitimate reason for the Release/Hold Harmless Agreement. That exists in every case that comes before a criminal court and is prosecuted by the State. Every criminal disposition short of trial saves the State resources associated with its prosecution. The Public Interest in saving the State the resources associated with the prosecution of a criminal matter is not a legitimate reason for a Release/Hold Harmless Agreement.

What does not appear in the record before the Court is an indication that the Prosecutor's Office engaged in an individualized analysis of the Defendant's civil rights claims before entering into the Release/Hold Harmless Agreement. There is no case specific showing that the claims of civil rights are marginal or frivolous. Furthermore, there is nothing in the record to suggest that at the time the Agreement was made, the

Prosecutor was, in fact, motivated by the marginal and frivolous nature of the civil rights claim. The fact is that A.P. Silva questioned the integrity of Police Officer Gary Yurkovic as to the issue of the presence of the female witnesses. She states in her deposition testimony that this was one of the reasons that she suggested to First Asst. McClure that the Plaintiff should be placed into PTI. Therefore, it is reasonable to conclude that one of the reasons that the Plaintiff was placed into PTI and one of the reasons for the Release/Hold Harmless Agreement was the actual merits as opposed to the marginal nature of the civil rights claim. That said, there is nothing in the record to suggest that the actual merits of the claim were analyzed carefully and that that analysis led to a conclusion of marginality and frivolousness.

The arguments of defense regarding the bias claim is another diversion. The Plaintiff never himself made a claim of bias. The Plaintiff has maintained from the very beginning that he was the subject of police brutality and a wrongful arrest. When given reciprocal discovery the Prosecutor's Office did not reach out to the individuals set-forth in that reciprocal discovery, particularly Pam Radziweicz, who we now know was having an affair with Officer Yurkovic. Instead they reached out for Officer Yurkovic who had already apparently stated to A.P. Pitchford that there were no individuals whose identity he was aware of at the scene of the incident. The Prosecutor's Office did nothing to investigate the material contained within the discovery provided by Plaintiff's counsel in the criminal case, but call up the very office whose integrity was in question.

It should also be pointed out in this case that A.P. Silva was admittedly new to the case. First Asst. McClure never indicated that she reviewed the file in any depth but for flipping through the file and discussing it with A.P. Silva. A.P. Silva did not testify

that she interviewed the witnesses in this matter, particularly the names provided by the defense. She did contact the "victim" police officers to see if they agreed with the disposition of the case. In the context of a Release/Hold Harmless Agreement the Prosecutor has an obligation to conduct an analysis of the merits of the civil rights claim. Id. at 529,530.

The defense states without factual support that the civil rights claims are without merit and frivolous. Again, they base this on the bias investigation which clearly was never an allegation of the Plaintiff. They submit various police reports and investigative reports to try and persuade the Court that the police officers are being truthful. These police officers have never been subjected to depositions. That being said, the first step in an analysis of merit with respect to the civil rights action is an analysis by the Prosecutor's Office that did not occur in this case. There is no testimony, there is no Affidavit or any other material in the record to indicate that an Assistant Prosecutor analyzed the civil rights claims in this case for the merit of the claims but for A.P. Silva who testified that she was not sure when she spoke to First Asst. McClure that Police Officer Yurkovic was being truthful when he indicated that the two female witnesses were not present at the scene. The reality is that Mr. Kandil was placed into the PTI program because of the merits of his civil rights claim, not due to the marginality and frivolousness of those claims.

Based on the foregoing lack of analysis by the Prosecutor's Office with respect to the underlying civil rights claim, the failure of the record to contain any indication that the Prosecutor's made the determination that the civil rights claims were marginal and

frivolous, the second prong of <u>Livingstone</u> has not been met and the Agreement is unenforceable.

For the defense to suggest that this "protracted" litigation is the result of a misrepresentation of the Plaintiff and Plaintiff's counsel is the height of arrogance. The defense completely ignores that the Release/Hold Harmless Agreement is unethical and against Public Policy. It is the defense that is utilizing the Release/Hold Harmless Agreement that should never have been requested and protracting this litigation.

## CONCLUSION

While there is sufficient evidence in the record to conclude that the Release/Hold Harmless Agreement was entered into voluntarily as that term has been defined in the context of Release/Hold Harmless Agreements involving the disposition of criminal matters, it is submitted to the Court that in the State of New Jersey such Release/Hold Harmless Agreements are so far contrary to Public Policy that they should not be enforced. Furthermore, moving beyond the voluntary prong of the analysis, there is nothing in the record to support the second phase of the analysis that being an individualized analysis of the merits of the civil rights claim, i.e., the Public Interest aspects of this. The proffered reason with respect to the Public Interest that being saving the State the expense and time of a criminal prosecution is not a legitimate reason. There is no indication that an analysis was done with respect to the merits of a civil rights claim.

                                                Respectfully submitted,

                                                Robert D. Kobin

RDK/jeb