# EXHIBIT "3"

Case 2:06-cv-04701-DMC -MF   Document 109-3    Filed 02/01/10   Page 2 of 7 PageID: 1663

KANDIL v. YURKOVIC, et al.                                   Testimony of R. KOBIN, ESQ. - 5-28-09

C O P Y

1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CASE NO. 06CV4701 (JAG)

| | |
|---|---|
| BASSEM KANDIL and FLORA KANDIL, his wife,<br><br>Plaintiffs,<br><br>v.<br><br>POLICE OFFICER GARY YURKOVIC, POLICE OFFICER ANTHONY MARK ABODE, POLICE OFFICER WILLIAM C. OELS, III, SERGEANT WILLIAM OELS, CHIEF OF POLICE, CITY OF NEW BRUNSWICK POLICE DEPARTMENT, MIDDLESEX COUNTY PROSECUTOR'S OFFICE, MIDDLESEX COUNTY CORRECTIONAL FACILITY, JOHN DOE SUPERVISING OFFICERS 1-10, JON DOES 1-10, ABC CORPS, 1-10,<br><br>Defendants. | DEPOSITION UNDER ORAL EXAMINATION OF:<br><br>ROBERT D. KOBIN, ESQ. |

B E F O R E:

MARYANNE DELPOME BONIELLO, a Certified Court Reporter of the State of New Jersey, at the offices of NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, P.A., 20 Commerce Boulevard, Succasunna, New Jersey, on Thursday, May 28, 2009, commencing at 3:50 p.m. pursuant to Notice.

SUPERIOR COURT REPORTERS, INC.
Certified Court Reporters
612 Bergen Boulevard
Ridgefield, New Jersey 07657
(201) 941-1550

---

2

A P P E A R A N C E S :

NUSBAUM, STEIN, GOLDSTEIN, BRONSTEIN & KRON, P.A.
BY: ROBERT D. KOBIN, ESQ.
Attorneys for Plaintiffs

DWYER, CONNELL & LISBONA, ESQS.
BY: WILLIAM T. CONNELL, ESQ.
Attorneys for Defendant P.O. Gary Yurkovic

GOLDEN, ROTHSCHILD, SPAGNOLA, LUNDELL, LEVITT & BOYLAN, P.C.
BY: GARY S. SPAGNOLA, ESQ.
Attorneys for Defendant P.O. Anthony Mark Abode

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
BY: SUSAN K. O'CONNOR, ESQ.
Attorneys for Defendants City of New Brunswick, New Brunswick Police Department and Director Joseph Catanese

MICHAEL J. STONE, ESQ.
Attorneys for Defendant P.O. William Oels, III

LAWRENCE Y. BITTERMAN, ESQ.
Attorney for P.O. Yurkovic, P.O. William C. Oels, III, and Sergeant William Oels on punitive damages claim

I N D E X

| WITNESS | PAGE |
|---|---|
| ROBERT D. KOBIN, ESQ. | |
| Direct by Mr. Connell | 3,31,50, 59,75,112 |
| Examination by Ms. O'Connor | 27 |
| Examination by Mr. Bitterman | 48,60 |
| Examination by Mr. Stone | 57,110 |

---

3

1  ROBERT D. KOBIN, ESQ.,
2  20 Commerce Boulevard, Succasunna, New Jersey, having
3  been duly sworn, was examined and testified as
4  follows:
5  DIRECT EXAMINATION BY MR. CONNELL:
6     Q.   Mr. Kobin, as you know, my name is
7  William Connell. We're here to take your deposition
8  concerning limited issues concerning your discussions
9  with Mr. Kandil and Susan Reed and anything else
10 relative to a release/hold harmless agreement which
11 was ultimately executed by your client and any
12 discussions relative thereto concerning his criminal
13 prosecution. Understood?
14    A.   Yes. And just let me make a comment. We
15 all understand the parameters of this deposition.
16    Q.   I was just going to say we also had a
17 discussion before Magistrate Arleo and we agreed that
18 there would be a maintenance of a privilege that you
19 could assert in the future with respect to any
20 communications or any questions that may be asked that
21 you don't raise at this point, we're allowing you to
22 raise that objection in the future if you believe that
23 it's subject to the attorney/client privilege or some
24 privilege that would go beyond the parameters of this
25 deposition which is to discuss issues which otherwise

---

4

1  would be protected by attorney/client privilege with
2  your clients, but that pertain to the release and hold
3  harmless agreement and any discussions relative to the
4  criminal prosecution related to that issue and when it
5  came about and discussions you had with your clients
6  or other people concerning that. Understood?
7     A.   Yes.
8     Q.   You agree with those parameters?
9     A.   Generally speaking, yep, I agree with the
10 parameters, as long as we stay focused on the criminal
11 matter leading up to -- I guess the end of it would be
12 the execution of the release and hold harmless.
13    Q.   But there is also an ongoing civil suit
14 before that all happened. So to the extent that the
15 civil suit, the complaint was filed and the release
16 and hold harmless agreement was executed after the
17 complaint was filed, we're entitled to find out things
18 of that nature and communications you had with your
19 clients concerning that.
20    A.   Concerning the civil suit, I'll have to
21 see how the question's asked. Okay?
22    Q.   Okay. You're an attorney-at-law in the
23 State of New Jersey and you were licensed to practice
24 in this state when, do you recall?
25    A.   I think '86.

Case 2:06-cv-04701-DMC -MF   Document 109-3   Filed 02/01/10   Page 3 of 7 PageID: 1664

KANDIL v. YURKOVIC, et al.                                    Testimony of R. KOBIN, ESQ. - 5-28-09

**Page 5**

1  Q.  And your date of birth is what?
2  A.  4-4-58.
3  Q.  Are you licensed in any other state?
4  A.  Florida, inactive.
5  Q.  When did you get admitted to Florida?
6  A.  Can't remember now.
7  Q.  Did you ever practice law in Florida?
8  A.  No. No, they have an inactive list.
9  Q.  You became an inactive member of the
10 Florida bar after becoming a member of New Jersey bar
11 in '86?
12 A.  Yeah. I was just trying to take some
13 time. If I came here in '96, I had already been a
14 member of the Florida bar, but I was always on the
15 inactive list.
16 Q.  We want to briefly go through your career
17 as an attorney. Where did you go to law school?
18 A.  Capital Law School, Columbus, Ohio.
19 Q.  And you graduated when?
20 A.  '85.
21 Q.  What was your first job after law school?
22 A.  Law clerk for Carella, Byrne, Bain,
23 Gilfillan. Maybe there were a few other names
24 associated with it.
25 Q.  When did you do that?

**Page 6**

1  A.  I got out in two and a half years, so it
2  was the winter. You know, I took the bar in the
3  winter instead of the summer. So if I graduated '85,
4  I think it was the winter of '86 until the fall of '86
5  because I had to do something until I started my
6  clerkship with Judge Conforti, so I think it was 1986.
7  Q.  So in 1986 you were with Carella, Byrne?
8  A.  Yeah.
9  Q.  Then after you passed the bar in 1986,
10 where did you go after that?
11 A.  Well, I was a law clerk from '86 to '87.
12 Q.  Okay.
13 A.  And to the fall. It's September to
14 September, that's in Morris County Civil Division.
15 Then I went to the Morris County Prosecutor's Office.
16 Q.  You were a law clerk for whom other than
17 the Carella, Byrne? Did you work in court as a clerk?
18 A.  Yes. Judge Conforti, September '86 to
19 September '87. In September '87 I became an assistant
20 prosecutor in Morris County, stayed there for nine
21 years, came here. One year short of vesting.
22 Q.  And Morris County -- in terms of your
23 pension. Morris County Prosecutor's Office, did you
24 serve in any different divisions of the prosecutor's
25 office?

**Page 7**

1  A.  Yes. The answer's yes.
2  Q.  What different departments did you serve?
3  A.  I kind of had a little bit of a different
4  setup than a lot of people, but I was trial division
5  at the beginning. I didn't go to juvenile court or
6  anything else. Oh, I guess first I was in I guess
7  what's called intake for a little while where they put
8  all the young people. Intake is just you're going to
9  remand it, you're going to send it to the grand jury,
10 bail hearings every day. Then I think I went to the
11 trial squad. I ran the forfeiture unit in trial
12 squad.
13     Then I became at some point -- and don't
14 ask me when -- head of the narcotics unit which is
15 called special enforcement unit because it technically
16 covers gambling and other types of vice, but you
17 really didn't do much in those areas. It was
18 predominantly narcotics prosecutions, and so those
19 were my technical positions. I tried cases in other
20 areas. So I tried cases in sex crimes, I tried cases
21 out of the homicide division, major crime division,
22 but I was technically the head of the narcotics
23 division.
24 Q.  Do you have any estimate as to how many
25 jury trials you had during your career?

**Page 8**

1  A.  No.
2  Q.  Did you ever -- strike that. Did Morris
3  County Prosecutor's office have a procedure relative
4  to providing release and hold harmless agreements,
5  release and/or hold harmless agreements with respect
6  to plea agreements?
7  A.  Not allowed.
8  Q.  I'm asking whether they had any
9  procedure.
10 A.  A written policy?
11 Q.  Yeah.
12 A.  No.
13 Q.  Is it fair to say then that you never
14 were involved in any Morris County prosecution where a
15 defendant was asked to sign a release and hold
16 harmless agreement?
17 A.  The answer to that question is yes.
18 Q.  You were involved?
19 A.  No. That was -- you said "never". I
20 thought it was a negative.
21 Q.  Let's make sure we understand what it is.
22 Were you ever involved in a defendant executing as
23 part of a negotiation or a plea agreement a release
24 and hold harmless agreement releasing police officers
25 or anyone else from any civil liability conditioned

Case 2:06-cv-04701-DMC -MF   Document 109-3   Filed 02/01/10   Page 4 of 7 PageID: 1665

KANDIL v. YURKOVIC, et al.                              Testimony of R. KOBIN, ESQ. - 5-28-09

**17**

1 is bad because I researched it, hey, John, this guy's
2 bugging me, okay. You tell him the first assistant
3 says no. So they're a lot of contexts. I just
4 remember a discussion with John O'Reilly about this
5 topic early in my career.
6     Q. And you do know that ultimately either
7 you thought it might have been shaky or you were
8 looking for his imprimatur or his name to also say
9 that it should not be done for the benefit of talking
10 to the police officer about it, that now you got the
11 first assistant that also agrees with me it shouldn't
12 be done, whatever reason, it's fair to say you did go
13 to John O'Reilly and you both agreed that ultimately,
14 it should not be done?
15     A. Well, you're saying I may have gone to
16 him and said to John, just this guy's bugging me about
17 this. No, it can't be done. I want to tell him that
18 you say it can't be done.
19     Q. But you don't remember?
20     A. If it's early in my career, it's a
21 question of juice, so to speak, okay.
22     Q. I understand.
23     A. And whether or not they're going to just
24 stop bugging me if I say it or do I need someone else
25 to say it.

**18**

1     Q. Okay. Now that we've had that
2 discussion, does that at all help your recollection as
3 to in what context you did talk to John O'Reilly about
4 it?
5     A. No. It confuses me more. That's why I
6 preface that there would be a whole lot of reasons for
7 me to have discussed it with John, okay, and I don't
8 remember why, but you know, for some reason, I
9 specifically remember the conversation.
10     Q. Okay. Do you ever remember after that
11 discussion early in your career the issue of a release
12 and hold harmless agreement again coming up in your
13 capacity as an assistant prosecutor in Morris?
14     A. The answer is no.
15     Q. And that includes any context from any of
16 your underlings or lesser prosecutors may have brought
17 the same issue to you? I meant to include that in
18 that question. Did you understand that?
19     A. I can tell you that as far as a release
20 and hold harmless agreement, the next time I had any
21 discussion or heard about it was in this case.
22     Q. Very good, because that's going to
23 preempt some more questions.
24     A. But just -- not to cut you off,
25 Mr. Connell. I'm focusing on the specific release and

**19**

1 hold harmless agreement. Were there ever cops or
2 police personnel who have said to me -- because
3 someone else will get to this -- who have said to me
4 through the years this guy's got a lawsuit against me,
5 okay, or he's filed a tort claim notice, I want to
6 take a more difficult stance with the individual as a
7 result of that, okay. So that certainly came. Up,
8 but nobody ever discussed get a release and hold
9 harmless agreement from him. So --
10     Q. Or have a plea conditioned on his
11 dismissal of a civil suit or notice of claim?
12     A. Correct, because everybody knew it
13 couldn't be done.
14     MR. STONE: Who's "everybody"?
15     THE WITNESS: Everybody that I worked
16 with.
17     MS. O'CONNOR: In the prosecutor's office
18 in Morris County?
19     THE WITNESS: Defense attorneys,
20 plaintiffs, everybody. I never talked to anybody who
21 thought it could be done.
22     Q. You said that it never came up in your
23 career until this case?
24     A. Release and hold harmless agreement?
25     Q. Right.

**20**

1     A. Guys being upset about tort claims
2 notices and things like that certainly came up and
3 them wanting to do something about it came up.
4     Q. And that would have been in terms of a
5 more aggressive stance with respect to prosecuting the
6 case instead of working out some sort of a deal within
7 the sentencing or the plea so that the civil suit
8 would go away?
9     A. Right. But the police were always told
10 tough luck. I mean we're not handling things like
11 that.
12     Q. After your career in the prosecutor's
13 office which was over in, you said you spent nine
14 years in there, so therefore, you're basically talking
15 about '97 when you came here?
16     A. '96.
17     Q. '96?
18     A. No. I spent nine years -- didn't I say
19 that?
20     Q. You said nine years there. And you've
21 been with this firm ever since?
22     A. Yes.
23     Q. And are you a certified criminal trial
24 attorney?
25     A. No.

Case 2:06-cv-04701-DMC -MF   Document 109-3   Filed 02/01/10   Page 5 of 7 PageID: 1666

KANDIL v. YURKOVIC, et al.                                Testimony of R. KOBIN, ESQ. - 5-28-09

**21**

1  Q. Are you a certified civil trial attorney?
2  A. No.
3  Q. Have you ever been certified?
4  A. No.
5  Q. Your practice includes the defense of
6  individuals who are charged with violations of motor
7  vehicle statutes and criminal statutes as well as
8  civil law?
9  A. Yes.
10 Q. And do you know about what percentage you
11 do in criminal versus civil?
12 A. At this point I'm doing very little
13 criminal work. Sue Reed's doing a little bit more,
14 but we are generally not doing as much as when I got
15 out of the prosecutor's office.
16 Q. Can you give me like a percentage of what
17 it is now, 90/10 or something like that?
18 A. Yeah, I'd say.
19 Q. What about when you were retained to
20 represent Mr. Kandil? Was the percentage still about
21 the same?
22 A. 80/20 if I can recall back to '04. Is it
23 '04?
24 Q. Yes. In your capacity as a criminal
25 defense attorney have you ever represented police

**22**

1  officers?
2  A. No. As criminal defendants, no.
3  Q. Have you ever represented police officers
4  in civil suits?
5  A. Yes.
6  Q. Do you recall how many times?
7  A. No.
8  Q. Do you recall what cities or towns that
9  the officers worked for?
10 A. They predominantly have been personal
11 injury actions.
12 Q. Associated with their jobs or
13 unassociated with their jobs?
14 A. Person injury actions, so yes, some of
15 them are also worker's comp actions which are held by
16 the office. I have not represented -- at least I
17 can't remember representing one in a civil rights-type
18 action.
19 Q. Okay. So you've represented police
20 officers as plaintiffs not as defendants?
21 A. Correct.
22 Q. And that would be in the civil sphere?
23 A. Yes. I mean it's just run-of-the-mill
24 stuff. They're on the side of the road, someone runs
25 into them, things like that. Generally, that type of

**23**

1  stuff.
2  Q. And this firm does worker's compensation
3  action as well?
4  A. Mr. Bronstein runs that department.
5  Q. You don't do comp?
6  A. I have never been a comp lawyer.
7  Q. In any of the criminal cases that you
8  have defended since you've been in private practice
9  since 1996, have you ever been engaged in a discussion
10 with respect to release and hold harmless discussions
11 being involved in a pendency of a criminal case and
12 giving up your client's rights to a civil suit other
13 than this case?
14 A. In a municipal court case.
15 Q. And in the municipal court case, do you
16 recall the name of the case?
17 A. No.
18 Q. Do you remember what the charge was?
19 A. Yeah.
20 Q. What was it?
21 A. Just give me a minute. There was an
22 individual -- I just need to -- did you say there was
23 no discussion specifically of a release and hold
24 harmless agreement in the case, if that was the
25 premise of your --

**24**

1  Q. No. I said were you ever involved in a
2  release and hold harmless agreement in your practice
3  of representing defendants in criminal cases and you
4  said there was a municipal court case?
5  A. No, there was not a release and hold
6  harmless agreement involved in that municipal court
7  case.
8  Q. There was a discussion concerning that
9  issue?
10 A. No. There was a discussion concerning
11 dismissal of an action that hadn't even been filed
12 against the police. There was a tort claims action
13 pending. A tort claims notice that had been filed by
14 this office against.
15 Q. And you were representing the defendant
16 who had been arrested?
17 A. I represented a defendant who had been
18 arrested.
19 Q. That defendant filed a tort claims notice
20 against the officer?
21 A. That defendant -- I will give you -- I'll
22 tell you what happened. He came to me to represent
23 him in a municipal court action that had to do with
24 driving under the influence, and it was one of these
25 DER --

**Page 65**

1  THE WITNESS: Well --
2  MR. BITTERMAN: It's either a yes or no.
3  THE WITNESS: It's not a yes or no, sir.
4  Did someone from this office who's an attorney who's
5  involved in this representation explain it to him are
6  you asking me?
7  MR. BITTERMAN: I'm asking you now. Did
8  you explain to your client -- because he was your
9  client, you're the one who took the case -- what PTI
10 was before the 9th of November 2005?
11 THE WITNESS: The answer is I can't tell
12 you I did it before I got to court that day.
13 MR. BITTERMAN: Do you know whether Ms.
14 Reed did before you got to court that day?
15 THE WITNESS: Well, did I ever ask her if
16 she did? I assume she did. She's a experienced
17 criminal lawyer.
18 MR. BITTERMAN: And as an experienced
19 criminal lawyer you're going to explain to your client
20 what PTI is, correct, so a client can make an
21 informed, intelligent decision whether they want it or
22 not?
23 THE WITNESS: I think she was there the
24 day they walked him over to PTI.
25 MR. BITTERMAN: Which would have been

**Page 66**

1  October 18th?
2  THE WITNESS: Yeah.
3  MR. BITTERMAN: You would have assumed,
4  as an experienced lawyer -- you would, I would, anyone
5  from law school 101, PD 101 -- would explain to their
6  clients what they were applying for. Correct?
7  THE WITNESS: But the premise of your
8  whole line of question --
9  MR. BITTERMAN: Please don't ask me
10 questions. The rules of this is I ask a question; you
11 give an answer.
12 THE WITNESS: The fact of the matter is
13 all these preliminary matters are as, generally
14 speaking, handled in this office by Ms. Reed.
15 MR. BITTERMAN: So now the answer to the
16 question you gave was you assume since Ms. Reed is a
17 competent attorney that when she walked Kandil over on
18 October 18th she explained what PTI was. Correct?
19 THE WITNESS: And there were probably
20 some discussions along the way.
21 MR. BITTERMAN: Between October 18th and
22 November 9th?
23 THE WITNESS: Right.
24 MR. BITTERMAN: As to status?
25 THE WITNESS: Right.

**Page 67**

1  MR. BITTERMAN: And you knew before
2  November 9th -- whether it was the 8th, 7th, 6th --
3  that the prosecutor's office accepted your client into
4  PTI. Correct?
5  THE WITNESS: Yeah.
6  MR. BITTERMAN: Okay. You wouldn't walk
7  into court November the 9th 15 minutes before court
8  and tell your client, here, sign these papers; you
9  don't know what the hell they are, you don't know what
10 the hell PTI is, just sign these papers?
11 THE WITNESS: That may or may not be
12 accurate depending on what the client wanted to do,
13 Mr. Bitterman. So if you're asking me was I
14 comfortable with the discussion that occurred and the
15 way this happened in the time frame that it happened
16 from this rejection on the 31st to an override by the
17 prosecutor to meeting the client down there on the
18 9th; that I was comfortable with the crushed time
19 frame of that? No, I was not.
20 MR. BITTERMAN: You've tried homicides?
21 THE WITNESS: Yes.
22 MR. BITTERMAN: You've tried aggravated
23 assaults. Correct?
24 THE WITNESS: Yes.
25 MR. BITTERMAN: This criminal trial

**Page 68**

1  business of ours, it's a pretty high pressure
2  business. Correct?
3  THE WITNESS: Right.
4  MR. BITTERMAN: You weren't shaking and
5  quaking when you went down there on November 9th as to
6  the issue of whether or not your client -- who
7  apparently knew for three weeks what PTI was --
8  whether or not they should accept PTI or reject PTI.
9  Correct? Or are you telling us you were crushed under
10 the weight of the pressure so you're unable to give
11 your client the proper information to make a proper
12 and informed decision?
13 THE WITNESS: The question wasn't whether
14 I was crushed. The question is whether or not he was.
15 Whether I was comfortable with the amount of time that
16 people had to absorb things, things like that.
17 MR. BITTERMAN: Did you at that
18 particular day say, no, I'm not comfortable, I want to
19 go in front of Judge DeVesa and place my lack of
20 comfort on the record?
21 THE WITNESS: I consulted with my client
22 as to what he would like to do.
23 MR. BITTERMAN: Did you say as your
24 attorney, I'm not comfortable, I feel crushed under
25 the pressure and weight of the time frame, I want to

Case 2:06-cv-04701-DMC -MF   Document 109-3   Filed 02/01/10   Page 7 of 7 PageID: 1668

KANDIL v. YURKOVIC, et al.                                    Testimony of R. KOBIN, ESQ. - 5-28-09

**81**

1  A. Did Susan Reed ever tell me that there
2  were conditions being discussed?
3  Q. That was a condition being discussed
4  concerning his acceptance into PTI?
5  A. Yes, at one point she did, obviously,
6  before I went down there on the 9th.
7  Q. So you, therefore, already knew that
8  there was a condition concerning a dismissal of the
9  civil suit before you got to the courthouse on
10 November 9th?
11 A. Correct.
12 Q. And what was the substance of the
13 information that you had? What was your working
14 knowledge of the condition before you got there on
15 November 9th?
16 A. That there was some discussion about that
17 and it was a fleeting discussion I had where I
18 chuckled, I said, "yeah, right" and I walked away.
19 Q. You walked away from Susan Reed?
20 A. Yeah. I said, "yeah, right" and I walked
21 away.
22 Q. Did she tell you that the State made this
23 as a condition of this plea bargain or that it was
24 their idea or did she tell you that it was the judge's
25 idea?

**82**

1  A. See, that I don't recall. My
2  recollection of my impression was as it was a very
3  brief conversation because for whatever reason, I
4  normally wouldn't have been there, to tell you the
5  truth.
6  Q. You're getting far afield from my
7  question. I just want to know whether or not you
8  recall a discussion with her between October 18th, '05
9  and you learning that there was a discussion about a
10 release and hold harmless agreement and dismissal of
11 the civil suit. Did you have that discussion with
12 Susan Reed that it was Judge DeVesa's idea that
13 prompted this?
14 A. No.
15 Q. Okay. You just knew it was in play; you
16 just didn't know who suggested it?
17 A. My impression was it was the State.
18 Q. That the State suggested it?
19 A. Yes, but that could have just come from
20 my impression of who puts conditions into PTI or it
21 could have come from a conversation.
22 Q. Once you had this conversation, did you
23 say to Susan Reed, where did that come from?
24 A. I didn't say that. I said, "yeah,
25 right", chuckled and walked away.

**83**

1  Q. You were not surprised then when you saw
2  that condition on the PTI form that you and your
3  client executed on November 9, 2005; you were
4  expecting to see it?
5  A. Yeah. And the conversation I think
6  happened the night before I went down there at about
7  this time of night.
8  Q. Did you talk to your client before going
9  down there about that condition?
10 A. I forget whether I called him that
11 evening or not.
12 Q. Did you ask Susan Reed, geez, did you
13 talk to Bassem Kandil about this condition since they
14 knew all about it?
15 A. Didn't ask her that.
16 Q. Did you ask Bassem Kandil have you had an
17 opportunity to talk to Susan Reed about this, the
18 condition of dismissing the suit?
19 A. Don't recall whether I did or didn't.
20 Q. Okay. Did Susan Reed tell you that after
21 this discussion that purportedly that she had with you
22 when it was agreed that you would agree if he got into
23 Pretrial Intervention that you would dismiss the civil
24 suit, did she tell you that the Court then went on the
25 record and talked about his application, that they're

**84**

1  going to go down right now, she was going to walk him
2  down and the State was going to allow him to apply,
3  that the State had already committed on the record to
4  if he's denied that they're going to -- they'll make
5  an application to the First Assistant Prosecutor
6  McClure and have her override it? Did she tell you
7  all about that; that this thing was going to become a
8  fait accompli because you certainly knew that the
9  prosecutor controls the program?
10 A. You lost me somewhere in that question,
11 Mr. Connell. I'm just telling you, you guys got to
12 give me -- just like you do with lay people. That's a
13 very long statement question. I can't handle them. I
14 don't know what you're talking about. Of course I had
15 conversations.
16 Q. I'm going to withdraw the question.
17 A. I had conversations with Miss Reed
18 throughout the course of this proceeding.
19 Q. But we're not talking about that. We're
20 only talking about after October 18, 2005.
21    Did Susan Reed tell you that after this
22 discussion that purportedly she had with you that was
23 related to the Court and the assistant prosecutor that
24 there would be -- there's no lawsuit and therefore,
25 there's nothing to dismiss; however, we will provide a